NO. 15-2440

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

LIGHTSPEED MEDIA CORPORATION,
Plaintiff,

v.

ANTHONY SMITH, et al.,
Defendants-Appellees,

Appeal of:
JOHN STEELE, & PAUL HANSMEIER,
Appellants.

---

On Appeal from the United States District Court
for the Southern District of Illinois, No. 3:12-cv-00889-DRH-SCW

---

**Separate Appendix of Appellants
John Steele & Paul Hansmeier**

---

Paul Hansmeier
100 South Fifth Street, Suite 1900
Minneapolis, MN 55402
612-234-5744

John Steele
500 Michigan Ave., Suite 600
Chicago, IL 60611
(312) 396-4154

# APPENDIX

## Table of Contents

| Document description | Location in Record | Page No. |
|---|---|---|
| Circuit Rule 30(d) Statement | N/A | ii |
| Hansmeier Notice of Appeal | Dkt. 204 | AA-1 |
| Steele Notice of Appeal | Dkt. 211 | AA-2 |
| Plaintiff's Notice of Voluntary Dismissal Without Prejudice | Dkt. 59 | AA-3 |
| Order on Plaintiff's Motion to Reconsider | Dkt. 100 | AA-6 |
| Text Entry Dated February 13, 2014 | Dkt. 123 | AA-19 |
| Notice of Motion | Dkt. 134 | AA-20 |
| Order Granting Motion for Contempt | Dkt. 136 | AA-21 |
| Minutes For Hearing on Motion for Sanctions | Dkt. 187 | AA-34 |
| Order Denying Motion for Contempt and For Discovery Obstruction | Dkt. 188 | AA-35 |
| Smith's Fee Itemization With Exhibits | Dkt. 200 | AA-45 |
| Exhibits To Smith's Motion For Reconsideration | Dkt. 197-1 | AA-89 |
| Memorandum of Paul Hansmeier in Opposition to Defendants' Joint Motion for Contempt | Dkt. 133 | AA-146 |
| Excerpts of Exhibits Presented by Smith re Steele | Dkt. 190 | AA-153 |
| Steele Fax to Sabadell | Dkt. 09 | AA-158 |

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), the undersigned certifies that the material required by Circuit Rule 30(a) is included in the required short appendix. All other material required by Circuit Rule 30(b) is included in the separately-bound appendix.


DATED: October 29, 2015

<div style="margin-left: 50%;">

/s/ Paul Hansmeier

Paul Hansmeier
100 South Fifth Street, Suite 1900
Minneapolis, MN 55402
612-234-5744

</div>

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

**LIGHTSPEED MEDIA CORP.,**

*Plaintiff*,

*v.*

**ANTHONY SMITH, et al.,**

*Defendants*.

Civil No. 12-889 DRH

**NOTICE OF APPEAL**

Notice is hereby given that Paul Hansmeier hereby appeals to the United States Court of Appeals for the Seventh Circuit from a final order penalizing him joint and severally in the amount of $65,000, entered in this action on the 5th day of June, 2015 at docket number 199.

/s/ Paul Hansmeier
Paul Hansmeier
100 5th Street South
Suite 1900
Minneapolis, MN 55402
612-234-5744

AA-001

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**LIGHTSPEED MEDIA CORP.,**

*Plaintiff,*

*v.*

**ANTHONY SMITH, et al.,**

*Defendants.*

Civil No. 12-889 DRH

**NOTICE OF APPEAL**

Notice is hereby given that John Steele hereby appeals to the United States Court of Appeals for the Seventh Circuit from a final order penalizing him $112,171.75, entered in this action on July 23, 2015 at docket no. 210.

/s/ John Steele
John Steele
500 Michigan Ave.
Suite 600
Chicago, IL 60611
(312) 396-4154

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

LIGHTSPEED MEDIA CORPORATION,    )
    )
        Plaintiff,    )
    v.    )
    )
ANTHONY SMITH,    )    No. 3:12-cv-00889-GPM-SCW
SBC INTERNET SERVICES, INC., d/b/a    )
AT&T INTERNET SERVICES;    )
AT&T CORPORATE REPRESENTATIVE #1;    )
COMCAST CABLE COMMUNICATIONS,    )
LLC., and COMCAST CORPORATE    )
REPRESENTATIVE #1    )    Judge: Hon. G. Patrick Murphy
    )
    )    Magistrate: Hon. Stephen C. Williams
        Defendants.    )
    )
    )

## PLAINTIFF'S NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE

**NOTICE IS HEREBY GIVEN** that, pursuant to Federal Rule of Civil Procedure 41(a)(1), Plaintiff voluntarily dismisses, without prejudice, all claims brought in this action. Defendant has filed neither an answer to the complaint nor a motion for summary judgment with respect to the same. Dismissal under Rule 41(a)(1) is therefore appropriate.

Respectfully submitted,

LIGHTSPEED MEDIA CORPORATION

**DATED:** March 21, 2013

By:    /s/ Paul Duffy
    Paul Duffy (Bar No. 6210496)
    Prenda Law Inc.
    161 N. Clark Street, Suite 3200
    Chicago, IL 60601
    Phone: 312-880-9160
    Fax: 312-893-5677
    E-mail:paduffy@wefightpiracy.com
    *Attorney for Plaintiff*

1

AA-003

2

AA-004

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 21, 2013, all counsel of record who are deemed to have consented to electronic service are being served a true and correct copy of the foregoing document using the Court's CM/ECF system, in compliance with Local Rule 5.2(a).


<u>/s/ Paul Duffy</u>
Paul Duffy

AA-005

Minute Entry for proceedings held before Chief Judge
David R. Herndon: Show Cause Hearing re: 107 Joint
Motion for Contempt held on 2/13/2014. Motion taken
under advisement. Mr. Steele, Mr. Hansmeier and Mr.
Duffy shall submit asset statements prepared by a certified
public accountant on or before 2/24/2014. MOTION to Stay
November 27, 2013 Order 114 filed by John Steele is
denied. (Court Reporter Laura Blatz.) (slj) (Entered:
02/13/2014)

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LIGHTSPEED MEDIA CORPORATION, ) | |
| ) | |
| Plaintiff, ) | Case No. 3:12-cv-00889 |
| ) | |
| v. ) | |
| ) | |
| ANTHONY SMITH, SBC INTERNET SERVICES, ) | |
| INC., d/b/a AT&T INTERNET SERVICES; AT&T ) | |
| CORPORATE REPRESENTATIVE #1; COMCAST ) | |
| CABLE COMMUNICATIONS, LLC, and ) | |
| COMCAST CORPORATE REPRESENTATIVE #1, ) | |
| ) | |
| Defendants. ) | |
| ) | |

### NOTICE OF MOTION

PLEASE TAKE NOTICE that on Thursday, March 20, 2014, Defendant Anthony Smith filed a Renewed Motion for Contempt. Because the Renewed Motion relies on numerous financial documents as exhibits, Defendant Smith filed said motion *ex parte*.

Respectfully,

___/s/ Jason Sweet_____
Jason E. Sweet (admitted *pro hac vice*)
Email: jsweet@boothsweet.com

BOOTH SWEET LLP
32R Essex Street
Cambridge, MA 02139
Tel.: (617) 250-8602
Fax: (617) 250-8883

*Counsel for Defendant Anthony Smith*

### CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2014, the foregoing document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be served via first-class mail to those indicated as non-registered participants.

/s/ Jason E. Sweet

AA-007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**LIGHTSPEED MEDIA CORP.,**

     **Plaintiff,**

**vs.**                                                    No.   **3:12-cv-889-DRH-SCW**

**ANTHONY SMITH, et al.,**

     **Defendants.**

### MEMORANDUM AND ORDER

**HERNDON, Chief Judge:**

This matter is before the Court on Defendants Anthony Smith ("Smith"), Comcast Cable Communications LLC and Comcast Corporate Representative #1 (together, "Comcast"), and SBC Internet Services, Inc. d/b/a AT&T Internet Services' ("AT&T") (collectively "defendants") joint motion for contempt, or in the alternative, for an order to plaintiff's counsel to show cause why they each should not be held in contempt (Doc. 107).   Plaintiff's counsel Paul Duffy ("Duffy") and Paul Hansmeier ("Hansmeier") responded (Docs. 111, 113).   At the direction of the Court (Docs. 112, 117), defendants filed a reply (Doc. 119).   On February 13, 2014, the Court held a hearing on the issues (Doc. 123).   For the following reasons, the defendants' motion will be **GRANTED.**

### I.   Background

On December 14, 2011, Lightspeed Media Corporation ("Lightspeed") filed suit in the Circuit Court of the Twentieth Judicial District in St. Clair County.

Page **1** of **13**

AA-008

Lightspeed owns or operates one or more paid-subscription adult entertainment websites.   In its first complaint, Lightspeed alleged that John Doe and more than 6,600 "co-conspirators" had gained unauthorized access to its website.   On December 16, 2011, the circuit court granted an *ex parte* motion for leave to obtain discovery by subpoena, from dozens of Internet Service Providers ("ISPs"), of information personally identifying the defendants.   AT&T and Comcast subsequently filed motions to quash the subpoenas and/or for a protective order. On May 22, 2013, the Illinois Supreme Court directed the circuit court to vacate its order denying the motion to quash.

On August 3, 2012, Lightspeed filed an amended complaint.  Lightspeed contended that Smith accessed content from Lightspeed's password-protected websites without authorization.  Lightspeed asserted that AT&T and Comcast improperly opposed Lightspeed's discovery, failed to act to protect Lightspeed's websites, and conspired with their customers to Lightspeed's detriment. Specifically, Lightspeed alleged 10 Counts: Computer Fraud and Abuse (Count I), Conversion (Count II), Unjust Enrichment (Count III), Unjust Enrichment (Count IV), Count V (Breach of Contract), Civil Conspiracy (Count VI), Civil Conspiracy (Count VII), Illinois Consumer Fraud and Deceptive Practices Act (Count VIII), Aiding and Abetting (Count X).  AT&T removed this action to federal court on August 9, 2012.

Plaintiff thereafter filed an emergency motion for Discovery prior to the Rule 26(f) Conference (Doc. 9) requesting the ISP information.   Judge G. Patrick

AA-009

Murphy held a hearing on the issue and denied the motion (Doc. 23). Defendants each filed motions to dismiss (Docs. 26, 28, 36). Prior to the resolution of the motions to dismiss, Lightspeed entered a notice of voluntary dismissal on March 21, 2013. Defendants subsequently moved for attorney's fees pursuant to 28 U.S.C. § 1927 (Docs. 61, 78, 82). Judge Murphy granted Defendant Smith's motion (Doc. 65) and counsel (Duffy, Hansmeier, and John Steele ("Steele")) sought reconsideration of that order (Docs. 66, 68, 74). On November 13, 2013, Judge Murphy held a hearing on the motions for reconsideration and the motions for attorney's fees by ComCast and AT&T (Doc. 96) in which he deferred ruling.

On November 27, 2013, Judge Murphy denied the motions to vacate, or in the alternative, reconsider the order granting Smith's motion for attorney fees, granted ComCast's and AT&T's motions for attorney's fees, and ordered that pursuant to 28 U.S.C. § 1927, Duffy, Hansmeier, and Steele are jointly and severally liable, and shall pay within 14 days of the order (December 11, 2013), attorney fees and costs to Smith in the amount of $72,367.00, to AT&T in the amount of $119,637.05, and to ComCast in the amount of $69,021.26 for a total judgment of $261,00252.11 with interest as provided by law (Doc. 100). Duffy, Hansmeier, and Steele filed a notice of Appeal on December 12, 2013.

On December 27, 2013, defendants filed a joint motion for contempt, or in the alternative, for an order to plaintiffs' counsel to show cause why they each should not be held in contempt (Doc. 107). Plaintiff's counsel Duffy and Hansmeier responded (Doc. 111, 113), Steele filed a motion to stay the sanction's

AA-010

order (Doc. 114), and, at the direction of the Court (Docs. 112, 118), defendants filed a reply (Doc. 119).

Defendants request 1) an order holding in contempt plaintiffs' counsel Steele, Duffy, and Hansmeier or, in the alternative, 2) an order requiring Duffy, Hansmeier and Steele to show cause why they should not each be held in contempt for their failure to timely comply with the fee order.   In their reply, defendants focus on the contempt.   They specifically request that this Court hold Duffy, Hansmeier and Steele in contempt of Court, and also order them to pay the defendants attorneys' fees incurred in seeking this finding of contempt, along with interest and additional daily fines for each day the sanctioned attorneys fail to make any and all payment(s) ordered.

Plaintiff's counsels' responses assert three points: (1) defendants have not submitted any evidence regarding compliance (Doc. 113 at 2), (2) the order is a money judgment and therefore not properly enforceable through contempt proceedings (Doc. 111 at 3-5; Doc. 113 at 2-4), and (3) defendants have otherwise failed to establish the elements of civil contempt (Doc. 111 at 5-6).   Hansmeier further asserts that in the alternative, the Court should grant plaintiff's counsel leave to seek a stay of the November 27, 2013 order (Doc. 113 at 4-6).

The Court held a hearing on defendants' motion for contempt on February 13, 2014 (Doc. 124).   During the proceedings, plaintiff's counsel admitted on the record to noncompliance, each stating that they had not paid the sanction amount to defendants or otherwise sought a supersedeas bond.   The Court also addressed

AA-011

plaintiff's counsels' argument that the Court should consider the sanctions order as a money judgment, concluding that the Court's order was not a money judgment but instead a sanctions order. The Court deferred ruling on the motion for contempt and directed plaintiff's counsel to file asset statements from a certified public accountant on or before February 24, 2014. The Court also considered Steele's motion to stay (Doc. 114) and heard arguments from the parties. The Court denied Steele's motion to stay on the record and addressed and similarly dismissed Hansmeier's stay request (Doc. 124).

## II.   Analysis

### A.   Civil Contempt

Federal courts have both inherent and statutory authority to punish for contempt and to coerce compliance with their orders. *International Union, UMWA v. Bagwell*, 512 U.S. 821, 831-833 (1994). To prevail on a request for a contempt finding, the moving party must establish by clear and convincing evidence that: (1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply. *S.E.C. v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010).

There is no debate as to whether plaintiff's counsel significantly violated Judge Murphy's November 27, 2013 order (hereinafter "Sanctions Order"). As previously indicated, plaintiff's counsel has not made a single payment.

AA-012

Furthermore, Duffy, Hansmeier, and Steele failed to make a reasonable and diligent effort to comply with the Sanctions Order.   While Steele filed a motion to stay the Sanctions Order, this motion was not accompanied by a supersedeas bond and was filed untimely.   *See* Fed. R. Civ. P. 62(d).

The key issue here is whether the Sanctions Order was "an unambiguous command."   Plaintiff's counsel asserted that the Sanctions Order is a money judgment, not an equitable decree.   At the show cause hearing, the Court held that the Sanctions Order was an equitable decree, specifically a sanctions order. However, plaintiff's counsel argues that this confusion is the primary reason they did not comply with the Sanctions Order.   The Court finds this argument disingenuous.   Seventh Circuit case law is quite clear.   *See Cleveland Hair Clinic, Inc. v. Puig*, 106 F.3d 165, 166 (7th Cir. 1997) ("Use of contempt power is an appropriate way to enforce a sanction for misconduct, which is not an ordinary money judgment.")   Furthermore, if plaintiff's counsel was confused, they could have filed a motion to clarify with Judge Murphy.

**B.     Inability to Pay**

At the show cause hearing, plaintiff's counsel emphatically indicated an inability to pay.   Specifically, "I can't pay what I don't have" (Show Cause Hr'g Tr. 22:16-17 (Hansmeier)).   Also, "[I]t's extremely important because if the Court issues sanction order for, I don't know, a billion dollars, we can't pay it.   And I don't believe that there's any case law to establish that – there's not a debtor's prison.   I mean if we can't pay it, we can't pay it" (Show Cause Hr'g Tr. 19:10-15

AA-013

(Steele)).   Plaintiff's counsel again pointed to their confusion over the nature of the Sanctions Order as the reason why they had not yet supplied the Court with their financial information.   The Court therefore directed plaintiff's counsel to provide asset statements prepared by a certified public accountant on or before February 24, 2014.   Plaintiff's counsel timely submitted financial condition statements to the Court *in camera*.

"Inability to pay is a valid defense in a contempt proceeding, but the party raising the defense has the burden of proving its inability to pay." *In re Re. Tech. Corp.*, 624 F.3d 376, 387 (7th Cir. 2010) (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983)).   In the case where there has been no attempt to comply with the Court's order, plaintiff's counsel must show a "complete inability to pay." *Id.* Plaintiff's counsel, "stated differently, . . . [has] the burden of establishing clearly, *plainly*, and *unmistakably* that compliance is *impossible*." *Id.* (internal citations and quotations omitted) (emphasis in original).

The Court finds that plaintiff's counsel has not met its burden.   They submitted incomplete, and to say the least suspicious, statements of financial condition.   Attached to each statement was a letter from their certified public accountant ("CPA").   In these letters, the CPA indicates a departure from generally accepted accounting principles.   He further notes that plaintiff's counsel elected to omit substantially all of the disclosures required by generally accepted accounting principles.   The Court finds these statements insufficient to establish plaintiff's counsel's inability to pay.

AA-014

Plaintiff's counsel significantly violated an unambiguous order of the Court. They also failed meet their burden regarding their inability to pay defense. Accordingly, the Court finds plaintiff's counsel Paul Duffy, Paul Hansmeier, and John Steele in civil contempt and defendants' joint motion for contempt (Doc. 107) is **GRANTED.**

## C.    Civil Contempt Sanction

"Sanctions for civil contempt are designed either to compel the contemnor into compliance with an existing court order or to compensate the complainant for losses sustained as a result of the contumacy."   *U.S. v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001).   Remedial sanctions compensate the complainant for his losses caused by the contemptuous conduct.   *Id.*   Coercive sanctions aim to coerce the contemnor's compliance with a court order.   *Id.*   A coercive sanction must afford the contemnor the opportunity to "purge", to avoid punishment by complying with the order.   *Id.*   The factors to be considered by the court in imposing a civil contempt sanction include: (1) Harm from noncompliance, (2) Probable effectiveness of the sanction, (3) Contemnor's financial resources and the burden the sanctions may impose; and (4) Contemnor's willfulness in disregarding the court's order.   *United States v. United Mine Workers of America*, 330 U.S. 258, 303-304 (1947).

The Court must "consider the character and magnitude of the harm threatened by continued contumacy . . . ."   *Id.* at 304.   As to the character of the harm, the Court finds that plaintiff's counsel *wilfully* violated the Sanctions Order.

AA-015

Plaintiff's attorneys have made no effort to comply.   In fact, until defendants filed the current contempt motion, plaintiff's counsel had not addressed the Court regarding the Sanctions Order, merely filing a notice of appeal.   While a violation need not be willful for the Court to impose civil contempt sanctions, willfulness inherent in the contemptuous act is a major consideration in determining the appropriate sanctions.  *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191 (1949) ("The absence of willfulness does not relieve from civil contempt"); *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996); *Stotler and Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir. 1989); *In re Federal Facilities Reality Trust,* 227 F.2d 657, 658 (7th Cir. 1955).

The Court also finds the magnitude of harm significant.   As indicated in the Sanctions Order, this case is "baseless" (Doc. 100 at 9).   Judge Murphy ordered sanctions for attorney's fees and costs because plaintiff "unreasonably and vexatiously multiplied the proceedings in this matter" (Doc. 100 at 10).   Plaintiff's counsel's failure to address the Sanctions Order further multiplies the proceedings. Not only is the magnitude of the harm significant in financial terms for the defendant in added attorney's fees and costs of the contempt motion but also in regards to the integrity of the Court.   The Court again notes that plaintiff's counsel made no effort to comply with the order to address the Court.   Also, the Court cannot ignore the behavior of plaintiff's counsel before the undersigned at the show cause hearing.   While the Court was unable to nail down any specific lies due, in significant   part,   to   plaintiff's   counsel   excellent   "attorney   speak",   the

AA-016

misrepresentations and half-truths presented indicate plaintiff's counsel's clear disrespect of the Court.[1]   Furthermore, as the Court indicated at the hearing in regards to Steele's motion to stay, "[W]ith respect to talking about the community, the community has to worry about lawyers who file unreasonable and vexatious claims.   That's where the harm to the community is . . . .   The community is worried about lawyers, worried about lawyers that file these kind[s] of lawsuits. So if, in fact, Judge Murphy is right – and for the time being until the Seventh Circuit says something differently, I have to assume he is – the community is worried about guys like you" (Show Cause Hr'g Tr. 38:6-15).

The Court is also directed to review plaintiff's counsel's financial resources. *United Mine Workers of Am.*, 330 U.S. at 304 ("[A] court which has returned a conviction for contempt must, in fixing the amount of a fine to be imposed . . . as a means of securing future compliance, consider the amount of [the party's] financial resources and the consequent seriousness of the burden to that particular [party].") As previously discussed, the Court has taken into consideration plaintiff's counsel's

---

[1] For example, in the show cause hearing, the parties addressed plaintiff's counsel's financial means.   The Court specifically asked why plaintiff's counsel had not yet submitted their financial information to the Court.   Hansmeier indicated that he had not provided this information as of yet because they were unsure as to whether the Court was going to rule the order a sanction's order or a money judgment.   Again, Hansmeier indicated "I can't pay what I don't have."   Bart Huffman, Attorney for AT&T, then indicated that plaintiff's counsel had mentioned that they have made millions of dollars.   Steele objected to this characterization, and asked Mr. Huffman to indicate where he would have publically touted making millions of dollars.   Mr. Huffman responded that he believed there was an article in FORBES. To which Mr. Steele responded, "No, absolutely, I never did, and I resent being told that I've said something that's not true.   If Mr. Huffman would like to present something that I personally made money of a certain amount, feel free, but it will never come, Your Honor" (Show Cause Hr'g Tr. 23:16-20).   After a quick Google search, the Court quickly comes across the following article: Kashmir Hill, *How Porn Copyright Lawyer John Steele Has Made A 'Few Million Dollars' Pursuing (Sometimes Innocent) 'Porn Pirates,'* FORBES, Oct. 15, 2012, *available at* http://www.forbes.com/sites/kashmirhill/2012/10/15/how-porn-copyright-lawyer-john-steele-justifies-his-pursuit-of-sometimes-innocent-porn-pirates/.   Therein, Mr. Steele states in response to the article's author suggestion that he has made $15 million settling these suits, "Maybe a little less. We don't track the amount we've recovered.   More than a few million."   The Court notes that while it is true this is not a "certain amount", it is disingenuous to imply destitution given the statement and, at the very least, the Court deserved a full, truthful explanation of the statement.

AA-017

ability to pay.  The Court also now takes judicial notice of the same attorneys'

ability to post a $101,650.00 supersedeas bond, Supersedeas Undertaking for

Appeal, *Ingenuity 13 LLC v. John Doe*, No. 2:12-cv-08333-ODW-JCx (C.D. Cal.

May 23, 2013), ECF No. 174, as well as their subsequent ability to post an

additional bond in the amount of $135,933.66, Supersedeas Undertaking,

*Ingenuity 13 LLC v. John Doe*, No. 2:12-cv-08333-ODW-JCx (C.D. Cal. July 23,

2013), ECF No. 229.  Plaintiff's counsel clearly had the ability to pay in those

instances and they failed to provide the Court with the information it needed in

order to adequately make an accurate assessment regarding their current ability to

pay.

    As a preliminary matter, the Court **DIRECTS** plaintiff's counsel to pay

interest on the sanction amounts pursuant to the Sanctions Order as provided by

law.   For clarification, the Court interprets this provision of the Sanctions Order as

follows.   The Court will apply the federal interest rate as contemplated in 28 U.S.C.

§ 1961, 18 U.S.C. § 3612, and 40 U.S.C. § 258(e)(1).   These sections direct the

Court to compute interest from the first day on which the defendant is liable for

interest at a rate equal to the weekly average 1-year constant maturity Treasury

yield for the calendar week preceding the first day on which the defendant is liable

for interest.   Plaintiff's counsel became liable for interest on December 11, 2013.

Therefore the .13% interest rate from the week ending December 6, 2013 will apply.

Plaintiff's counsel is responsible for the entire time period from the date of liability

to the date of compliance, including those days during which this motion was

AA-018

pending.

The Court believes that both coercive and remedial sanctions are warranted in this case.   *See United Mine Workers of Am.*, 330 U.S. at 302-303; *Shakman v. Democratic Organization of Cook County*, 533 F.2d 344, 349 (7th Cir. 1976); *Dowell*, 257 F.3d at 699.   The Court has determined this to be the most effective way to ensure compliance with the Sanctions Order and to uphold the integrity of the Court.

The Court sanctions plaintiff's attorneys in the amount of 10% of the original sanction amounts equally divided among Duffy, Steele, and Hansmeier.   This sanction is to be paid to the defendants as follows: $7,236.70 to Smith, $11,963.75 to AT&T, and $6,902.13 to ComCast, for a total amount of $26,102.58.   This remedial sanction contemplates the attorney's fees and costs incurred by defendants during the course of litigating this contempt motion.   The Court acknowledges that a lodestar calculation is traditionally used.   However, requiring defense counsel to provide billing statements would most certainly cause delay and further litigation thereby negating the goals of this order and only further harming the defendants.   The previous clarification regarding interest does not apply to this sanction.

Finally, plaintiff's counsel shall comply with the Sanctions Order and this order within 7 days, on or before March 31, 2014.   Compliance is construed by the Court as follows.   Plaintiff's counsel may make payment to all of the defendants of the ordered amounts in full.   Plaintiff's counsel may also file a motion to stay and

AA-019

accompanying supersedeas bond of the full amount.   Fed. R. Civ. P. 62(d).   Bonds or payments of partial amounts will not be considered compliance with this Court's order.   Failure to comply with this order in that timeframe shall result in a $500 per day per attorney fine for up to 30 days.   After 30 days, this amount shall increase to $1,000 per day per attorney.

The Court notes that defendant, Smith filed a "Renewed Motion for Contempt" on March 20, 2014, as the Court was finishing up the final draft of this order.   The Court will consider that motion as a motion for an additional sanction for contempt since it relates directly to representations made in Court and in the financial statements by plaintiff's counsel.   Counsel, Steele, Duffy and Hansmeier, shall respond to the March 20 motion, no later than April 20, 2014.   Upon reviewing those responses, the Court will consider whether to require another hearing and the range of sanctions that it may be considering, if any.

**IT IS SO ORDERED.**

Digitally signed
by David R.
Herndon
Date: 2014.03.24
13:04:51 -05'00'

**Chief Judge**
**United States District Court**

AA-020

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**LIGHTSPEED MEDIA CORPORATION,**

     **Plaintiff**

**-vs-**

**ANTHONY SMITH, et al,**

     **Defendant**                 **Case No.   12-cv-889-DRH**

## MINUTES OF HEARING ON MOTION FOR SANCTIONS

**PRESIDING:   Hon. David R. Herndon, U.S. District Judge**

**Date:**  November 12, 2014      **Place:**  East St. Louis, Illinois

**Court Reporter:**  Laura Esposito    **Courtroom Deputy:**  Caitlin Fischer

**Counsel for Plaintiff:** Paul Duffy, Paul Hansmeier, John Steele

**Counsel for Defendants:** Daniel G. Booth, Jason E Sweet, Andrew G. Toennies

                               **TIME:   1:40 PM – 2:40 PM**

---

Counsel present as indicated above.

Defendant's counsel addresses the court regarding the sanctions that the plaintiffs were ordered to pay.   Discovery issues regarding the sanctions were also discussed with the Court.

Plaintiffs address the court regarding the same issues with sanctions.

Court admits exhibits.

Matter is taken under advisement.

AA-021

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**LIGHTSPEED MEDIA CORP.,**

     **Plaintiff,**

**vs.**                    **No.   3:12-cv-889-DRH-SCW**

**ANTHONY SMITH, et al.,**

     **Defendants.**

### MEMORANDUM AND ORDER

**HERNDON, District Judge:**

### I.   INTRODUCTION

This case is before the Court on Anthony Smith's Motion for Contempt (Doc. 135) and Motion for Sanctions for Obstructing Discovery (Doc. 153) as to Paul Hansmeier, Paul Duffy, and John Steele (collectively, "Lightspeed's Counsel"). Both matters have been fully briefed ((as to Motion for Contempt: Response by Paul Hansmeier Doc. 154; Response by Paul Duffy Doc. 155; Response by John Steele Doc. 156; and Reply by Anthony Smith Doc. 161) and (as to Motion for Sanctions for Obstructing Discovery: Response by Paul Hansmeier Doc. 159; Response by John Steele Doc. 160; Response by Paul Duffy Doc. 162). The Court heard oral argument from the parties on November 12, 2014 (Doc. 187). For the reasons discussed herein, the motions are **DENIED**.

### II.   BACKGROUND

Page **1** of **10**

AA-022

**A. Overview**

On December 14, 2011, Lightspeed Media Corporation ("Lightspeed") filed suit in the Circuit Court of the Twentieth Judicial District in St. Clair County. Lightspeed owns or operates one or more paid-subscription adult entertainment websites. In its first complaint, Lightspeed alleged that John Doe and more than 6,600 "co-conspirators" had gained unauthorized access to its website. On December 16, 2011, the circuit court granted an *ex parte* motion for leave to obtain discovery by subpoena, from dozens of Internet Service Providers ("ISPs"), of information personally identifying the defendants. AT&T and Comcast subsequently filed motions to quash the subpoenas and/or for a protective order. On May 22, 2013, the Illinois Supreme Court directed the circuit court to vacate its order denying the motion to quash.

On August 3, 2012, Lightspeed filed an amended complaint. Lightspeed contended that Smith accessed content from Lightspeed's password-protected websites without authorization. Lightspeed asserted that AT&T and Comcast improperly opposed Lightspeed's discovery, failed to act to protect Lightspeed's websites, and conspired with their customers to Lightspeed's detriment. AT&T removed this action to federal court on August 9, 2012.

Plaintiff thereafter filed an emergency motion for discovery prior to the Rule 26(f) Conference (Doc. 9) requesting the ISP information. Judge G. Patrick Murphy held a hearing on the issue and denied the motion (Doc. 23). Defendants each filed motions to dismiss (Docs. 26, 28, 36). Prior to the resolution of the motions to

AA-023

dismiss, Lightspeed entered a notice of voluntary dismissal on March 21, 2013. Defendants subsequently moved for attorney's fees pursuant to 28 U.S.C. § 1927 (Docs. 61, 78, 82). Judge Murphy granted Smith's motion (Doc. 65) and Lightspeed's Counsel sought reconsideration of that order (Docs. 66, 68, 74). On November 13, 2013, Judge Murphy held a hearing on the motions for reconsideration and the motions for attorney's fees by ComCast and AT&T (Doc. 96) in which he deferred ruling.

On November 27, 2013, Judge Murphy denied the motions to vacate, or in the alternative, reconsider the order granting Smith's motion for attorney fees, granted ComCast's and AT&T's motions for attorney's fees, and ordered Lightspeed's Counsel to pay attorney's fees totaling $261,052.11 (pursuant to 28 U.S.C. § 1927). The fee order was to be paid within 14 days

On December 27, 2013, defendants filed a joint motion for contempt, or in the alternative, for an order directing Lightspeed's Counsel to show cause why they each should not be held in contempt (Doc. 107). As of the filing of the December 27th motion for contempt, Lightspeed's Counsel had not paid the fee order or sought a stay. Duffy and Hansmeier filed oppositions (Doc. 111 and Doc. 113). Duffy argued that defendants had failed to determine whether any of plaintiff's counsel "has assets sufficient to comply with the judgment of the Court" (Doc. 111 p. 6). Hansmeier claimed, "the quarter of a million dollars liability created by the … Order would impose a crippling financial liability on Hansmeier" (Doc. 113 P. 6). In January 2014, Steele moved to stay the sanctions order (Doc. 114). Steele claimed,

AA-024

"[t]he quarter of a million dollars liability created by … Order would impose a crippling financial liability on Steele" (Doc. 115 p. 3).

The Court heard argument on February 13, 2014. During the proceedings, plaintiff's counsel admitted on the record to noncompliance, each stating that he had not paid the sanction amount to defendants or otherwise sought a supersedeas bond. Additionally, Lightspeed's Counsel emphatically indicated an inability to pay. The Court denied Steele's motion to stay, and took the Contempt Motion under advisement, allowing Lightspeed's Counsel 10 days to submit asset statements from a certified public accountant. Thereafter, Lightspeed's Counsel submitted their financial records to the Court for *in camera* review.

The Court issued its order addressing the Contempt Motion on March 24, 2014 (Doc. 136). As to the inability to pay arguments, the Court found that Lightspeed's Counsel had not met the applicable burden. The Court concluded the records submitted by Lightspeed's Counsel were incomplete and suspicious. The Court found Lightspeed's Counsel in contempt and issued a sanction in the amount of 10% of the original sanction. On April 4, 2014, the Court granted Lightspeed's Counsel's motion to stay pending appeal and for approval of form of supersedeas bond (Doc. 148). Supersedeas bond was posted by John Steele in the amount of $287,300.00 on April 8, 2014 (Doc. 149).

On appeal, the Seventh Circuit affirmed the original order of sanctions and the additional sanctions issued on March 24, 2014. Thereafter, defense counsel

AA-025

collected on the bond.[1]

**B.   Motion for Contempt (Doc. 135)**

Smith contends that Lightspeed's Counsel's prior assertions regarding inability to pay were misleading and/or untrue. Smith contends that Lightspeed's Counsel is fully capable of paying the amounts ordered by the Court and has acted to conceal or otherwise move assets off-shore. In his motion, Smith asks the Court for an order against Lightspeed's Counsel imposing additional sanctions for failing to pay as ordered; freezing their assets; sanctioning them for interfering with discovery; and granting Smith access to the financial statements they provided the Court for *in camera* review.

As previously noted, after the motion for contempt was filed, payment was collected on the bond posted by Steele. Accordingly, portions of the requested sanctions are now moot.

**C.   Motion for Sanctions for Obstructing Discovery (Doc. 153).**

While the December 27th motion for contempt was pending, Smith issued third-party subpoenas to certain financial institutions to ascertain facts concerning Lightspeed's Counsel's financial resources and their ability to pay the amount ordered (Doc. 116-1) (the "January 2014 Subpoenas"). Hansmeier moved to quash the January 2014 Subpoenas (Doc. 116) and the Court denied that motion (Doc. 125). On or about March 7, 2014, Smith issued additional third-party subpoenas. On March 18, 2014, Hansmeier contacted Smith's counsel to object to the

---

[1]  At oral argument for the presently pending motions, Smith reported collecting on the bond.

AA-026

March 7th subpoenas (Doc. 157-1 p. 6). Hansmeier stated that he was not provided with notice or service (Doc. 157-1 p. 6). Smith's counsel responded, stating that Hansmeier was not a party to this action and Rule 45(a)(4) only required notice and service to parties (Doc. 157-1 p. 6). Smith's counsel also noted that plaintiff, Lightspeed, received copies of the disputed subpoenas and reminded Hansmeier that the Court previously determined service on plaintiff's counsel (Duffy) constitutes service upon Hansmeier as well (Doc. 157-1 p. 6) (*see also* Doc. 100 p. 5) ("service on Duffy was effective for all of Plaintiff's counsel, past and present, including Steele and Hansmeier").

Eventually, despite disagreement over interpretation of Rule 45, Smith's counsel volunteered to withdraw and reissue the subpoenas (Doc. 157-1 pp. 7-8). Smith's counsel then enquired about the form of service Hansmeier would prefer: "When I send out new copies tomorrow, I will email them to you and Messrs. Steele and Duffy. Or would you prefer I send them via certified mail so that you each may later claim to have never received them?" (Doc. 157-1 p. 8). Hansmeier responded, "I do not accept service via e-mail, but it is relatively common practice to send a courtesy electronic copy in addition to the formal paper copy in order to create a record of notice, which I believe addresses the point raised in your e-mail." (Doc. 165-1 p. 1).

On March 25, 2014, Smith's counsel reissued the March 7th subpoenas (dated March 24, 2014). Smith served the reissued subpoenas on Steele, Duffy, and Hansmeier by certified mail on March 26, 2014 (Doc. 165-2).

AA-027

After receiving the subpoenas, Steele told Smith's counsel that he contacted the third parties to notify them that "the subpoenas must be withdrawn" (Doc. 153-1) as the action had been stayed. Smith's counsel responded noting that although the contempt order had been stayed (Doc. 148), the disputed subpoenas were issued in conjunction with the March 20th motion for sanctions (Doc. 135), which was still pending (Doc. 153-1). Smith's counsel then requested as follows:

> 1) to stop interfering with legitimate discovery efforts; and 2) [provide] confirmation in the form of faxes or emails from each of the entities you inappropriately contacted stating that you cleared up this "misunderstanding" and that discovery is back on track.

(Doc. 153-1). Steele did not comply with this request. Smith also asserts as follows: (1) Steele sent a copy of the Court's order staying the contempt order (Doc. 148) to at least one subpoenaed bank in an attempt to foster the mistaken belief that the bank should not comply with the subpoena and 2) Duffy and Steele faxed copies of the motion to quash the January 2014 subpoenas – after the motion had been denied – to at least two subpoenaed banks in an attempt to obstruct discovery.

At the November 12th hearing, Steele stated that he never intentionally made any misrepresentations to third parties. He admitted to sending at least one banking institution a copy of the Court's order staying the contempt order but insists he never commented on how the bank should interpret that order. Steele contends he simply sent the order, at the bank's request, and any misinterpretations can only be attributed to the bank. At the November 12th hearing Duffy denied the allegations directed at him and stated that if he did send

AA-028

the motion to quash to one of the banking institutions it was in error. Moreover, Duffy asserts that he cannot be held responsible for a banking institution improperly relying on a motion to quash as a basis for not responding to a subpoena (Duffy stated he did not know why a bank would rely on a motion to quash as opposed to an order).

## III.   ANALYSIS

With regard to the Motion for Contempt (Doc. 135), the question before the Court is whether Lightspeed's Counsel, as of November 2013, had sufficient assets to pay the fee order. Smith cites to various records reflecting Lightspeed's Counsel's significant financial assets in 2010, 2011, and 2012. The financial records cited by Smith, however, do not definitively demonstrate that Lightspeed's Counsel understated their financial resources in relation to the fee order issued by this Court in November 2013. In addition, Smith has uncovered questionable financial activity on the part of Lightspeed's Counsel (*See e.g.,* Doc. 135 p. 3 (noting records showing payment to McCullough Sparks, an asset protection law firm that specializes in the "541 Trust," which "removes assets from your personal ownership and from any disclosure of your personal assets. It is a private document and it cannot be discovered through any public records."); Doc. 135 p. 9 (contending that Hansmeier drained Alpha Law's assets and dissolved Alpha law in an effort to avoid paying attorney fees in another case)). Smith contends that the referenced activity demonstrates misconduct and supports a finding of contempt. The Court disagrees.

Page **8** of **10**

AA-029

The arguments raised by Smith and the records cited in support thereof leave this Court with a high degree of suspicion as to the representations Lightspeed's Counsel have previously made to this Court. The Court does not believe that Lightspeed's Counsel have conducted themselves in a professional manner. However, suspicion is not a sufficient basis for a finding of contempt. Ultimately, Smith has failed to meet his burden of demonstrating that Lightspeed's Counsel is in contempt of this Court's orders. Accordingly, the Motion for Contempt (Doc. 135) is **DENIED**.

With regard to the Motion for Sanctions for Obstructing Discovery (Doc. 153), once again the Court is highly suspicious of the alleged conduct. However, the evidence presented by Smith does not present sufficient basis for a finding of obstruction and/or the imposition of sanctions. Further, although the explanations provided by Duffy and Steele are questionable, they are not so inherently implausible as to establish sanctionable conduct. Accordingly, the Motion for Sanctions for Obstructing Discovery (Doc. 153) is **DENIED.**

### IV. CONCLUSION

For the reasons discussed herein, the Motion for Contempt (Doc. 135) is

AA-030

**DENIED**. **FURTHER,** the Motion for Sanctions for Obstructing Discovery (Doc.

153) is **DENIED.**   Hopefully, this will put an end to this ugly and distasteful

chapter in the annals of litigation for this case and this district with these attorneys.

**IT IS SO ORDERED.**

Signed this 18th day of November, 2014.

Digitally signed by
David R. Herndon
Date: 2014.11.18
14:41:20 -06'00'

**District Judge**
**United States District Court**

AA-031

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LIGHTSPEED MEDIA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:12-cv-889-DRH-SCW |
| | ) | |
| v. | ) | **DEFENDANT ANTHONY** |
| | ) | **SMITH'S ITEMIZATION OF** |
| ANTHONY SMITH, SBC INTERNET SERVICES, | ) | **ADDITIONAL EXPENSES** |
| INC., d/b/a AT&T INTERNET SERVICES; AT&T | ) | **INCURRED IN CONDUCTING** |
| CORPORATE REPRESENTATIVE #1; COMCAST | ) | **THIRD PARTY DISCOVERY,** |
| CABLE COMMUNICATIONS, LLC, and | ) | **INCLUDING COSTS AND** |
| COMCAST CORPORATE REPRESENTATIVE #1, | ) | **ATTORNEY'S FEES** |
| | ) | |
| Defendants. | ) | |

Defendant Anthony Smith ("Smith") respectfully submits this Itemization of Additional Expenses Incurred in Conducting Third Party Discovery, Including Costs and Attorney's Fees.

In its June 5, 2015 Memorandum and Order (Doc. 199), the Court reconsidered its denial (Doc. 188) of Smith's motions for contempt (Doc. 135) and for discovery sanctions (Doc. 153). The Court awarded sanctions against Plaintiff's counsel John Steele ("Steele") and Paul Hansmeier ("Hansmeier") "for their contemptuous statements in court." Doc. 199 p. 17. Further, the Court found Plaintiff's counsel Paul Duffy ("Duffy") and Steele "engaged in unreasonable, willful obstruction of discovery in bad faith" and awarded sanctions to Smith "in the amount of the additional expenses incurred in conducting third party discovery," apportioned equally between Steele and Duffy. *Id.* p. 16. With regard to those discovery sanctions, the Court ordered Smith to submit his reasonable costs by July 3, 2015. *Id.* Smith responds to that Order by this filing and the attached itemized invoice of time entries and costs for Smith (Exhibit A) and supporting affidavits of Smith's counsel. The total amount requested is $94,343.51.

AA-032

## I.     Relevant Factual Background.

## A.     Smith Sought Discovery to Remedy Plaintiffs' Counsel's Misrepresentations.

Smith's post-dismissal discovery efforts were sparked when Steele, Hansmeier and Duffy (collectively "Plaintiff's counsel") failed to comply with the Court's November 27, 2013 order sanctioning them under Section 1927. Doc. 100. Defendants jointly moved for contempt one month later. Doc. 107. In January and February 2014, Plaintiff's counsel each claimed they lacked the means to pay. *See* Doc. 111 p. 6 (Duffy); Doc. 113 p. 6 (Hansmeier); Doc. 115 p. 3 (Steele); Doc. 127 pp. 8:10-21 (Hansmeier), 10:9-16 & 19:10-15 (Steele), & 20:10-21:9 (Duffy). On March 2, 2014 the Court found their financial condition statements were insufficient to establish an inability to pay, and found them in contempt for the first time. Doc. 136 p. 7. On April 4, 2014 the Court stayed its contempt order from resulting in additional fees. Doc. 148.

Smith sought discovery from Plaintiff's counsel personally, serving on Steele, Duffy, and Hansmeier interrogatories and requests for production concerning their finances on January 21, 2014. See Doc. 135 Exs. V & X. None of Plaintiff's counsel ever complied with those discovery requests; they denied receiving them, as is their wont. *Id.*; *see generally* Doc. 165 p. 3 n. 4.

Smith sought third-party discovery about Plaintiff's counsel's financial resources and their ability to pay the amount ordered. Doc. 153 p. 2. On January 16, 2014, he issued subpoenas to twelve financial institutions: Bank of America, Wells Fargo, First Advantage, JP Morgan Chase, OneWest Bank, TCF National Bank, Fifth Third Bank, Citibank, Ready Street Bank, Hiway FCU, Indymac, and Marquette Bank. Doc. 116-1 Ex. B. Plaintiffs' counsel jointly moved to quash the subpoenas on January 30, 2014. Doc. 116. The Court denied the motion on February 19, 2014. Doc. 125. Smith continued his discovery concerning Plaintiff's counsel's financial

AA-033

resources and the veracity of their claimed inability to pay, issuing a second wave of subpoenas to third parties T-Mobile, American Express, MasterCard, GoDaddy, TransFirst, Hotmail, Google and Twitter on or about March 7, 2014. Doc. 153 p. 2. To mollify Plaintiff's counsel's objections to these subpoenas, "out of an abundance of caution," Smith withdrew them and reissued them on March 25, 2014. Doc. 165 pp. 2-3; Doc. 185 pp. 2-5. On or about the same date he issued further subpoenas to MCZ/Centrum Flamingo III, LLC, Pearl Insurance, Pershing LLC, Sabadell United Bank ("Sabadell"), BNY Mellon and Capital One Bank. Doc. 165 p. 7; Doc. 165-5. Smith continued to pursue discovery by investigating other sources with information pertinent to Plaintiff's counsel's finances. *See* Doc. 161 p. 1 n. 1; *see also* Doc. 189, 194, 195, 197.

**B.    Steele and Duffy Actively and Willfully Obstructed Pertinent Discovery.**

Steele and Duffy actively sought to obstruct this third-party discovery. Steele informed JP Morgan Chase on January 29, 2014 that he intended to move to quash the subpoenas. Doc. 199 p. 13. Steele sent the bank an unstamped copy of the joint motion to quash on January 30, 2014, the day it was filed. Doc. 116, 199 p. 13. The bank's requests for a file-stamped copy went unanswered through February 2014. Doc. 193-3 p. 4. The Court denied the motion on February 19, 2014. Doc. 125. Yet two weeks later, on March 3, Duffy faxed a stamped copy of the motion to JP Morgan Chase. Doc. 135 p. 9. Duffy's misrepresentation led the bank to believe the motion to quash to be pending, prohibiting compliance with the subpoena. *Id.* Exh. Z ¶¶ 2-6. Duffy's actions were "intentionally obstructive, as he had reason to know the motion to quash had been denied at the time he relayed it to the bank." Doc. 199 pp. 13-14.

On April 11, 2014, Steele informed Smith's counsel that he had received his copies of the Smith's latest subpoenas and claimed, "As you know the action has been stayed and any

AA-034

outstanding subpoenas must be withdrawn. I have already contacted the third parties involved, and notified them." Doc. 153-1. Smith's counsel responded that the Court's April 4, 2014 Order, reflecting Steele's payment of a supersedeas bond pending appeal, only stayed the contempt order, not third-party discovery. *Id.*; *see* Doc. 136 p. 13. Yet five days later, on April 16, 2014, Steele faxed a copy of the April 4 Order to Sabadell Bank, falsely stating that "the order I have included shows that the Court stayed the matter on April 4, 2014." Doc. 158, 158-1 p. 4. "Despite Steele's explicit knowledge that discovery of his financial records had not been stayed, he proceeded to inform the bank that a stay was in place. This demonstrates his knowing interference in Smith's discovery efforts." Doc. 199 p. 14.

Hansmeier moved to quash Smith's March 2014 wave of subpoenas on April 22, 2014. Doc. 157. The motion was denied on October 20, 2014. Doc. 185. Sabadell was promptly notified and produced responsive documents that Smith's counsel received on November 17, 2014, about eight months after issuing the subpoena. *See* Doc. 193 p. 5 n. 6, Doc. 193-4. Sabadell produced extensive records showing Steele's substantial resources that contradicted his claimed insolvency; his misrepresentations to Sabadell and Hansmeier's motion to quash sought to avoid or delay those records' disclosure. Doc. 199 pp. 15-16; Doc. 190 Ex. A. Plaintiff's counsel effectively put off Sabadell's production until after the November 12, 2014 hearing on Smith's motions for contempt and discovery sanctions. Doc. 187.

At that hearing, Plaintiff's counsel each denied misrepresenting their financial status and, "[w]ith regard to obstructing discovery, Steele and Duffy indicated they never intentionally made misrepresentations to third parties." Doc. 199 p. 7. Smith's motion to reconsider (Doc. 189) "shed[] new light on Duffy and Steele's efforts to obstruct discovery by misleading subpoenaed

AA-035

banking institutions." Doc. 199 p. 13. Smith's extensive efforts to expose their obstructions led to "newly discovered financial evidence to support his assertion that, despite their pleas of insolvency, Steele and Hansmeier had sufficient assets to satisfy the Fee Order." *Id.* p. 14.

**II.     It Is Proper for the Court to Award Smith the Full Amount of His Itemized Expenses, Costs and Attorney's Fees.**

**A.     Both Rule 37 and Section 1927 Support a Full Award to Smith.**

The Court cited both Federal Rule of Civil Procedure 37(b)(2)(C) and 28 U.S.C. § 1927 as grounds for awarding Smith his reasonable expenses for obstructions of discovery. Doc. 199 pp. 11-12. Smith's motion for sanctions for obstructing discovery also cited both Rule 37 and Section 1927. Doc. 153 pp. 3-4 & 6-7. Both grounds support an award of the full amount of Smith's costs, expenses, and attorney's fees itemized hereunder.

"District courts possess wide latitude in fashioning appropriate sanctions and evaluating the reasonableness of the attorneys' fees requested. ... [W]e will uphold any exercise of the district court's discretion that could be considered reasonable, even if we might have resolved the question differently ourselves." *Johnson v. Kakvand*, 192 F.3d 656, 661 (7th Cir. 1999) (citations omitted) (affirming Rule 37(b) sanctions and attorney's fees). "The review of an order imposing sanctions under section 1927 is a deferential one, subject to the abuse of discretion standard. ... This court need only inquire whether any reasonable person could agree with the district court's sanction award." *Kapco Mfg. Co. v. C & O Enters., Inc.*, 886 F.2d 1485, 1491 (7th Cir. 1989).

An attorney who violates Rule 37(b) must "pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). Steele and Duffy's obstructions were not justified and an award of expenses would be just. Further, an

AA-036

attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Smith requests an award of all additional expenses, costs and attorney's fees he incurred as a result of their discovery obstructions, whether termed "reasonable expenses, including attorney's fees" under Rule 37 or "excess costs, expenses, and attorney's fees reasonably incurred" under Section 1927.

**B.      Smith Seeks an Award of All Expenses, Fees and Costs Reasonably Incurred Related to Additional Third Party Discovery as a Result of Plaintiff's Counsel's Actions.**

Smith requests an award of his reasonable expenses, costs and attorney's fees based on the discovery sanctions. Doc. 199 pp. 13-14 & 16. All additional litigation costs attributable to the discovery violations, as substantiated by the itemized invoice submitted herewith, should be reimbursed. Smith specifically requests reimbursement for his reasonable costs, fees, and expenses incurred in additional efforts to obtain the obstructed discovery from JP Morgan Chase and Sabadell, and in the additional discovery Smith pursued when the discovery was obstructed. He also seeks to recover his attorney's fees for litigating his motion for discovery sanctions (Doc. 153), its supplement (Doc. 158), and reply in support (Doc. 171); his opposition to Hansmeier's motion to strike that reply (Doc. 179); the hearing on the motion for sanctions (Doc. 187); and his motion for reconsideration (Doc. 189), reply in support (Doc. 193), and his supplemental filings thereto (Doc. 195, 197), and this filing. Those costs, fees and expenses are directly attributable to the discovery infractions, as explained below, so they should be compensated.

AA-037

1.      **Smith Seeks an Award of Expenses, Fees and Costs He Reasonably Incurred in Conducting Third Party Discovery.**

Plaintiffs' counsel used a variety of measures to obstruct discovery. They jointly moved to quash all of Smith's January 2014 subpoenas, and Hansmeier moved to quash all of Smith's March 2014 subpoenas. Doc. 116 & 157; *see* Doc. 125 & 185 (denying the motions). Steele and Duffy obstructed Smith's January 2014 subpoena to JP Morgan Chase; Steele falsely informed the bank that the discovery had been stayed, and after their motion to quash the subpoenas was denied, Duffy faxed the motion to the bank as if it were still pending. The obstructions delayed Smith's access to critical evidence of Plaintiff's counsel's financial status, necessitating a second wave of subpoenas in March and a motion for discovery sanctions. Steele obstructed the March 2014 subpoena to Sabadell Bank, further delaying vital evidence (*see* Doc. 199 p. 15) that, along with the January 2014 obstruction, ultimately necessitated Smith's motion for reconsideration.

In preparing and serving his January 16, 2014 subpoenas requesting discovery from financial institutions, Smith incurred costs and fees in his "attempt to ascertain certain facts relevant to the Court's § 1927 sanctions order." Doc. 125 p. 3. Likewise, in preparing and issuing his March 2014 subpoenas issued to financial institutions and other third parties, Smith incurred costs and fees in conjunction with his then-pending motion for contempt. Doc. 188 p. 7 (citing Doc. 135 & 153-1). All of those costs and fees, and those Smith incurred in reviewing the discovery responses and preparing them for the Court's review, would have been avoided if Plaintiff's counsel had timely complied with the Court's November 27, 2013 Order. Doc. 100; see Doc. 107 & 136. Their choice not to pay the sanctions ordered necessitated all such costs, including attorney's fees, which were therefore "excess costs" recoverable under Section 1927. *See* Doc. 90 p. 2 (collecting cases). The Seventh Circuit has affirmed the Court's exercise of its

AA-038

discretion to award Smith fees for the entire case under Section 1927. *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 708-09 (7th Cir. 2014); *see* Doc. 183-1; Doc. 183-2 pp. 15-18.

Those costs are also compensable as "reasonable expenses, caused by the failure" of Plaintiff's counsel under Rule 37(b)(2)(C). Under Rule 37, "an award of sanctions must be proportionate to the circumstances surrounding the failure to comply with discovery." *Crown Life Ins. Co. v. Craig*, 995 F.2d 1376, 1382 (7th Cir. 1993). The Seventh Circuit "will presume proportionality when there are wilful or bad faith violations of discovery orders. The same presumption applies when there is a pattern of contumacious conduct or dilatory tactics or the failure of less drastic sanctions." *Id.* at 1383; *see also id.* at 1384 (affirming sanctions; where the violator's "failure to comply with discovery orders was wilful and demonstrated contumacious conduct and less severe sanctions failed, the sanction here involved was proportionate to the violation"). *See also Loctite Corp. v. Fel-Pro, Inc.*, 667 F.2d 577, 585 (7th Cir. 1981) (affirming award under 35 U.S.C. § 285 after plaintiff's failure to comply with discovery rules) (though "under Rule 37, attorney's fees are limited to those emanating from the abuse of the discovery process ... nearly all of the proceedings in this suit result from Loctite's initial failure to specify its charges against Fel-Pro. Thus, there can be little difference between the amount relating to the entire lawsuit and the amount flowing from the abuse of the discovery process.").

Because Plaintiff's counsel's frivolous, bad faith actions necessitated all of Smith's discovery attorney's fees and costs, they should all be reimbursed under Rule 37 and Section 1927 as "additional expenses incurred in conducting third party discovery." Doc. 199 p. 16.

Ordinarily Rule 37's proportionality limits recovery to expenses, including fees, directly caused by a discovery violation. *See Maynard v. Nygren*, 332 F.3d 462, 471 (7th Cir. 2003)

AA-039

("Rule 37 supports only the reimbursement of fees resulting from the discovery violation.") (citing Fed. R. Civ. P. 37(c)(1)). But that limitation, which would bar recovery of the discovery costs and fees Smith incurred in the January discovery before the acts of obstruction, does not apply when the suit was entirely frivolous. *Id.* ("As long as the suit as a whole was not frivolous, and we have no reason to believe that it was, the remaining attorney's fees would have been incurred even without the discovery violation; thus, the causality requirement was not met."). The Court has repeatedly termed this lawsuit frivolous. Doc. 61 p. 1, 100 p. 8, 185 p. 2; *see* Doc. 189 p. 9. Plaintiff's counsel's failure to timely pay the sanctions ordered was not just frivolous but an act of civil contempt. Doc. 136. Their failure to pay was partly based on claimed insolvency that was itself false and contemptuous, as Smith has shown. Doc. 199. Accordingly, Smith requested an award of all expenses incurred in conducting the discovery, because "Plaintiff's Counsel's numerous false representations have caused Smith to incur significant additional expenses in conducting third party discovery to obtain accurate financial documentation." Doc. 135 p. 15; *accord* Doc. 189. p. 9. "Pursuant to Fed. R. Civ. P. 37, Smith should be awarded sanctions in an amount sufficient to cover his costs, including attorneys' fees incurred in conducting third-party discovery, necessitated solely by Plaintiff's Counsel's misconduct." Doc. 135 p. 15. Plaintiff's counsel's chain of bad-faith litigation calls for full relief.

In the alternative, if the Court chooses not to impose all of Smith's itemized discovery costs, expenses and fees on Steele and Duffy, Smith requests the amounts incurred in conducting all additional discovery after his January subpoenas were stymied, plus the costs of obtaining the obstructed JP Morgan Chase and Sabadell productions. Where a party's Rule 37 violation "has caused the need for additional discovery, it is only just that that party bear the costs of

AA-040

conducting the additional discovery, as well as the costs and fees associated with the moving party's effort to obtain the needed discovery." *Commonwealth Edison Co. v. Diversified Techs. Grp.*, Case No. 93 C 4138, 1996 U.S. Dist. LEXIS 7872, *7 (N.D. Ill. June 7, 1996).

**2.   Smith Seeks an Award of Expenses, Fees and Costs Reasonably Incurred in Briefing and Litigating Issues Related to Steele and Duffy's Obstructions.**

Section 1927 and Rule 37(b) support awarding Smith his "expenses incurred in obtaining and defending an award." *Rickels v. City of South Bend*, 33 F.3d 785, 787 (7th Cir. 1994). "The rationale of fee-*shifting* rules is that the victor should be made whole--should be as well off as if the opponent had respected his legal rights in the first place." *Id.* (emphasis in original). Both Section 1927 and Rule 37(b) are fee-shifting provisions. *Nissenbaum v. Milwaukee County*, 333 F.3d 804, 811 (7th Cir. 2003) (as "Rule 37 establish[es a] fee-shifting regimen[], an award is automatic"); *Bender v. Freed*, 436 F.3d 747, 751 (7th Cir. 2006) ("the fee-shifting sanction of § 1927"); *Shales v. General Chauffeurs, Sales Drivers and Helpers Local Union No. 330*, 557 F.3d 746, 749 (7th Cir. 2009) ("§ 1927, a real fee shifting law"); *accord* Doc. 199 pp. 11-12.

Steele and Duffy's discovery obstructions were directly responsible for significant additional briefing costs. Smith requests the fees he incurred in briefing his April 18, 2014 motion for sanctions related to the discovery obstructions.[1] Doc. 153. That motion specifically requested monetary sanctions, noting, "sanctions to be awarded should be calculated to deter this type of conduct, and may take into consideration Smith's attorney fees incurred in the amount of $4,908 in connection with this motion." *Id.* pp. 6-7. *See* Ex. A pp. 6-7.

---

[1] Smith first documented Duffy's misrepresentation to JP Morgan Chase in his March 20, 2014 motion for contempt. Doc. 135 p. 9 & Ex. Z. The Court has separately ordered Steele and Hansmeier to compensate Smith for the contempts addressed in that motion so Smith does not request any fees he incurred in briefing that motion, to avoid double recovery.

AA-041

Smith further requests the fees incurred in his opposition (Doc. 165) to Hansmeier's motion to quash (Doc. 157); in supplementing the Rule 37 motion to detail the Sabadell obstruction (Doc. 158), and his reply in support of the motion (Doc. 171), plus fees incurred in reviewing Plaintiffs' counsel's responses in opposition (Doc. 159, 160, 162) when preparing the reply; and in Smith's opposition (Doc. 179) to Hansmeier's motion to strike that reply (Doc. 173, 175). Those fees were all incurred in overcoming their discovery obstructions. Smith served his subpoena on Sabadell in March 2014. Doc. 165-5 pp. 33-39. Steele used the Court's April 4, 2014 Order as a pretext to interfere with Sabadell's response. Doc. 158-1. That bought Steele time; before Smith could determine the facts of the obstruction and call them to the Court's attention (*see* Doc. 158), Hansmeier moved to quash, postponing Sabadell's production until just after the November 12, 2014 hearing. On November 17, 2014 Smith received documents from Sabadell showing that in January and February 2014, while Steele claimed he could not afford to pay the sanctions, he was flush with ample funds that he largely devoted to remodeling his home. *See* Doc. 189 p. 6. Smith's motions were denied on November 18, 2014 (Doc. 188), before he could notify the Court of this evidence received the day before. Plaintiff's counsel should bear all costs and fees Smith expended in an attempt to litigate around their discovery interferences.

The evidence of Steele and Hansmeier's finances that Smith at last obtained, once the obstructions were finally overcome, was so compelling that the Court did not require a hearing on Smith's motion for reconsideration. Doc. 199 p. 12 ("Rule 37 requires no evidentiary hearing, and none is warranted where the briefs and affidavits fully recount the circumstances surrounding the noncompliance."). Thus, if not for the obstructions, that evidence would have been available earlier and the hearing could have been avoided. Because all costs and fees

AA-042

incurred in the November 12, 2014 hearing related to the discovery sanctions were therefore necessitated only by the obstructions, Steele and Duffy should also bear them. Smith's attorneys were required to fly to Illinois to argue the sanctions motion, necessitating travel expenses and time; each attorney spent 9.5 hours total flying to St. Louis from Massachusetts, and then back again. *See* Doc. 182 ("The parties may NOT appear by phone for the hearing.").

Smith also requests recovery of his fees related to his motion for reconsideration (Doc. 189), Hansmeier and Steele's responses (Doc. 191, 192), Smith's reply in support (Doc. 193), and his supplemental filings thereto (Doc. 195, 197). Reimbursement is not limited to the costs of the initial motion for discovery sanctions. "If only the original motion ... were compensable, the fee-shifting provision of Rule 37 would have little effect." *Catapult Communications Corp. v. Foster*, No. 06 C 6112, 2009 U.S. Dist. LEXIS 76677, *4 (N.D. Ill. Aug. 25, 2009) (approving fees for motion for reconsideration). Where a defendant's motion for Rule 37 sanctions is denied based on a plaintiff's willful failure to comply with discovery, as shown in a subsequent motion for reconsideration by evidence of the plaintiff's false statements, sanctions against that plaintiff properly include the reasonable expenses incurred not only in the motion for reconsideration, but also in the original underlying motions related to sanctions and in preparing for and participating in the evidentiary hearing thereon. *Joshi v. Professional Health Services, Inc*., 606 F. Supp. 302, 310 (D.D.C. 1985), *aff'd*, 817 F.2d 877, 881 (D.C. Cir. 1987). *Cf. Nelson v. Millennium Labs., Inc.*, Case No. 2:12-cv-01301-PHX-SLG, 2014 U.S. Dist. LEXIS 56650, *9-10 (D. Ariz. Apr. 15, 2014) (considering plaintiff's "history of discovery abuse and the lack of candor," imposing not just expenses and fees of instant motion for Rule 37 sanctions and reply, but also previously denied fees, expenses and costs associated with deposition abused by plaintiff).

AA-043

The same principle applies where, as here, it is Plaintiff's counsel at fault rather than Plaintiff itself. Where a defendant's discovery motion is denied based on a willful, bad faith misrepresentation by plaintiff's counsel, and the court reconsiders the issue based on evidence of the misrepresentation, counsel should bear the costs incurred in both the original motion and the subsequent motion for sanctions. *See Wilcox v. Kmart Corp.*, Civ. A. No. 94-6122, 1995 U.S. Dist. LEXIS 3347, *2-4 & 11 (E.D. Penn. Mar. 14, 1995) (awarding fees and expenses for both motion to compel and motion for reconsideration). Therefore Smith seeks compensation for his briefing fees related thereto.

## III.   The Court Should Use the Lodestar Method to Assess the Fees Reasonably Incurred.

"Rule 37(b) allows the court to award only 'reasonable expenses,'" including attorney's fees. *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 729 F.2d 469, 475 (7th Cir. 1984). Likewise, Section 1927 permits an award only of fees, costs, and expenses "reasonably incurred." 28 U.S.C. § 1927. The lodestar method is typically used to calculate such expenses. *See* Doc. 90 pp. 3-4. Under the lodestar method, attorney's fees are calculated as "the hours reasonably expended multiplied by the reasonable hourly rate." *Johnson v. GDF, Inc.,* 668 F.3d 927, 929 (7th Cir. 2012); *see also Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983). "There is a strong presumption that the lodestar calculation yields a reasonable attorneys' fee award." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 639 (7th Cir. 2011). There are "three determinations required to set that figure: (1) the number of hours reasonably expended by … counsel, (2) the reasonable hourly rate for those services, and (3) costs." *Johnson*, 668 F.3d at 931.

AA-044

**A.    Smith's Attorneys Reasonably Expended the Time Itemized as a Result of Steele and Duffy's Discovery Obstructions.**

The lodestar method entitles the petitioning party to compensation only for attorney time "reasonably expended." *Hensley,* 461 U.S. at 433; *Johnson,* 668 F.3d at 931. Time spent unreasonably cannot be compensated. *People Who Care v. Rockford Dep't of Ed.,* 90 F.3d 1307, 1314 (7th Cir. 1996). In particular, time that is "excessive, redundant, or otherwise unnecessary" is disallowed, *Hensley,* 461 U.S. at 434*; Johnson,* 668 F.3d at 931, as is time spent on unrelated matters, *Gautreaux v. Chicago Housing Auth.,* 491 F.3d 649, 661 (7th Cir. 2007), or time resulting from overstaffing of the case, *Schlacher v. Law Offices of Phillip J Rotche & Assocs., P.C.,* 574 F.3d 852, 858 (7th Cir. 2009). The party seeking fees has the burden of proving the reasonableness of the hours worked by submitting evidence supporting those hours. *Hensley,* 461 U.S. at 433; *Spegon v. Catholic Bishop of Chicago,* 175 F.3d 544, 553 (7th Cir. 1999). The fee award may be reduced if the documentation is inadequate. *Hensley,* 461 U.S. at 433.

Smith's attorneys made every effort to avoid duplicating each others' work and to minimize the cost of the representation to Smith, as their time records reflect. *See* Ex. B & C. They expended a reasonable amount of hours pursuing discovery to demonstrate Plaintiff's counsel's misrepresentations in the face of their willful obstructions. This was no small task; as another District Court has observed, Plaintiff's counsel "obfuscate other facts, especially those concerning their operations, relationships, and financial interests. [Their] web of disinformation is so vast that [even they] cannot keep track—their explanations of their operations, relationships, and financial interests constantly vary." Doc. 92-4 p. 8 (Order Issuing Sanctions, *Ingenuity 13 LLC v. John Doe*, Case No. 2:12-cv-8333-ODW(JCx) (C.D. Cal. May 6, 2013). False claims of Plaintiff's counsel's insolvency spurred Smith to single-handedly dive into that

AA-045

web of disinformation, chasing a paper trail through dozens of banks and other financial institutions, reviewing thousands of pages of documents and electronic records about accounts controlled by Plaintiff's counsel and more than a dozen of their shell companies. *See* Doc. 124 p. 4 (discussing Plaintiff's counsel's "financial shell game"). Plaintiff's counsel's habit of opening and promptly shuttering accounts, in an apparent attempt to obscure both their present financial resources and the proceeds' source, complicated Smith's task. *See* Doc. 135 p. 4. They further prolonged and vexatiously multiplied his task by interfering with third-party discovery, and by a series of baseless filings and false statements in Court, which required further filings by Smith's counsel. In all, his additional discovery efforts involved 224.30 of attorney time expended over eighteen months; slightly more than he spent litigating the stillborn case-in-chief. *See* Doc. 90 p. 4. Plaintiff's counsel's misrepresentations and obstructions made all that time necessary.

**B.    Smith's Attorney's Fees Are Market Rate and Are Presumptively Reasonable.**

The reasonable hourly rate is "derived from the market rate for the services rendered." *Johnson,* 668 F.3d at 933; *Pickett,* 664 F.3d at 640. The market rate is "the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the kind of work in question." *Stark v. PPM Am., Inc.,* 354 F.3d 666, 674 (7th Cir. 2004). "[T]he attorney's actual billing rate for comparable work is presumptively appropriate to use as the market rate." *Mathur v. Bd. of Trustees of S. Ill. Univ.,* 317 F.3d 738, 743 (7th Cir. 2003) (internal quotation omitted). The burden of proving the market rate is on the party seeking fees. *Gautreaux,* 491 F.3d at 659; *Stark,* 354 F.3d at 674.

Smith satisfies his burden. He has submitted supporting affidavits from his lead counsel, Jason E. Sweet and Daniel G. Booth, listing the hourly rates charged by the two partners. These

AA-046

rates were the normal hourly rates of the attorneys and were the rates charged to Smith in connection with the discovery. *See* Doc. 90 pp. 5-6. At $409 per hour for both partners, these rates were also a relative bargain. *Id.* The Court approved that rate as reasonable in the first Order sanctioning Plaintiff's counsel. Doc. 100 pp. 11-12. Before that Order, the Court described as modest both the total Smith's counsel billed and their hourly rates: "That's actually a pretty modest request around this place. We used to see fees for removal petitions that would run twice that. ...  [T]hat seems like a pretty modest amount to me in this case. ... That's what you call bargain rates around here." Doc. 100 pp. 4:17-22, 5:16-23 & 17:11-18. Though Smith's counsel have raised their rates for other clients since they began to represent him in 2012, they have not sought to reflect those higher rates in this case. The evidence shows that the regular $409 per hour rates charged by Smith's attorneys are the relevant market rates and are reasonable, if not low, for purposes of calculating fees under Section 1927 and Rule 37.

**C.     Smith's Costs Were Reasonably Incurred in Conducting Third Party Discovery.**

Smith incurred reasonable costs in conducting third-party discovery. He paid out $1,567.04 total to cover third parties' duplication and postage costs in responding to his January 16, 2014 subpoenas: $124.50 to Bank of America; $189.41 to Fifth Third Bank; $203.84 to CitiBank; $90.50 to TCF Bank, $708.13 to JP Morgan Chase, and $250.66 to Wells Fargo. He further paid $164.00 to TransUnion to research credit records for Plaintiff's counsel and certain payees of their firm Prenda Law. Smith would not have incurred those costs if Plaintiff's counsel had timely paid the sanctions under the Court's November 27, 2013 Order, honestly stated their finances in early 2014 instead of raising a spurious poverty defense, or responded to Smith's January 21, 2014 discovery requests. Those costs should be compensable under 28 U.S.C. §

AA-047

1927 or Rule 37(b). Rule 37 sanctions "should encompass all expenses, whenever incurred, that would not have been sustained had the opponent conducted itself properly." *Aerway Labs., Inc. v. Arco Polymers, Inc.*, 90 F.R.D. 563, 565-66 (N.D. Ill. 1981), *cited with approval in Tamari v. Bache & Co. (Lebanon) S.A.L.*, 729 F.2d 469, 475 (7th Cir. 1984)).

The $708.13 Smith paid to JP Morgan Chase would also compensable because Steele and Duffy directly obstructed that discovery. Further costs caused by their obstructions include: $81.60 to Sabadell and $6.20 to GoDaddy for their duplication and postage costs in responding to Smith's March 2014 subpoenas (Doc. 165-5 pp. 12-17 & 33-39); $10.00 to the Delaware Secretary of State for Monyet, LLC's incorporation documents; and $175.00 to Scottrade, Inc. for its costs of duplication and postage in response to Smith's February 6, 2015 subpoena concerning Monyet, LLC. Smith incurred those costs to expose Plaintiff's counsel's financial misrepresentations to the Court, and because Steele and Duffy's obstructions prevented Smith from timely access to the information sought. Those costs should all be compensable.

Smith's $137.86 in postage costs should also be compensable, as they were also necessitated by Plaintiff's counsel's misrepresentations and evasions, and their interference and noncompliance with discovery. Of that total, Smith spent $32.28 in postage on January 21, 2014, sending Plaintiff's counsel copies of the January third-party subpoenas, and the discovery requests to which Plaintiff's counsel never responded; another $23.46 sending them his March 7, 2014 subpoenas, which Smith withdrew at their demand; and $57.14 on March 26, 2014, sending them his reissued subpoenas. *See* Doc. 165, 165-2. He also spent $24.99 on an overnight delivery to expedite his subpoena issued to Scottrade while his motion for reconsideration was pending.

17

AA-048

Smith's costs and expenses associated with the November 12, 2014 hearing, necessitated by Plaintiff's counsel's false statements and Steele and Duffy's discovery obstructions, should also be compensable. The Rule 54(d) "limits on fees and costs available to a prevailing party post-judgment" do not apply when the Court imposes sanctions under Rule 37. *Rosenthal Collins Group, LLC v. Trading Techs., Int'l, Inc.*, No. 05 CV 4088, 2010 U.S. Dist. LEXIS 64767, *16 (N.D. Ill. June 29, 2010). Accordingly, "courts in this circuit (and others) have found that attorney travel costs are fair game in the sanctions context." *Id.* (collecting cases); *see* Fed. R. Civ. P. 54(d)(2)(E). Smith's attorneys incurred actual out-of-pocket expenses totaling $926.63 for their round-trip flight from Boston to St. Louis, hotel accommodations, car rental, and dining expenses over two days. *See* Exhibit B. To avoid double recovery, Smith requests only half that total, $463.31, as the hearing addressed not just Smith's motion for discovery sanctions but also Steele and Hansmeier's contempt, for which the Court has already ordered sanctions.

## IV.     The Amount of Sanctions Sought Is Reasonable in the Circumstances of this Case.

In light of the nature of the case, the work performed, and the outcome obtained, Smith's requested sanction of $94,343.51 is more than proper. No adjustment to the lodestar amount, which represents reasonable hours worked at presumptively reasonable rates, is necessary or appropriate. *See* Doc. 90 pp. 7-8. The hours and hourly rate, and the itemized costs and expenses, are eminently reasonable for the more than a year spent fending off obstructive tactics, and ferreting out and poring over documents to prove Plaintiff's counsel falsehoods to the Court. Their bad faith interference with Smith's discovery, which ultimately exposed yet more of their malfeasance, justifies the amount he requests. The amount is also proportionate to the millions of dollars Plaintiff's counsel sought in this case, and a pittance compared with the millions more

AA-049

they obtained by filing frivolous cases much like this. *See* Doc. 14 pp. 16-17 (arguing that this action, before removal, was "only for the purposes of coercing millions of dollars in settlement payments and not for the purposes of prosecuting this lawsuit"); Doc. 61-6.

At the outset of this case, Steele could be found bragging about his millions in ill-gotten proceeds. *See* Doc. 136 p. 10 n. 1. Lately he and his confederates have been busy squirreling their proceeds away, falsely representing their financial status to the Court, and trying to cover their tracks. Their falsehoods and obstructions created significant costs for Smith, which they should be made to bear. *See Riddle* & *Associates, P. C. v. Kelly,* 414 F.3d 832, 835 (7th Cir. 2005) (one purpose of Section 1927 is "to ensure that those who create unnecessary costs also bear them") (internal quotation omitted); *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 729 F.2d 469, 475 (7th Cir. 1984) ("Requiring a party to bear these costs could offset substantially the very award that the party has obtained. This would create a disincentive for seeking sanctions in the first place and thus undermine the purposes behind Rule 37(b).") (discussing costs on appeal).


Dated: July 2, 2015                          Respectfully,

                                              /s/ Dan Booth
                                             Dan Booth (admitted *pro hac vice*)
                                             dbooth@boothsweet.com

                                             Jason E. Sweet (admitted *pro hac vice*)
                                             jsweet@boothsweet.com

                                             BOOTH SWEET LLP
                                             32R Essex Street
                                             Cambridge, MA 02139
                                             Tel.: (617) 250-8602
                                             Fax: (617) 250-8883

                                             *Counsel for Defendant Anthony Smith*

AA-050

**CERTIFICATION PURSUANT TO LOCAL RULE 7.1(b)**

I hereby certify that on this 2nd day of July, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record and provide service upon each.

       /s/ Dan Booth          
Dan Booth

AA-051

# Booth Sweet LLP

32R Essex Street • Cambridge, MA 02139
**Phone:** 617.250.8602 | **Fax:** 617.250.8883

| | INVOICE |
|---|---|

| *Lightspeed Media Corp. v. Smith*, No. 3:12-cv-889 (S.D. Ill.) | **Invoice Date** | July 2, 2015 |
|---|---|---|
| Fees and costs accrued pursuing discovery | **Invoice Number** | 7022015 |
| | **Invoice Amount** | $94.343.51 |

| | | | | Attorney's Fees |
|---|---|---|---|---|
| 1/17/2014 | Draft Schedule A to subpoenas; prepare and send subpoenas to potential financial institutions | J.S. | 5.4 | $2,208.60 |
| 1/21/2014 | Draft interrogatories and requests for production; prepare and send discovery requests & 1/17/2014 subpoenas to Steele, Hansmeier & Duffy | J.S. | 5.8 | $2,372.20 |
| 1/23/2014 | Confer with JP Morgan Chase re: requesting 30 day extension | J.S. | 0.1 | $40.90 |
| 1/24/2014 | Draft and send subpoena requests to BluePay | J.S. | 0.3 | $122.70 |
| 1/30/2014 | Review Prenda's motion to quash [#116] Smith's 1/17/2014 subpoenas | D.B. | 0.2 | $81.80 |
| 1/30/2014 | Review correspondence and responsive documents from Pearl Insurance | J.S. | 1.9 | $777.10 |
| 2/6/2014 | Confer with FDIC re: subpoena to IndyMac; IndyMac in FDIC receivership | J.S. | 0.1 | $40.90 |
| 2/12/2014 | Research and draft opposition to Prenda's motion to quash [#116] | J.S. | 4.2 | $1,717.80 |
| 2/13/2014 | Research and draft opposition to Prenda's motion to quash [#116] | D.B. | 1.5 | $613.50 |
| 2/14/2014 | Confer with ISP co-counsel re: opposition to Prenda's motion to quash [#116] | J.S. | 0.5 | $204.50 |

AA-052

| 2/14/2014 | Draft opposition to motion to quash; including legal research and conferring with co-counsel | D.B. | 2.9 | $1,186.10 |
| 2/16/2014 | Finalize and file opposition to Prenda's motion to quash [#116] | D.B. | 0.9 | $368.10 |
| 2/19/2014 | Review order [#125] denying Prenda's motion to quash [#116]; provide copy of order to subpoenaed banks | J.S. | 0.9 | $368.10 |
| 2/20/2014 | Review correspondence and responsive documents from BluePay | J.S. | 0.8 | $327.20 |
| 2/20/2014 | Confer with CitiBank re: internal subpoena procedure for credit card statements; provide password for responsive documents now that motion to quash[#116] denied | J.S. | 0.2 | $81.80 |
| 2/21/2014 | Review responsive documents from CitiBank | J.S. | 6.8 | $2,781.20 |
| 2/24/2014 | Edit Schedule A to subpoenas; prepare and send subpoenas | J.S. | 0.6 | $245.40 |
| 2/25/2014 | Confer with BluePay re: "trade references" in responsive documents | J.S. | 0.3 | $122.70 |
| 2/25/2014 | Edit Schedule A to subpoenas; prepare and send subpoenas | J.S. | 0.4 | $163.60 |
| 2/25/2014 | Confer with ISP co-counsel regarding Steele's request for consent to motion for protective order | D.B. | 0.6 | $245.40 |
| 2/26/2014 | Review correspondence and responsive documents from DaVinci | J.S. | 0.5 | $204.50 |
| 2/26/2014 | Review correspondence and responsive documents from Epoch | J.S. | 0.1 | $40.90 |
| 2/26/2014 | Confer with ISP co-counsel regarding Steele's phone calls to ISPs re: request for consent to motion for protective order | J.S. | 0.5 | $204.50 |
| 2/26/2014 | Edit Schedule A to subpoenas; prepare and send subpoenas | J.S. | 0.2 | $81.80 |
| 2/26/2014 | Correspondence with Steele & Hansmeier wherein they deny receiving 1/17 discovery requests | J.S. | 0.5 | $204.50 |

AA-053

| 2/26/2014 | Draft list of email addresses, phone numbers and domain names identified in responsive documents | J.S. | 0.7 | $286.30 |
| 2/27/2014 | Correspond with CounterMail re: subpoena request | J.S. | 0.2 | $81.80 |
| 2/27/2014 | Review correspondence and responsive documents from CCBill | J.S. | 0.3 | $122.70 |
| 2/27/2014 | Edit Schedule A to subpoenas; prepare and send subpoenas | J.S. | 0.8 | $327.20 |
| 2/27/2014 | Correspondence with Prenda attorneys; all three deny receiving 1/17 discovery requests; Steele claims to have emails from ISPs consenting to protective order | D.B. | 0.4 | $163.60 |
| 2/28/2014 | Confer with TMobile re: subpoena request | J.S. | 0.1 | $40.90 |
| 3/3/2014 | Confer with ISP co-counsel regarding discovery requests | D.B. | 0.1 | $40.90 |
| 3/3/2014 | Review correspondence and responsive documents from Gamma Entertainment | J.S. | 0.3 | $122.70 |
| 3/3/2014 | Edit Schedule A to subpoenas; prepare and send subpoenas | J.S. | 0.2 | $81.80 |
| 3/3/2014 | Confer with Bank of America re: extension of time to respond to subpoena requests | J.S. | 0.3 | $122.70 |
| 3/4/2014 | Review responsive documents from Bank of America | J.S. | 0.5 | $204.50 |
| 3/4/2014 | Confer with ISP co-counsel regarding Prenda's in-camera filing | D.B. | 0.1 | $40.90 |
| 3/4/2014 | Correspond with GoDaddy re: subpoena requests | J.S. | 0.3 | $122.70 |
| 3/4/2014 | Edit Schedule A to subpoenas; prepare and send subpoenas | J.S. | 0.2 | $81.80 |
| 3/5/2014 | Confer with ISP co-counsel regarding filing supplemental financial information | D.B. | 0.2 | $81.80 |

AA-054

| 3/6/2014 | Review correspondence and responsive documents from Regus | J.S. | 0.3 | $122.70 |
|---|---|---|---|---|
| 3/7/2014 | Confer with JP Morgan re: status. Informed of Duffy's interference | J.S. | 0.2 | $81.80 |
| 3/7/2014 | Edit Schedule A to subpoenas; prepare and send subpoenas | J.S. | 0.3 | $122.70 |
| 3/7/2014 | Draft and send second request for discovery to Prenda principals | J.S. | 0.6 | $245.40 |
| 3/7/2014 | Confer with GoDaddy re: extension of time to respond to subpoena requests | J.S. | 0.1 | $40.90 |
| 3/7/2014 | Review correspondence and responsive documents from Regus | J.S. | 0.3 | $122.70 |
| 3/7/2014 | Correspondence with Prenda attorneys re: status of discovery requests | J.S. | 0.1 | $40.90 |
| 3/10/2014 | Confer with Wells Fargo re: extension of time to respond to subpoena requests | J.S. | 0.2 | $81.80 |
| 3/10/2014 | Review responsive documents from Fifth Third Bank | J.S. | 6.2 | $2,535.80 |
| 3/11/2014 | Edit Schedule A to subpoenas; prepare and send subpoenas | J.S. | 0.6 | $245.40 |
| 3/11/2014 | Confer with 2CO re: subpoena requests | J.S. | 0.1 | $40.90 |
| 3/11/2014 | Fact research: Brett Gibbs disclosures regarding financial records of Prenda | D.B. | 0.3 | $122.70 |
| 3/7/2014 | Review correspondence and responsive documents from Fifth Third Bank | J.S. | 4.0 | $1,636.00 |
| 3/12/2014 | Confer with JPMorgan re: subpoena requests | J.S. | 0.1 | $40.90 |
| 3/12/2014 | Review correspondence and responsive documents from Wells Fargo | J.S. | 0.8 | $327.20 |
| 3/13/2014 | Confer with Google re: subpoena objections | J.S. | 0.2 | $81.80 |

AA-055

| 3/13/2014 | Review correspondence and responsive documents from JPMorgan | J.S. | 5.8 | $2,372.20 |
| 3/14/2014 | Review correspondence and responsive documents from JPMorgan | J.S. | 6.6 | $2,699.40 |
| 3/14/2014 | Confer with Sweet re: Prenda's denying service of subpoenas | D.B. | 0.1 | $40.90 |
| 3/15/2014 | Correspond with CounterMail re: subpoena request | J.S. | 0.2 | $81.80 |
| 3/15/2014 | Research money laundering via CHIPS | J.S. | 0.5 | $204.50 |
| 3/15/2014 | Research SoverignMan | J.S. | 1.0 | $409.00 |
| 3/15/2014 | Research off-shore entities and banking | J.S. | 2.0 | $81.80 |
| 3/15/2014 | Research Latvia/SoverignMan | J.S. | 1.2 | $490.80 |
| 3/17/2014 | Prepare and send copies of subpoenas to Steele, Hansmeier and Duffy for T-Mobile; American Express; Mastercard; GoDaddy; TransFirst; Hotmail; Google; andTwitter | J.S. | 0.3 | $122.70 |
| 3/17/2014 | Legal research re: Hansmeier asserting right to prior notice of third-party subpoenas | D.B. | 0.9 | 286.30 |
| 3/18/2014 | Edit Schedule A to subpoenas; prepare and send subpoenas | J.S. | 0.9 | $368.10 |
| 3/18/2014 | Email Hansmeier notice of subpoenas | J.S. | 0.4 | $163.60 |
| 3/18/2014 | Review correspondence and responsive documents from Citibank | J.S. | 1.0 | $409.00 |
| 3/19/2014 | Email Steele notice of subpoenas | J.S. | 0.3 | $122.70 |
| 3/19/2014 | Review correspondence and responsive documents from TCF Bank | J.S. | 8.3 | $3,394.70 |
| 3/26/2014 | Confer with MasterCard re: subpoena request | J.S. | 0.1 | $40.90 |

AA-056

| 3/26/2014 | Edit Schedule A to subpoenas; prepare and resend 3/11 subpoenas | J.S. | 0.7 | $286.30 |
|---|---|---|---|---|
| 3/26/2014 | Send copies of subpoenas to Prenda principals | J.S. | 0.6 | $245.40 |
| 3/26/2014 | Correspond with Bank of America re: incomplete document production | J.S. | 0.1 | $40.90 |
| 3/27/2014 | Confer with Bank of America re: extension of time to respond to subpoena requests | J.S. | 0.2 | $81.80 |
| 3/27/2014 | Confer with GoDaddy re: extension of time to respond to subpoena requests | J.S. | 0.1 | $40.90 |
| 4/10/2014 | Review correspondence and responsive documents from Pearl Insurance | J.S. | 1.0 | $409.00 |
| 4/11/2014 | Correspond with Steele re: interference with discovery | J.S. | 0.3 | $122.70 |
| 4/11/2014 | Confer with Sweet regarding Steele interference with discovery | D.B. | 0.2 | $81.80 |
| 4/13/2014 | Research and draft motion for discovery sanctions | J.S. | 3.2 | $1,308.80 |
| 4/14/2014 | Legal research regarding interference with discovery requests | D.B. | 0.8 | $327.20 |
| 4/14/2014 | Confer with Booth re: motion for discovery sanctions | J.S. | 0.3 | $122.70 |
| 4/15/2014 | Research and draft motion for discovery sanctions | J.S. | 2.1 | $858.90 |
| 4/16/2014 | Review GoDaddy documents | J.S. | 0.3 | $122.70 |
| 4/16/2014 | Confer TMobile re: lack of responsive documents | J.S. | 0.2 | $81.80 |
| 4/17/2014 | Research and draft motion for discovery sanctions | J.S. | 4.2 | $1,717.80 |

AA-057

| 4/18/2014 | Confer with Sweet re: 1) Hansmeier email denying service of second round of subpoenas; and 2) motion for sanctions for interference with discovery | D.B. | 0.3 | $122.70 |
|---|---|---|---|---|
| 4/18/2014 | Edit and file motion for discovery sanctions [#153] | J.S. | 0.4 | $163.60 |
| 4/18/2014 | Correspond with Hansmeier re: discovery sanctions motion | J.S. | 0.1 | $40.90 |
| 4/19/2014 | Research and draft opposition to motion to quash [#157] | J.S. | 2.3 | $940.70 |
| 4/20/2014 | Research and draft opposition to motion to quash [#157] | J.S. | 3.9 | $1,595.10 |
| 4/21/2014 | Confer Wachovia re: lack of responsive documents | J.S. | 0.1 | $40.90 |
| 4/22/2014 | Review Prenda's motion for sanctions and to quash [#157] | D.B. | 0.9 | $368.10 |
| 4/22/2014 | Draft opposition to Prenda's motion to quash [#157] | D.B. | 4.8 | $1,963.20 |
| 4/22/2014 | Draft opposition to Prenda's motion for sanctions and to quash [#157] | J.S. | 0.5 | $204.50 |
| 4/23/2014 | Draft and file supplement [#158] to discovery sanctions motion [#153] | J.S. | 0.6 | $245.40 |
| 4/23/2014 | Confer with Sabadell Bank re: Steele's interference | J.S. | 0.4 | $163.60 |
| 4/23/2014 | Draft opposition to Prenda's motion to quash [#157] | D.B. | 4.3 | $1,758.70 |
| 4/24/2014 | Edit Schedule A to subpoena; prepare and send subpoena | J.S. | 0.6 | $245.40 |
| 4/24/2014 | Confer with GMS Group re: Steele's interference | J.S. | 0.4 | $163.60 |
| 4/25/2014 | Draft opposition to Prenda's motion to quash [#157] | J.S. | 2.4 | $981.60 |

AA-058

| 4/29/2014 | Confer with Pershing re: pswd; review responsive documents | J.S. | 1.2 | $490.80 |
| 4/30/2014 | Confer with Prebish re: authenticity of letter and distribution of assets | J.S. | 0.2 | $40.90 |
| 5/2/2014 | Review Hansmeier's opposition [#159] to discovery sanctions [#153] | J.S. | 0.5 | $204.50 |
| 5/2/2014 | Review Steele's opposition [#160] to discovery sanctions [#153] | J.S. | 0.3 | $122.70 |
| 5/4/2014 | Research and draft opposition to motion to quash [#116] | J.S. | 4.1 | $1,676.90 |
| 5/5/2014 | Review Duffy's opposition [#162] to discovery sanctions [#153] | J.S. | 0.1 | $40.90 |
| 5/5/2014 | Review oppositions to motion for discovery sanctions [#153] | D.B. | 0.8 | $327.20 |
| 5/6/2014 | Correspond with Hansmeier re: discovery requests | J.S. | 0.2 | $81.80 |
| 5/6/2014 | Confer with Sweet re: inadvertent disclosures and Hansmeier's email | D.B. | 0.4 | $163.60 |
| 5/6/2014 | Edit and file Smith's opposition [#163/165] to Prenda's motion to quash [#157] | J.S. | 0.3 | $122.70 |
| 5/7/2014 | Review Prenda's reply [#166] to Smith's opposition to quash [#163/165] | J.S. | 0.4 | $163.60 |
| 5/7/2014 | Confer with Sweet re: Hansmeier and Steele emails regarding inadvertent disclosure | D.B. | 0.4 | $163.60 |
| 5/7/2014 | Correspond with Steele, Hansmeier, and Duffy regarding inadvertent disclosure in #163 | D.B. | 0.5 | $204.50 |
| 5/7/2014 | Legal research regarding Rule 5.2(a)/ inadvertent disclosures | D.B. | 0.4 | $163.60 |
| 5/7/2014 | Review Hansmeier reply in support [#166] of his motion to quash | D.B. | 0.4 | $163.60 |
| 5/9/2014 | Research and draft reply in support of discovery sanctions [#153] | J.S. | 5.3 | $2,167.70 |

AA-059

| 5/13/2014 | Review Prenda's motion for contempt [#169] re: [#163] | J.S. | 0.2 | $81.80 |
|---|---|---|---|---|
| 5/13/2014 | Research and draft reply in support of discovery sanctions [#153] | J.S. | 3.0 | $1,227.00 |
| 5/15/2014 | Confer with Pershing | J.S. | 0.1 | $40.90 |
| 5/15/2014 | Confer with GMS Group | J.S. | 0.4 | $163.60 |
| 5/15/2014 | Research and draft reply in support of discovery sanctions [#153] | J.S. | 4.1 | $1,676.90 |
| 5/16/2014 | Edit and file reply [#172] in support of discovery sanctions [#153] | J.S. | 0.5 | $204.50 |
| 5/16/2014 | Research and draft opposition to motion for contempt [#169] | J.S. | 2.2 | $899.80 |
| 5/19/2014 | Review Prenda's motion to strike [#173] Smith's motion for discovery sanctions [#153] | J.S. | 0.3 | $122.70 |
| 5/19/2014 | Research and draft opposition to motion for contempt [#169] | J.S. | 3.5 | $1,431.50 |
| 5/20/2014 | Research and draft opposition to motion for contempt [#169] | J.S. | 6.1 | $2,494.90 |
| 5/20/2014 | Review and edit draft of opposition to Prenda's motion for contempt [#169] | J.S. | 0.5 | $204.50 |
| 5/20/2014 | Review Prenda's motion to strike [#175] Smith's motion for discovery sanctions [#153] | J.S. | 0.3 | $122.70 |
| 5/21/2014 | Edit and file Smith's opposition [#176] to Prenda's motion for contempt [#169] | J.S. | 0.6 | $245.40 |
| 5/23/2014 | Correspond with Steele, Hansmeier, and Duffy regarding deficiencies in responding to discovery requests | D.B. | 0.2 | $81.80 |
| 5/24/2014 | Review Prenda's reply [#178] in support of its motion for contempt [#169] | J.S. | 0.2 | $81.80 |
| 5/27/2014 | Research and draft Smith's opposition [#179] to Prenda's motion to strike [#175] | J.S. | 3.7 | $1,513.30 |

AA-060

| 5/29/2014 | Research and draft Smith's opposition [#179] to Prenda's motion to strike [#175] | J.S. | 4.2 | $1,717.80 |
|---|---|---|---|---|
| 5/30/2014 | Edit and file Smith's opposition [#179] to Prenda's motion to strike [#175] | J.S. | 0.4 | $163.60 |
| 10/20/2014 | Review order [#184-86] denying motions to quash [#157], strike [#172] and contempt [#169] | D.B. | 0.2 | $81.80 |
| 10/27/2014 | Confer with Sabadell Bank re: order denying motion to quash | J.S. | 0.2 | $81.80 |
| 10/28/2014 | Confer with Sabadell Bank re: subpoena compliance and Steele's interference | J.S. | 0.4 | $163.60 |
| 10/28/2014 | Confer with Sabadell Bank re: subpoena compliance | J.S. | 0.4 | $163.60 |
| 11/10/2014 | Research Florida corporations and registry of deeds re: Samana LLC, owner of Steele's home | J.S. | 0.9 | $368.10 |
| 11/10/2014 | Prepare documents and materials for oral argument | J.S. | 0.4 | $163.60 |
| 11/10/2014 | Review motions for sanctions and contempt; prepare for motion hearing | D.B. | 1.5 | $613.50 |
| 11/11/2014 | Flight to St. Louis for motion hearing | J.S. | 5.0 | $2,045.00 |
| 11/11/2014 | Flight to St. Louis for motion hearing | D.B. | 5.0 | $2,045.00 |
| 11/12/2014 | Confer with Booth; review facts of Prenda attorneys' financial holdings and discovery interferences | J.S. | 1.0 | $409.00 |
| 11/12/2014 | Confer with Sweet; review facts of Prenda attorneys' financial holdings and discovery interferences; prepare for motion hearing | D.B. | 1.2 | $490.80 |
| 11/12/2014 | Attend motion hearing | J.S. | 1.0 | $409.00 |
| 11/12/2014 | Attend motion hearing | D.B. | 1.0 | $409.00 |
| 11/13/2014 | Return flight to Boston after motion hearing | J.S. | 4.5 | $1,840.50 |

AA-061

| 11/13/2014 | Return flight to Boston after motion hearing | D.B. | 4.5 | $1,840.50 |
| 11/14/2014 | Review correspondence and responsive documents from Sabadell Bank | J.S. | 1.0 | $409.00 |
| 11/18/2014 | Review order [#188] denying motion for discovery sanctions [#153] | J.S. | 0.3 | $122.70 |
| 11/18/2014 | Review order [#188] denying motion for discovery sanctions [#153] | D.B. | 0.3 | $122.70 |
| 12/3/2014 | Confer with GMS Group re: Steele's interference | J.S. | 0.3 | $122.70 |
| 12/3/2014 | Research and draft motion for reconsideration | J.S. | 2.0 | $818.00 |
| 12/4/2014 | Confer with JPMorgan and its counsel re: Duffy and Steele's interference | J.S. | 0.3 | $122.70 |
| 12/11/2014 | Research and draft motion for reconsideration | J.S. | 4.3 | $1,758.70 |
| 12/11/2014 | Draft and send subpoena for JPMorgan notes for conversations with Steele and Duffy | J.S. | 0.4 | $163.60 |
| 12/11/2014 | Confer with GMS Group re: Steele's interference | J.S. | 0.4 | $163.60 |
| 12/11/2014 | Confer with JPMorgan re: Duffy and Steele's interference | J.S. | 0.4 | $163.60 |
| 12/15/2014 | Confer with JPMorgan and its counsel  re: Duffy and Steele's interference | J.S. | 0.3 | $122.70 |
| 12/15/2014 | Edit and file Smith's motion for reconsideration [#189] | J.S. | 0.2 | $81.80 |
| 12/29/2014 | Review Hansmeier's opposition [#191] to Smith's motion for reconsideration [#189] | J.S. | 0.5 | $204.50 |
| 12/29/2014 | Review Steele's opposition [#192] to Smith's motion for reconsideration [#189] | J.S. | 0.3 | $122.70 |
| 1/13/2015 | Review Duffy's opposition [#193] to Smith's motion for reconsideration [#189] | J.S. | 0.1 | $40.90 |

AA-062

| 1/22/2015 | Draft and file supplement [#194] to motion for reconsideration [#189] | J.S. | 0.8 | $327.20 |
|---|---|---|---|---|
| 1/28/2015 | Confer with TCF Bank re: incomplete discovery responses. Failed to provide Monyet documents | J.S. | 0.2 | $81.80 |
| 1/30/2015 | Review correspondence and responsive documents from JPMorgan | J.S. | 0.4 | $163.60 |
| 2/4/2015 | Research Monyet history and transactions | J.S. | 1.3 | $531.70 |
| 2/4/2015 | Confer with Scottrade re: subpoena procedure | J.S. | 0.1 | $40.90 |
| 2/6/2015 | Edit Schedule A to subpoena; prepare and send subpoena | J.S. | 0.3 | $122.70 |
| 2/13/2015 | Draft and file supplement [#195] to motion for reconsideration [#189] | J.S. | 0.4 | $163.60 |
| 2/13/2015 | Review Steele's opposition [#196] to Smith's supplement [#195] | J.S. | 0.1 | $40.90 |
| 2/19/2015 | Correspondence from Steele | J.S. | 0.1 | $40.90 |
| 2/19/2015 | Review correspondence and responsive documents from Scottrade | J.S. | 0.9 | $368.10 |
| 2/25/2015 | Confer with law firm brokering sale of Steele's home | J.S. | 0.4 | $163.60 |
| 2/25/2015 | Confer with law firm that set up Monyet | J.S. | 0.4 | $163.60 |
| 2/25/2015 | Review for and list relevant Scottrade transactions; draft supplement to motion for reconsideration [#189] | J.S. | 0.5 | $204.50 |
| 2/26/2015 | Confer with law firm brokering sale of Steele's home | J.S. | 0.1 | $40.90 |
| 2/26/2015 | Draft and file supplement [#197] to motion for reconsideration [#189] | J.S. | 0.2 | $81.80 |
| 2/27/2015 | Review Hansmeier's opposition [#198] to Smith's supplement [#197] | J.S. | 0.1 | $40.90 |

AA-063

| 4/15/2015 | Confer with TCF Bank re: incomplete discovery responses. Failed to provide additional documents | J.S. | 0.2 | $81.80 |
|---|---|---|---|---|
| 6/5/2015 | Review order [#199] granting motion for reconsideration [#189] and ordering sanctions for obstructing discovery | J.S. | 0.4 | $163.60 |
| 6/5/2015 | Review order [#199] granting motion for reconsideration [#189] and ordering sanctions for obstructing discovery | D.B. | 0.4 | $163.60 |
| 6/25/2015 | Confer with Booth re: itemization | J.S. | 0.4 | $163.60 |
| 6/25/2015 | Confer with Sweet re: itemization | D.B. | 0.4 | $163.60 |
| 6/26/2015 | Prepare invoice for itemization; review and confirm amounts | J.S. | 1.3 | $531.70 |
| 6/29/2015 | Draft itemization of additional expenses | D.B. | 5.2 | $2,126.80 |
| 6/30/2015 | Draft itemization of additional expenses | D.B. | 5.6 | $2,290.40 |
| 6/30/2015 | Review invoice for itemization and confirm amounts | D.B. | 0.2 | $81.80 |
| 7/2/2015 | Prepare affidavit for itemization | J.S. | 0.4 | $163.60 |
| 7/2/2015 | Prepare affidavit for itemization; file itemization, invoice, and affidavits | D.B. | 0.5 | $204.50 |
| **SUBTOTAL** | | | | **$91,738.70** |

| Third-Party Discovery Costs | |
|---|---|
| TransUnion | $164.00 |
| Bank of America | $124.50 |
| Fifth Third Bank | $189.41 |
| CitiBank | $203.84 |

AA-064

| | |
|---|---|
| TCF Bank | $90.50 |
| JPMorgan | $708.13 |
| Delaware Secretary of State | $10.00 |
| GoDaddy | $6.20 |
| WellsFargo | $250.66 |
| Sabadell Bank | $81.60 |
| Scottrade | $175.00 |
| **SUBTOTAL** | **$2,003.84** |

| | | Postage |
|---|---|---|
| 1/21/2014 | Subpoenas & discovery requests to Prenda principals | $32.28 |
| 3/7/2014 | Second round of discovery requests to Prenda principals | $23.46 |
| 3/26/2014 | Subpoenas to Prenda principals | $57.13 |
| 2/6/2015 | Subpoena to Scottrade (overnight) | $24.99 |
| **SUBTOTAL** | | **$137.86** |

| | | Expenses for November 12 , 2014 Hearing |
|---|---|---|
| 11/11-11/13 | Flight (round-trip), car rental, and hotel | $725.83 |
| 11/11-11/13 | Additional baggage fees | $50.00 |
| 11/11-11/13 | Dining expenses | $150.40 |
| **SUBTOTAL** | | **$926.23** |
| Adjusted subtotal (less 50%) | | **$463.11** |

AA-065

| Invoice Summary | |
|---|---:|
| Attorney's Fees | $91,738.70 |
| Third-Party Discovery Costs | $2,003.84 |
| Postage | $137.86 |
| Expenses for November 12, 2014 Hearing | $463.11 |
| TOTAL | $94.343.51 |
| PREVIOUS BALANCE DUE | $0.00 |
| CURRENT BALANCE DUE AND OWING | $94.343.51 |

AA-066

**From:** "jsweet@boothsweet.com" <jsweet@boothsweet.com>
**Subject:** **Fwd: Package Confirmation | St Louis Tue, Nov 11, 2014**
**Date:** November 10, 2014 10:53:06 AM EST
**To:** Dan Booth <dbooth@boothsweet.com>, Dan Booth <danbooth@earthlink.net>
**Cc:** Dan Booth <dbooth@boothsweet.com>, Dan Booth <danbooth@earthlink.net>
▶    1 Attachment, 13.2 KB

Begin forwarded message:

**From:** Orbitz <travelercare@orbitz.com>
**Date:** October 3, 2014 4:06:11 PM EDT
**To:** <jsweet@boothsweet.com>
**Subject:** **Package Confirmation | St Louis Tue, Nov 11, 2014**



**Orbitz record locator PBORB-450-092-3044**

**Package Confirmation | St Louis Tue, Nov 11, 2014**

You can always view your itinerary online for the most up-to-date information.

| Airline | Record locator |
|---|---|
| United Airlines | CQRV6C |

### Traveler information

Traveler names, loyalty programs, and ticket type

**Flight traveler information**

| Traveler 1 | **JASON E SWEET** |
|---|---|
| Airline Ticket Number: | 0167429111032 Electronic |
| Primary phone number: | 6176204762 |
| Seat preference: | Any Seat |
| Meal (if available): | Standard |
| Requests for disabled travelers: | Notice to airline of the ticket number |

| Traveler 2 | **DANIEL G BOOTH** |
|---|---|
| Airline Ticket Number: | 0167429111033 Electronic |
| Seat preference: | Any Seat |
| Meal (if available): | Standard |
| Requests for disabled travelers: | Notice to airline of the ticket number |

| Hotel reservations under: | Jason Sweet |
|---|---|

**Car registration information**
Car reservation under:    **JASON SWEET**

When you pick up your car, you must have a valid credit card in the driver's name.

### Air + Hotel + Car

### Cost and Billing Summary

This booking is subject to our Privacy Policy and our Terms and Conditions

**Trip cost**

**Flight + Hotel + Car Package**

Airline ticket(s): 2
Hotel night(s): 2
Rooms: 1
Car rental days: 2

**Booked together**                    **$725.83**

**Total due at booking**          **$725.83**
Includes taxes and fees

**Please Note:** You will see separate charges for this purchase totaling the purchase amount.

Additional baggage fees may apply.

This reservation was made on Fri, Oct 3, 2014 3:01 PM CDT .

### Billing information

**Card holder's name:**
Jason E. Sweet

**Card type:**
MasterCard

**Card number:**
************9329

AA-067

**Orbitz record locator PBORB-450-092-3044**

To make changes to your trip, go to [Trip details](#) | [Terms and conditions](#)

**Billing Address:**
32R Essex Street
Cambridge, MA 02139
US

## Flight itinerary

**Orbitz record locator: PBORB-450-092-3044**

[Flight terms and conditions](#)

| Leave | Tue, Nov 11 | | 4hr 57min Total time |
|---|---|---|---|
| Depart | **Boston, Massachusetts** |  | United Airlines 5587 |
| 10:05 AM | Boston Logan Airport (BOS) \| Terminal B | | Economy \| Embraer 175 |
| Stop 1 | Chicago, Illinois | | 862 mi \| 2hr 55min |
| **12:00 PM** | O'Hare Airport (ORD) \| Terminal 2 | | |

Seats: 16-D , 21-C | Seats are confirmed. | Meal: Food and drinks for purchase

Flight 5587 Operated by /SKYWEST DBA UNITED EXPRESS

Change planes. Time between flights: 0hr 46min

| Depart | **Chicago, Illinois** |  | United Airlines 5251 |
|---|---|---|---|
| 12:46 PM | O'Hare Airport (ORD) \| Terminal 1 | | Economy \| Embraer 175 |
| Arrive | **St Louis, Missouri** | | 255 mi \| 1hr 16min |
| **2:02 PM** | St Louis Airport (STL) \| Terminal 1 | | |

Seats: 15-C , 16-D | Seats are confirmed.

Flight 5251 Operated by /SKYWEST DBA UNITED EXPRESS

| Return | Thu, Nov 13 | | 4hr 29min Total time |
|---|---|---|---|
| Depart | **St Louis, Missouri** |  | United Airlines 3642 |
| 7:56 AM | St Louis Airport (STL) \| Terminal 1 | | Economy \| CRJ 700 |
| Stop 1 | Chicago, Illinois | | 255 mi \| 1hr 24min |
| **9:20 AM** | O'Hare Airport (ORD) \| Terminal 2 | | |

Seats: 16-C , 12-D | Seats are confirmed.

Flight 3642 Operated by /GOJET AIRLINES DBA UNITED EXPRESS

Change planes. Time between flights: 0hr 50min

| Depart | **Chicago, Illinois** | | United Airlines 1547 |
|---|---|---|---|
| 10:10 AM | O'Hare Airport (ORD) \| Terminal 1 | | Economy \| Boeing 737 |
| Arrive | **Boston, Massachusetts** | | 862 mi \| 2hr 15min |
| **1:25 PM** | Boston Logan Airport (BOS) \| Terminal B | | |

Meal: Food and drinks for purchase

### Trip Policies

**Payment**
Your credit card will be charged the Orbitz package price indicated at the time of booking. You may see separate charges on your credit card statement - one from Orbitz and one from the supplier you selected.

**Cancellation**
Cancellations of your Orbitz Package will incur a cancellation fee. The amount of the fee will depend on when you cancel. You may only cancel your entire Orbitz Package and not any individual component. See our booking terms and conditions for more details or call our Customer Service Team at 1-888-656-4546.

**Change**
Changes to your Orbitz Package after the time of booking will incur both change fees and any additional amount attributable to any increase in price of your Orbitz Package that result from the changes. Changes are subject to availability and to restrictions and limitations imposed by airlines, hotels, and other travel providers. Some airline tickets cannot be changed. See our booking terms and conditions for more details or call our Customer Service Team at 1-888-656-4546.

### Flight Status Updates

The following alerts have been setup for this trip.

**Jason Sweet**
[jsweet@boothsweet.com](mailto:jsweet@boothsweet.com)
Receiving:Departure Alerts

For flights departing early in the morning, you may receive trip notifications in the middle of the night.

*add alerts for [6] more people*

[Manage alerts](#) | [Learn more](#)

AA-068

Security update: Airports and airlines now require that you obtain a boarding pass before entering the security checkpoint. Review the latest airport security rules.

## Hotel Information

**Orbitz record locator PBORB-450-092-3044**

### Hotel

**Red Roof PLUS St Louis Forest Park/Hampton Avenue** hotel details | map
**Hotel confirmation number:** 67MWUS

5823 Wilson Ave, 5823 Wilson Ave, Saint Louis, MO 63110 US
**Phone:** +1 (314) 645-0101 | **Fax:** +1 (314) 645-0119

### Date and time:

**Check-in:** Tue, Nov 11, 2014 | **Check-out:** Thu, Nov 13, 2014
**Hotel check-in/check-out:** 03:00 PM 11:00 AM

### Reservation

**Room(s): 1 | Guest(s) 2 | Night(s): 2**

### Jason Sweet must check in to this room.

**Guest(s) 2 | Night(s): 2**
**Room description:** 2 Full beds smoke-free with free wifi and flat screen tv
**Special requests:** Non-smoking

*Special requests are sent to the hotel but cannot be guaranteed.Orbitz recommends that you contact the hotel directly to ensure your request can be accommodated.

## Car information

**Orbitz record locator PBORB-450-092-3044**

**PRINT THIS ENTIRE PAGE.** This confirmation will serve as your **CAR VOUCHER.** You will need to present it, in its entirety, at pick-up as **PROOF OF PURCHASE.**

### Rental:



**Budget Economy Car**
Budget Booking Reference: 49426126US1

Hyundai Accent or similar
    Automatic
    Air conditioning

**Passenger(s):** 5

**Luggage:** 2

AA-069

**Pick-up:**
**Tue, Nov 11, 2014 | 2:32 PM | St Louis Airport (STL) | In terminal**
**Phone:** 314-423-7497
Shuttle information
**Arriving on flight:** United Airlines 5251

**Drop-off:**
**Thu, Nov 13, 2014 | 6:56 AM | St Louis Airport (STL) | In terminal**
(Same as pick-up location)

For a complete list of rental rules for this agency, visit the My Trips section of the website and click on car rental rules.

### Activities Information

 **Add activities in St Louis**

Lastly, please remember that your itineraries are always available in My Trips. If you have any questions, please visit Orbitz Customer Service.

Again, thank you for choosing Orbitz.

Enjoy your trip!

The Orbitz Travel Team

**Please do not respond directly to this e-mail. Contact us here

Orbitz

500 W. Madison St., Suite 1000

Chicago, IL 60661

Jason Sweet
Booth Sweet LLP
32R Essex Street
Cambridge, MA 02139
T: (617) 250-8619
F: (617) 250-8883
www.boothsweet.com
www.facebook.com/BoothSweet

This e-mail is from the law firm Booth Sweet LLP, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and any attachments.

BOOTH SWEET LLP

AA-070

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

———————————————————————————

| | | |
|---|---|---|
| LIGHTSPEED MEDIA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:12-cv-889-DRH-SCW |
| | ) | |
| v. | ) | |
| | ) | |
| ANTHONY SMITH, SBC INTERNET SERVICES, | ) | |
| INC., d/b/a AT&T INTERNET SERVICES; AT&T | ) | |
| CORPORATE REPRESENTATIVE #1; COMCAST | ) | |
| CABLE COMMUNICATIONS, LLC, and | ) | |
| COMCAST CORPORATE REPRESENTATIVE #1, | ) | |
| | ) | |
| Defendants. | ) | |

———————————————————————————

**AFFIDAVIT OF JASON E. SWEET IN SUPPORT OF DEFENDANT ANTHONY
SMITH'S ITEMIZATION OF ADDITIONAL EXPENSES INCURRED IN
CONDUCTING THIRD PARTY DISCOVERY, INCLUDING COSTS AND
ATTORNEY'S FEES**

I, Jason E. Sweet, do hereby swear and say as follows:

1. I am an attorney at law licensed to practice before the Courts of the State of Massachusetts
   and admitted *pro hac vice* before this Court, among others. I am a partner in the law firm of
   Booth Sweet LLP, attorneys for Defendant Anthony Smith ("Smith"). Unless otherwise
   stated, I have personal knowledge of the following facts and, if called and sworn as a
   witness, could and would competently testify thereto.

2. Attached as Exhibit A to Smith's Itemization of Additional Expenses is an invoice accurately
   reflecting work I performed in this case over the last eighteen months attributable to the
   discovery obstructions of Plaintiff's counsel John Steele and Paul Duffy, and accurately
   reflecting costs and expenses Smith incurred attributable to their discovery obstructions.

AA-071

3. My standard billing rate was $409.00 per hour when I began to work on this case. I have since worked at higher rates for other clients but have not sought higher rates in this case. The United States District Court for the District of Massachusetts determined that my $409.00 per hour rate was reasonable in *AF Holdings v. Chowdhury*, No. 1:12-cv-12105-JLT (D.Mass. Oct. 22, 2013). The Court has approved sanctions against Plaintiff's counsel at my $409.00 per hour rate, in an Order affirmed on appeal. Doc. 100, 183-2.

4. I devoted roughly 175 hours in this case over the last eighteen months on matters necessitated by Plaintiff's counsel's misrepresentations of their financial status and noncompliance with discovery requests, Ultimately all of that time was all attributable to John Steele and Paul Duffy's obstructions of third-party discovery, without which the time would have been obviated.

5. Attached as Exhibit B to Smith's Itemization of Additional Expenses is a true and correct copy of the Orbitz travel itinerary for my trip to St. Louis for the November 12, 2014 motion hearing. The itinerary reflects the prices of my flight, car rental, and hotel, as well as the nearly 5 hour flight time from Boston to St. Louis and the nearly 4.5 hour flight back.

6. The total amount of attorney's fees, costs and expenses incurred by my firm related to the aforementioned matters in this case is $94,343.51.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 2, 2015                    /s/ Jason E. Sweet
                                       Jason E. Sweet

AA-072

3

AA-073

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| LIGHTSPEED MEDIA CORPORATION, ) | |
| ) | |
| Plaintiff, ) | Case No. 3:12-cv-889-DRH-SCW |
| ) | |
| v. ) | |
| ) | |
| ANTHONY SMITH, SBC INTERNET SERVICES, ) | |
| INC., d/b/a AT&T INTERNET SERVICES; AT&T ) | |
| CORPORATE REPRESENTATIVE #1; COMCAST ) | |
| CABLE COMMUNICATIONS, LLC, and ) | |
| COMCAST CORPORATE REPRESENTATIVE #1, ) | |
| ) | |
| Defendants. ) | |

**AFFIDAVIT OF DANIEL G. BOOTH IN SUPPORT OF DEFENDANT ANTHONY
SMITH'S ITEMIZATION OF ADDITIONAL EXPENSES INCURRED IN
CONDUCTING THIRD PARTY DISCOVERY, INCLUDING COSTS AND
ATTORNEY'S FEES**

I, Daniel G. Booth, do hereby swear and say as follows:

1.  I am an attorney at law licensed to practice before the Courts of the State of Massachusetts
    and admitted *pro hac vice* before this Court, among others. I am a partner in the law firm of
    Booth Sweet LLP, attorneys for Defendant Anthony Smith ("Smith"). Unless otherwise
    stated, I have personal knowledge of the following facts and, if called and sworn as a
    witness, could and would competently testify thereto.

2.  Attached as Exhibit A to Smith's Itemization of Additional Expenses is an invoice accurately
    reflecting work I performed in this case over the last eighteen months attributable to the
    discovery obstructions of Plaintiff's counsel John Steele and Paul Duffy, and accurately
    reflecting costs and expenses Smith incurred attributable to their discovery obstructions.

AA-074

3.  My standard billing rate was $409.00 per hour when I began to work on this case. I have since worked at higher rates for other clients but have not sought higher rates in this case. The Court has approved sanctions against Plaintiff's counsel at my $409.00 per hour rate, in an Order affirmed on appeal. Doc. 100, 183-2.

4.  I devoted roughly 50 hours in this case over the last eighteen months on matters necessitated by Plaintiff's counsel's misrepresentations of their financial status and noncompliance with discovery requests, Ultimately all of that time was all attributable to John Steele and Paul Duffy's obstructions of third-party discovery, without which the time would have been obviated.

5.  Attached as Exhibit B to Smith's Itemization of Additional Expenses is a true and correct copy of the Orbitz travel itinerary for my trip to St. Louis for the November 12, 2014 motion hearing. The itinerary reflects the prices of my flight, car rental, and hotel, as well as the nearly 5 hour flight time from Boston to St. Louis and the nearly 4.5 hour flight back.

6.  The total amount of attorney's fees, costs and expenses incurred by my firm related to the aforementioned matters in this case is $94,343.51.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: July 2, 2015                      /s/ Daniel G. Booth

                                         Daniel G. Booth

AA-075

# EXHIBIT G

AA-076

IRS DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI OH 45999-0023

Date of this notice: 12-20-2010

Employer Identification Number:

Form: SS-4

Number of this notice: CP 575 G

MONYET LLC
LEE S MCCULLOUGH III SOLE MBR
5255 EDGEWOOD DR
PROVO, UT 84604

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.

WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

Thank you for applying for an Employer Identification Number (EIN). We assigned you
EIN            . This EIN will identify you, your business accounts, tax returns, and
documents, even if you have no employees. Please keep this notice in your permanent
records.

When filing tax documents, payments, and related correspondence, it is very important
that you use your EIN and complete name and address exactly as shown above. Any variation
may cause a delay in processing, result in incorrect information in your account, or even
cause you to be assigned more than one EIN. If the information is not correct as shown
above, please make the correction using the attached tear off stub and return it to us.

A limited liability company (LLC) may file Form 8832, *Entity Classification Election*,
and elect to be classified as an association taxable as a corporation. If the LLC is
eligible to be treated as a corporation that meets certain tests and it will be electing S
corporation status, it must timely file Form 2553, *Election by a Small Business
Corporation*. The LLC will be treated as a corporation as of the effective date of the S
corporation election and does not need to file Form 8832.

To obtain tax forms and publications, including those referenced in this notice,
visit our Web site at www.irs.gov. If you do not have access to the Internet, call
1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

IMPORTANT REMINDERS:

* Keep a copy of this notice in your permanent records. **This notice is issued only
  one time and the IRS will not be able to generate a duplicate copy for you.**

* Use this EIN and your name exactly as they appear at the top of this notice on all
  your federal tax forms.

* Refer to this EIN on your tax-related correspondence and documents.

If you have questions about your EIN, you can call us at the phone number or write to
us at the address shown at the top of this notice. If you write, please tear off the stub
at the bottom of this notice and send it along with your letter. If you do not need to
write us, do not complete and return the stub. Thank you for your cooperation.

AA-077

Case 3:12-cv-00889-DRH-SCW   Document 197-1   Filed 02/26/15   Page 3 of 3   Page ID #4443
Case: 15-2440   Document: 26   Filed: 10/29/2015   Pages: 151

3/4

Dec-16-2010 11:17 AM Lee S. McCullough, III, P.C.

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 12:23 PM 12/16/2010*
*FILED 12:23 PM 12/16/2010*
*RV 101197651 - 4914053 FILE*

## STATE *of* DELAWARE
## LIMITED LIABILITY COMPANY
## CERTIFICATE *of* FORMATION

First: The name of the limited liability company is _____
Monyet LLC _____

Second: The address of its registered office in the State of Delaware is _____

1201 Orange St., #600 _____ in the City of Wilmington ___ ,

Zip code 19899 _____ . The name of its Registered agent at such address is

InCorp Services, Inc. _____

Third: (Use this paragraph only if the company is to have a specific effective date of dissolution: "The latest date on which the limited liability company is to dissolve is _____ .")

Fourth: (Insert any other matters the members determine to include herein.)

In Witness Whereof, the undersigned have executed this Certificate of Formation this

16th ___ day of December ___ , 2010 .

By: _____
Authorized Person (s)

Name: Doug Jones ___

# EXHIBIT H

AA-079





# BUSINESS ACCOUNT APPLICATION AND AGREEMENT
## CHECKING ACCOUNTS AND SAVINGS ACCOUNTS
### WITH CHECK ACCESS

**TCF BANK**
Since 1923
*Open 7 Days.™*
your convenience bank™

| ACCOUNT NUMBER (the "Account"): | ACCOUNT TYPE: |
|---|---|
| | 1195 FREE SMALL BUSINESS CHECKING |

| DATE: 12/28/2010 | SALESPERSON: | OFFICER # (OPT.): |
|---|---|---|

**PRODUCT TYPE:**
☐ Premium Commercial  ☐ Small Business Money Market
☐ Premier Business  ☐ Corp. Prime Yield
☐ Free Small Business  ☐ Commercial  ☐ Free Community Group
☐ Business Checking w/Int. (a.k.a. Organizational NOW)  ☐ Select Business

**OWNERSHIP TYPE:**
☐ Partnership
☐ Sole Proprietor(s)
☐ Limited Liability Co. (LLC)
☐ Public Unit
☐ Corporation
☐ Limited Liability Partnership (LLP)  ☐ Pension/Profit Sharing
☐ Business-Related Trust
☐ Non-Profit Organization
☐ RE Broker Trust

| BUSINESS NAME "CUSTOMER" | MONYET LLC | CORPORATION |
|---|---|---|

| BUSINESS ADDRESS (No PO Box - see Statement Mailing Address below) | 1201 ORANGE STREET SUITE 600 |
|---|---|

| CITY/STATE  WILMINGTON DE | ZIP CODE  19899 |
|---|---|

| BUSINESS TELEPHONE | FEDERAL ID NUMBER/ SOCIAL SECURITY NUMBER |
|---|---|

| BUILDING, SUITE, ROOM, FLOOR NO. | D.B.A. | ATTN, C/O |
|---|---|---|

IF THE STATEMENT MAILING ADDRESS IS DIFFERENT FROM THE ABOVE ADDRESS, PLEASE COMPLETE BELOW. ATTN. C/O:

| ADDRESS | BUILDING, SUITE, ROOM, FLOOR NO. | CITY | STATE | ZIP CODE |
|---|---|---|---|---|

If this is a pension or profit sharing plan, the entire beneficial interest ☐ is   ☐ is not   held by natural persons.

| Card | 1. Authorized Signer Name (Title)  PAUL ROBERT HANSMEIER | Date of Birth | Social Security # |
|---|---|---|---|
| Address | 100 3RD AVE S  UNIT 404 | City/State  MINNEAPOLIS | MN | Zip Code  55401 |
| ID Type  D | ID Number | ID State / ID Country  MN | Issue Date  05/01/2010 | Expiration Date  05/08/2014 |

| Card | 2. Authorized Signer Name (Title) | Date of Birth | Social Security # |
|---|---|---|---|
| Address | | City/State | Zip Code |
| ID Type | ID Number | ID State / ID Country | Issue Date | Expiration Date |

| Card | 3. Authorized Signer Name (Title) | Date of Birth | Social Security # |
|---|---|---|---|
| Address | | City/State | Zip Code |
| ID Type | ID Number | ID State / ID Country | Issue Date | Expiration Date |

CF-PCD-0700 (06/09/10)

AA-080

Account Number: ▮▮▮▮▮▮▮

| Card | 4. Authorized Signer Name (Title) | | | Date of Birth | Social Security # |
|---|---|---|---|---|---|
| Address | | | City/State | | Zip Code |
| ID Type | ID Number | ID State / ID Country | | Issue Date | Expiration Date |

| Card | 5. Authorized Signer Name (Title) | | | Date of Birth | Social Security # |
|---|---|---|---|---|---|
| Address | | | City/State | | Zip Code |
| ID Type | ID Number | ID State / ID Country | | Issue Date | Expiration Date |

| Card | 6. Authorized Signer Name (Title) | | | Date of Birth | Social Security # |
|---|---|---|---|---|---|
| Address | | | City/State | | Zip Code |
| ID Type | ID Number | ID State / ID Country | | Issue Date | Expiration Date |

## ACCOUNT AGREEMENT

### DEFINITIONS

"**Account**" means the checking or savings account(s) listed above.

"**Account Contract**" means: (1) this Agreement; (2) TCF's *Terms and Conditions for Checking and Savings Accounts* or TCF's *Terms and Conditions for Certificates*, as applicable; (3) TCF's *Deposit Account Services and Prices Schedule*; (4) TCF's *Current Rates and Yields Schedule*; (5) the *TCF Privacy Policy* (if applicable); and (6) any additional agreements between you and TCF and any additional disclosures that TCF may give you. TCF may change your Account Contract from time to time upon notice to you.

"**Affiliates**" means any company directly or indirectly owned by us or TCF Financial Corporation.

"**Authorized Signer**" means the Authorized Signers named on pages one and two of this Agreement.

"**Item**" and "**Non-Cash Item**" have the meaning defined in TCF's *Terms and Conditions for Checking and Savings Accounts.*

"**TCF**," "**TCF Bank**," "**we**," "**us**," and "**our**" mean TCF® National Bank. We are owned by TCF Financial Corporation.

"**You**" and "**your**" mean each person or entity named above as Customer. If there is more than one Account owner, "you" and "your" mean each owner individually and all owners together.

### YOUR ACCOUNT

You are the legal owner of the Account, which exists as soon as you make a deposit to it. TCF does not have to allow any withdrawals or transfers from the Account until: (1) all Authorized Signers have signed this Agreement and any other documentation that TCF requires, and returned them to us; and (2) all other terms of your Account Contract with TCF have been met.

If you are a sole proprietor, public unit, non-profit organization, or real estate broker trust, you may be eligible for a Business Checking with Interest account (also known as an Organizational Negotiable Order of Withdrawal, or "NOW," account). Otherwise, you are eligible for a demand deposit account, Small Business Money Market account, or a Corporate Prime Yield account.

### ELECTRONIC COMMUNICATIONS

In this section, "you" and "your" mean you, the Customer named above, and each Authorized Signer.

You agree that TCF may send you electronic communications including, but not limited to, emails regarding: your accounts with TCF; TCF products, promotions, services; website updates; and notifications offered by or through TCF that we think may be of interest to you. You may ask us to stop sending promotional information by electronic communications by simply selecting the "unsubscribe" or "opt out" option presented in these types of electronic communication.

*Page 2 of 5*

CF-PCD-0700 (06/09/10)

AA-081

Account Number: ▉▉▉▉▉▉

## FAIR CREDIT REPORTING ACT AND SHARING OF INFORMATION

In this section, "you" and "your" mean you, the Customer named above, and each Authorized Signer.

You agree to give TCF current information about you and your financial situation when you apply for an Account with TCF (or an account for which you are an Authorized Signer) and whenever TCF asks for this information while you have a business relationship with TCF. You state and agree that all information you give or will give to TCF is true, correct, and complete.

You also give TCF permission to get credit reports (including credit scores, such as FICO scores) and other kinds of financial and personal information about you from credit reporting agencies and other third parties. TCF may get this information when you apply for an Account with TCF (or an account for which you are an Authorized Signer) and at any time while you have a business relationship with TCF.

You give TCF permission to investigate and use in our banking business the information described in this section, such as when we: (1) decide whether to open an account for you or at your request (or an account for which you are an Authorized Signer); (2) review your Account or collect money you owe us on your Account (or an account for which you are an Authorized Signer); (3) assign to your Account a code that we use, along with other information, to determine whether to pay your checks or other transactions; (4) assign your Account to a category that we use to determine whether to make certain deposits available to you sooner than would otherwise be required by your Account Contract; or (5) have other legitimate business reasons to investigate and use the information.

You give TCF permission to share or otherwise disclose the information described in this section, and other information about you and your transactions with us, with our Affiliates, and for our Affiliates to use this information to determine whether to offer you other products and services or for other legitimate business purposes. You also give TCF permission to exchange or otherwise disclose this information with other financial institutions, law enforcement agencies, third party service providers, and other third parties that are not Affiliates. Our reasons for doing so may include, but are not limited to: (1) enabling TCF to conduct our business; (2) protecting ourselves against fraud or other financial loss; (3) offering various products and services directly or through a third party; and (4) answering questions about TCF's credit experience with you.

See *TCF Privacy Policy* for more information about TCF's use of information obtained in connection with products or services used for personal, family, and household purposes.

Initial here on behalf of yourself and the Customer named above if you agree to the terms set forth above in this section called "Fair Credit Reporting Act and Sharing of Information":

1. Initial   2. Initial _____   3. Initial _____   4. Initial _____

## NSF AND OVERDRAFT FEE ACKNOWLEDGEMENT.

TCF charges an NSF/Overdraft fee of $35 each time an item (such as a check, an ATM or debit card transaction, in-person withdrawal, ACH or other electronic transaction, or other Debit) is submitted to TCF for payment and your Account is overdrawn or would be overdrawn if we paid the item. We may charge this fee regardless of whether we pay or decline to pay the item. TCF may add or may change the NSF/Overdraft Fee as permitted in your Account Contract. More than one NSF/Overdraft Fee may be charged against your Account each day, depending on the number of items submitted for payment from your Account and other withdrawals made from your Account.

TCF may post some or all Debit transactions together and we may post some categories of Debit transactions before others. Either way, we will post Debit items to your Account in order of highest dollar amount to lowest dollar amount within each category. The order in which TCF posts transactions results in more NSF/Overdraft Fees than if we posted these items in a different order. TCF currently posts Credits before Debits.

TCF encourages you to use your Account responsibly, and to take steps to avoid overdrafts whenever possible. You should keep track of all your transactions and reconcile your Account records to your monthly statement. Promptly correct your records if you receive notice of an NSF, overdraft, or returned deposit, and remember to deduct any related service charges. To check your balance and recent transactions posted to your Account, you can call TCF at 1-800-TCF-BANK (823-2265) and use the automated service or speak to a customer service representative, or use TCF Online Banking (www.tcfbank.com). Ask us about our overdraft line of credit product, which may be a lower cost alternative to overdrafts.

1. Initial   2. Initial _____   3. Initial _____   4. Initial _____

## CERTIFICATION OF FEDERAL TAXPAYER IDENTIFICATION NUMBER

(In this certification below, "I," "me," and "my" mean the Authorized Signer on behalf of the Account owner.)
Under penalties of perjury, I certify on behalf of the Account owner that:

1. The social security number or employer identification number shown on this form is the Account owner's correct taxpayer identification number (or I am waiting for a number to be issued to Account owner); and

2. The Account owner is not subject to backup withholding because: (a) the Account owner is exempt from backup withholding; or (b) the Account owner has not been notified by the Internal Revenue Service (IRS) that the Account owner is subject to backup withholding as a result of a failure to report all interest or dividends; or (c) the IRS has notified the Account owner that the Account owner is no longer subject to backup withholding; and

3. The Account owner is a U.S. citizen or other U.S. person, as defined below (including a U.S. resident alien).

Note: Certification Instructions, You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

Signature of U.S. Person:  ⎰⎰⎰⎰⎰⎰⎰⎰⎰⎰⎰⎰    Date 12/28/10

Definition of a U.S. person. For federal tax purposes, you are considered a U.S. person if you are:
- An individual who is a U.S. citizen or U.S. resident alien;
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;
- An estate (other than a foreign estate); or
- A domestic trust (as defined in Internal Revenue Service Regulations section 301.7701-7).

## STATEMENT OF CHECKING ACCOUNT ACTIVITY
### (FOR MN CHECKING ACCOUNTS ONLY)

In this section, "you" and "your" mean the Customer named above, and each Authorized Signer for this Account.

By signing below, you state that you hold or have held a checking account(s) at the following financial institution(s) in the past 12 months:
TCF _____

Of these accounts, the following were closed without your consent for the reasons stated here (if this sentence does not apply, state "none"):
N̸A _____

You also state that you ☐ have ☒ have not been convicted of a crime because of the use of a check or similar item within the past 24 months.

*Page 3 of 5*

CF-PCD-0700 (06/09/10)

AA-082

Account Number: ███████

## ARBITRATION AGREEMENT ACKNOWLEDGEMENT

Your Account Contract includes an arbitration agreement. If there is a dispute between you and TCF and the dispute is covered by the arbitration agreement, then either you or TCF may require the dispute to be resolved by arbitration in front of an arbitrator. This means that you and TCF will not have the right to a jury or court trial to resolve the dispute or the right to pursue a claim as a class action. You have the right to reject the arbitration agreement by giving written notice to TCF within 30 days after the date of this Agreement following the procedures described in your Account Contract. See the section called "Arbitration of Disputes" in TCF's *Terms and Conditions for Checking and Savings Accounts* or TCF's *Terms and Conditions for Certificates*, as applicable, for more information.

1. Initial _____   2. Initial _____   3. Initial _____   4. Initial _____

## ACKNOWLEDGEMENT

By signing below, the Authorized Signers state and agree on your behalf that they have received a copy of: (1) this Agreement; (2) TCF's *Terms and Conditions for Checking and Savings Accounts*; (3) TCF's *Deposit Account Services and Prices Schedule*; (4) TCF's *Current Rates and Yields Schedule*; and (5) the *TCF Privacy Policy*. All of these documents, together with any additional agreements between you and TCF and any additional disclosures that TCF may give you, are part of your Account Contract with TCF. The Authorized Signers agree on your behalf to all the terms of your Account Contract with TCF as it may be amended from time to time. By opening or continuing your Account or using any Account-related service, the Authorized Signers confirm, on your behalf, your agreement to all the terms of your Account Contract with TCF as it may be amended from time to time. The Authorized Signers also state and agree on your behalf that you are requesting Electronic Fund Transfers ("EFT") services, including but not limited to a TCF® *Miles Plus* Business Check Card and/or a TCF ATM Card for the Account indicated above. The Authorized Signers state and agree on your behalf that the Account will only be used for business purposes and not for personal, family, or household purposes, and that you will use your TCF® *Miles Plus* Business Check Card and/or a TCF ATM Card solely to purchase business-related goods and services.

For accounts designated as a real estate broker trust account at the time of account opening, any interest on the account, less allowable service charges, will be paid to the applicable state authority in accordance with the governing state law.

The Authorized Signers agree that the Ownership Type designated on page one accurately describes the company or organization establishing the Account and that the Account is not being opened on behalf of a foreign financial institution as that term is defined under the Bank Secrecy Act.

## AUTHORIZED SIGNATURES (SIGNATURE VERIFICATION)

By:  1. _____   Manager   4. _____
     Authorized Signer      Title          Authorized Signer      Title

     2. _____              5. _____
     Authorized Signer      Title          Authorized Signer      Title

     3. _____              6. _____
     Authorized Signer      Title          Authorized Signer      Title

**TO OPEN AN ACCOUNT, THIS AGREEMENT MUST BE SIGNED OR INITIALED
BY THE APPROPRIATE PERSON IN ALL PLACES WHERE INDICATED.**

CF-PCD-0700 (06/08/10)

AA-083

# Scottrade

## BROKERAGE ACCOUNT APPLICATION

☐ Web Site or Search Engine
☐ TV or Radio Advertising
☐ Magazine / Newspaper Ad
☐ News Article
☐ Friend Referral / Promotion Code
☐ I am an Existing Scottrade Customer

### Select Account Type

☐ Custodial (use minor's SSN)   ☐ Individual   ☐ Joint   type _____   ☐ Qualified Plan   type _____
☐ Investment Club   ☐ Coverdell ESA   ☐ IRA   type _____   ☒ Partnership   type _LLC_
☐ Non Corporate Organization   ☐ Trust   ☐ Guardianship/Conservatorship   ☐ Update Account # _____
☐ Estate   ☐ Corporate   type _____

| APPLICANT | CO-APPLICANT (IF ANY) |
|---|---|

Title of Account (If applicable name of corporation/partnership/trust/etc )
Monyet LLC

| ☐ Mr / ☐ Mrs / ☐ Ms | Name First | Middle | Last | ☒ Mr / ☐ Mrs / ☐ Ms | Name First Paul | Middle Robert | Last Hansmeier |
|---|---|---|---|---|---|---|---|

Street Address (P O Box or c/o address not permitted)
1201 Orange St. #600

Street Address (P O Box or c/o address not permitted)
100 3rd Ave S #404

| City Wilmington | State DE | ZIP plus 4 19899 | City Minneapolis | State MN | ZIP plus 4 55401 |
|---|---|---|---|---|---|

| Home Phone Number | Work Phone Number | Cell Phone Number | Home Phone Number | Work Phone Number | Cell Phone Number |
|---|---|---|---|---|---|

Mailing Address (if different from home address P O Boxes may be used)

| Social Security or Tax ID Number | Date of Birth | Social Security or Tax ID Number | Date of Birth |
|---|---|---|---|

Are you a U S Citizen?  ☒ YES Skip to Occupation
Non U S Citizens  ☐ NO Complete the section below

Are you a U S Citizen?  ☒ YES Skip to Occupation
Non U S Citizens  ☐ NO Complete the section below

Country of Citizenship _____   Country of Citizenship _____

Are you a permanent U S Resident?
☐ YES  Alien Registration Number _____
☐ NO  Indicate your Visa type _____ AND complete and sign
the U S Visa Holder Statement (form number SF1039)
If you plan on staying in the U S 183 days or less contact our International Department to apply for an account

Are you a permanent U S Resident?
☐ YES  Alien Registration Number _____
☐ NO  Indicate your Visa type _____ AND complete and sign
the U S Visa Holder Statement (form number SF1039)
If you plan on staying in the U S 183 days or less contact our International Department to apply for an account

### Occupation
☐ Employed (specify occupation) _____
☒ Self Employed  ☐ Unemployed  ☐ Retired  ☐ Homemaker  ☐ Student

### Occupation
☐ Employed (specify occupation) _____
☒ Self Employed  ☐ Unemployed  ☐ Retired  ☐ Homemaker  ☐ Student

Employer (If self employed  specify job function)
Manager

Employer (If self employed  specify job function)
Attorney

Employer Address
N/A

Employer Address
80 S 8th St Ste 900 Minneapolis MN 55402

### Please answer the following
☐ Yes ☒ No  Is any applicant employed by or affiliated with a securities firm  a securities exchange or FINRA?  (If yes  provide name and address of Compliance Dept )
☐ Yes ☒ No  Is any applicant  a control person  or  affiliate  of a public company as defined by the SEC?  This would generally include 10% shareholders  members of the Board of Directors and policy making officers  (If yes  provide trading symbol and company)
☐ Yes ☒ No  Is any applicant or member of immediate family or business associate a senior foreign political official?

### Type of Account (Choose A or B)
A) Internet Trading (Requires e-mail address)
☒ Internet  All securities & proceeds held in account
Trade confirmations and monthly account statements will be posted to your online account free of charge
To receive paper copies for a fee  check one or both of the following )  ☐ Mail trade confirmations ($1 each)  ☐ Mail account statements ($2 each)

E mail Address
prhansmeier@thefirm, MN

Referred By  (Name and/or Referral Number) _____

B) Non Internet Trading (Be advised that non Internet Commission Rates will apply )
☐ Safekeeping   Indicate Instructions   ☐ Hold Proceeds  OR  ☐ Mail Proceeds
☐ Hold Dividends & Interest  OR  ☐ Mail Dividends & Interest

### Additional Services
☐ Margin (IRAs excluded) Sign Margin Agreement below ☐ Options Send me an Options Application & Disclosure Document ☒ Transfer Account to Scottrade Send me the Account Transfer form

Under penalties of perjury I certify that  (1) the number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me)  (2) I am not subject to backup withholding because  (a) I am exempt from backup withholding  (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of failure to report all interest or dividends  or (c) the IRS has notified me that I am no longer subject to backup withholding  and (3) I am a U S  person (including a U S  resident alien)  The IRS does not require your consent to any provision of this document other than the certification required to avoid backup withholding  Applicants who are subject to backup withholding must cross out item (2)

BY SIGNING THIS AGREEMENT I ACKNOWLEDGE THAT I HAVE RECEIVED READ AND AGREE TO ABIDE BY THE TERMS OF THE ACCOMPANYING BROKERAGE ACCOUNT AGREEMENT  WHICH CONTAINS A PRE DISPUTE ARBITRATION CLAUSE AT SECTION 29

X _____   12/27/10   X _____   12/27/10
Applicant/Authorized Person's Signature   Date   Co Applicant/Authorized Person's Signature   Date

### MARGIN PRIVILEGES  SIGN BELOW ONLY IF YOU DESIRE A MARGIN ACCOUNT
By signing this agreement I acknowledge that I have received  read and agree to abide by the terms of the accompanying Brokerage Account Agreement  including the Margin Account section starting at Section 53

X _____   _____   X _____   _____
Applicant/Authorized Person s Signature   Date   Co Applicant/Authorized Person s Signature   Date

| FOR SCOTTRADE USE ONLY | | | | SNAP Approved |
|---|---|---|---|---|
| Online Application Entry | Registered Rep | Registered Principal | New Accounts Rep | |

SF1000/12 09

AA-084

# THE OPERATING AGREEMENT OF
# MONYET LLC

This Operating Agreement of MONYET LLC (the "Agreement") is made and entered by and among the Members of the Company, as such term is defined in Section 2.1.M below.

## RECITALS

A. The Members have formed a Delaware limited liability company (the "Company") in accordance with the Act, for the purposes and on the terms, covenants and conditions set forth herein.

B. Concurrent with the execution of this Agreement, the Members have caused the Articles of Organization for the Company to be filed with the Secretary of State of the State of Delaware.

C. The Members have each reviewed this Agreement, in its entirety, and desire to cause the same to be adopted as and for the operating agreement of the Company, in accordance with the Act.

## AGREEMENT

Pursuant to the Act, and in exchange for good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the undersigned Members and Manager mutually agree and covenant as follows:

## ARTICLE 1. ORGANIZATION

1.1   Creation. The Members have formed a Delaware limited liability company pursuant to the provisions of the Act.

1.2   Name. The business of the Company shall be conducted under the name of MONYET LLC.

1.3   Principal Place of Business. The principal place of business for the Company shall be at such place or places as the Manager may direct from time to time.

1

AA-085

## ARTICLE 2  DEFINITIONS

2.1          The terms used in this Agreement shall have the following meanings:

A          Act means the Delaware Limited Liability Company Act as amended from time to time.

B          Additional Capital Contributions means contributions of cash or other properties to the Company, in addition to the Members' Initial Capital Contributions, by the Members as set forth in Section 6.2 below.

C          Adjusted Capital Account Balance means, with respect to any Member, the positive balance of the Member's Capital Account as adjusted pursuant to Section 2.1(E).

D          Adjusted Capital Account Deficit means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)          Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)          Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

E          Capital Account means, with respect to any Member, the Capital Account maintained for such Person in accordance with the following provisions:

(i)          To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of profits and any items in the nature of income or gain which are specially allocated pursuant to Section 7.2 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any Property distributed to such Member.

(ii)          To each Member's Capital Account there shall be debited the amount of cash and the value of any Property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of losses and any items in the nature of expenses or losses which are specially allocated pursuant to Section 7.2

2

AA-086

hereof, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(iii)     In the event any interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv)     _ the amount of any liability for purposes of Sections 2.1E(i) and 2.1E(ii) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The Members agree that the initial balance of each Member's Capital Account shall be the Initial Capital Account Balance for such Member as set forth on the books and records of the Company. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Members shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or the Members), are computed in order to comply with such Regulations, the Members may make such modification, provided that is not likely to have a material effect on the amounts distributable to any Member pursuant to Section 11.5 hereof upon the dissolution of the Company. The Members also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event unanticipated events (for example, the acquisition by the Company of oil or gas properties) might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

F     Capital Contributions means, with respect to any Member, the amount of money and the initial value of any property (other than money) contributed to the Company with respect to the interest in the Company held by such Member pursuant to the terms of this Agreement. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Company by the maker of the note (or by a Person related to the maker of the note within the meaning of Regulations Section 1.704-1(b)(2)(ii)(c)) shall not be included in the Capital Contribution of any Member until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations Section 1.704-1(b)(2)(iv)(d)(2).

G     Code means the Internal Revenue Code of 1986, as amended.

H     Company means **MONYET LLC**, a Delaware limited liability company.

3

AA-087

I                                                                 with respect to each Member the
Initial Capital Account Balance specified for such Member in the books and records of the
Company.

J                                                                 of the Company
assets, profits, surplus or losses as shown in, and all rights of a Member of a limited liability
company under the Act and under this Agreement.

K                                          the meaning set forth in Section 11.3.

L        Manager(s) means the manager or managers of the Company, as set forth in
Section 8.1 below.

M        Member or Members means the Members of the Company as set forth in Section
4.1 below.

N        Nonrecourse Deductions has the meaning set forth in Section 1.704-2(b)(1) of the
Regulations.

O        Nonrecourse Liability has the meaning set forth in Section 1.704-2(b)(3) of the
Regulations.

P        Ownership Interest means the Ownership Interest in the Company of each
Member as set forth in Section 4.1 below.

Q        Partner Nonrecourse Debt has the meaning set forth in Section 1.704-2(b)(4) of
the Regulations, references to "Partner" therein being deemed to refer to the Members.

R        Partner Nonrecourse Debt Minimum Gain means an amount, with respect to each
Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such
Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance
with Section 1.704-2(i)(3) of the Regulations, with references therein to "Partner" being deemed
to refer to the Members and to "Partnership" being deemed to refer to the Company.

S        Partner Nonrecourse Deductions has the meaning set forth in Sections 1.704-
2(i)(1) and 1.704-2(i)(2) of the Regulations, with references therein to "Partner" being deemed to
refer to the Members.

T        Partnership Minimum Gain has the meaning set forth in Regulations Section
1.704-2(b)(2) and 1.704-2(d), with references therein to "Partnership" being deemed to refer to
the Company.

U        Person means any individual, partnership, corporation, trust, limited liability
company, or other entity.

4

AA-088

V <u>Profits Interest</u> means the Profits Interest in the Company of each Member as set forth in Section 4.2.

W <u>Regulations</u> means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE 3  PURPOSES

The principal business purpose for which the Company is organized is to buy, own, manage, improve, develop, and sell investment assets and to operate other businesses and joint ventures which shall be developed by the Members and Managers. The Company may also operate for any other lawful purpose for which a limited liability company may be organized under the laws of the State of Delaware.

## ARTICLE 4  MEMBERS OF THE COMPANY

4.1 <u>Members</u>. The initial Members of the Company and the ownership interest held by each Member are shown below:

| <u>Member Name</u> | <u>Ownership Interest</u> |
|---|---|
| The Mill Trust | 100.00% |

4.2 <u>Profits Interests</u>. The Company may issue Profits Interests to the Members from time to time pertaining to individual projects depending on the participation of each Member in each particular project. A Profits Interest does not entitle a person to any equity or capital in the Company, but only to a share of future earnings from a particular project as specifically agreed in a separate writing executed by the Company and the Members.

## ARTICLE 5  LIABILITY OF MEMBERS AND EMPLOYEES

Neither the Members, the Manager nor the employees of the Company are personally liable under a judgment, decree, or order of a court, or in any other manner, for a debt, obligation, or liability of the Company.

5

AA-089

ARTICLE 6  CAPITAL CONTRIBUTIONS; LOANS

6.1    Initial Capital Contributions.  The property and assets initially contributed by the
Members as identified on the books and records of the Company shall constitute the Initial
Capital Contributions to the Company.

6.2    Additional Capital Contributions.  With the consent of the Members, an individual
Member may make additional contributions of cash and other properties into the Company which
shall constitute Additional Capital Contributions.

6.3    Capital Calls.  In the event that the Managers determine that additional capital is required
for the operations of the Company, the Managers may give notice to the Members (and to any
assignees) of a capital call.  The notice shall be given sixty days before the capital call deadline,
and the notice shall include the date of the capital call deadline and the amount of capital
required of each Member (or assignee).  In the event that any Member or assignee fails to
contribute the amount of capital required by that person as described in the notice by the capital
·call deadline, the Member (or assignee) shall have his or her interest diluted proportionally so
that those who do meet the capital requirement receive capital interests and ownership interests
in proportion with their contributions.

6.4    Withdrawal of Capital Contributions. Except as otherwise expressly provided in this
Agreement:

       A     Distributions shall be made only in accordance with Section 7.3 and no Member
shall have the unilateral right to withdraw assets of the Company;

       B     No Member shall be personally liable to any other Member for the return of any
part of the Members' Capital Contributions; and

       C     Capital Contributions shall not bear interest.

ARTICLE 7  ALLOCATIONS OF
PROFITS AND LOSSES; CASH DISTRIBUTIONS

7.1    Profits and Losses.  Except as provided in Section 7.2, Profits and losses shall be
allocated as follows:

       A     If all of the Members approve a project which provides for the distribution of
profits based on Profits Interests, then any profits from such a project shall be allocated
accordingly.

       B     In the event a Member has contributed appreciated property to the Company in
kind, and the property is later transferred by the Company (including but not limited to sales or

6

AA-090

distributions in kind) income, gain, loss or other deductions shall be allocated to the contributing Member.

     C     Otherwise, all profits and losses shall be allocated to Members who have a positive capital account in proportion with their capital accounts.

     D     Finally, if all Members have a capital account balance of zero, profits and losses shall be allocated in proportion with their Ownership Interests.

7.2    Special Allocations. The following special allocations shall be made in the following order:

     A     Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Article 7, if there is a net decrease in Partnership Minimum Gain during any Company Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This Section 7.2A is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

     B     Partner Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-1(i)(4) of the Regulations, notwithstanding any other provision of this Article 7, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Company Fiscal Year, each Member who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations. This Section 7.2B is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

     C     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such

7

AA-091

Member as quickly as possible, provided that an allocation pursuant to this Section 7.2C shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 7.2 have been tentatively made as if this Section 7.2C were not in the Agreement.

     D    Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 7.2D shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article 7 have been made as if Section 7.2C hereof and this Section 7.2D were not in the Agreement.

     E    Nonrecourse Deductions. Nonrecourse Deductions for any fiscal year shall be specially allocated among the Members in proportion to their then applicable Capital Accounts.

     F    Partner Nonrecourse Deductions. Any Partner Nonrecourse Deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

     G    Code Section 754 Adjustment. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their then applicable Capital Accounts in the event Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to whom such distribution was made in the event Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

7.3    <u>Distribution of Assets</u>. The Managers may retain in the Company some or all of the Company's assets to be used for current needs or future growth of the business. No Member may unilaterally demand or require distributions from
as determined by the Managers. The Managers may make distributions pro rata in proportion to the capital accounts of the Members or make distributions which are not pro rata if capital accounts are adjusted accordingly.

AA-092

## ARTICLE 8 MANAGEMENT OF THE COMPANY

8.1 <u>Management</u>. The business, operations and properties of the Company shall be managed by Paul Robert Hansmeier. Additional or successor Managers may be appointed by the unanimous vote of the current Managers. Each Manager shall have an equal vote. Each Manager shall have authority to act or sign alone on behalf of the Company.

8.2 <u>Personal Service Contract</u>. In choosing Managers in this Company, the Members are relying upon their knowledge of the character, integrity and business acumen of the Managers. As a result, a Manager's right to manage the affairs of the Company is a personal service contract with the Members which cannot be assigned to any other person or entity. In the event a Manager's right to manage the Company is voluntary or involuntary assigned, that assignment shall be void and the Manager shall be deemed to have violated its duties under this Agreement and its management rights shall immediately terminate. In the event that a Manager should die, become incapacitated, or should cease to be a Member of the Company for any reason, the person shall also at that time cease to be a Manager of the Company.

8.3 _ The Managers shall be responsible for the management of the Company's business and activities with all rights and powers generally conferred by law or necessary, advisable or consistent in connection therewith. No Member shall have any right to act or sign on behalf of the Company or to represent the Company. The Managers may delegate authority to any one Manager or to any person in a writing executed by a majority of the Managers.

8.4 <u>Specific Powers of the</u> _ The Managers shall have all specific rights and powers required or appropriate to the management of the Company business, as conferred by this Agreement, by the Act or otherwise, including by way of illustration and not by way of limitation the following:

A To acquire, hold and dispose of any real or personal property, interest therein, or appurtenance thereto, as well as personal or mixed property connected with any real property, including the purchase, lease development, improvement, maintenance, exchange, trade or sale of such properties, at such price, rental or amounts, for cash, securities or other property, and upon such terms, as are deemed by such Manager(s) to be in the best interest of the Company;

B . To authorize any entity in which the Company holds an interest to acquire, hold and dispose of any real or personal property, interest therein, or appurtenance thereto, as well as personal or mixed property connected with any real property, _ the purchase, lease development, improvement, maintenance, exchange, trade or sale of such properties, at such price, rental or amounts, for cash, securities or other property, and upon such terms, as are deemed by such Manager(s) to be in the best interest of the Company; .

C To borrow money and, if security is required therefore, to mortgage or lien any portion of the property of the Company, to obtain replacements of any mortgage or other security device, and to prepay, in whole or in part, refinance, increase, modify, consolidate, or extend any

9

AA-093

mortgage or other security device, all of the foregoing at such terms and in such amounts as are deemed by such Manager(s) to be in the best interest of the Company;

D    To authorize any entity in which the Company owns an interest to borrow money and, if security is required therefore, to authorize such entity to mortgage or lien any portion of the property of such entity, to obtain replacements of any mortgage or other security device, and ·to prepay, in whole or in part, refinance, increase, modify, consolidate, or extend any mortgage or other security device, all of the foregoing at such terms and in such amounts as are deemed by such Manager(s) to be in the best interest of the Company;

E    To place record title to, or the right to use, Company assets in the name or names of a nominee or nominees for any purpose convenient or beneficial to the Company;

F    To acquire and enter into any contract or insurance which the Company deems necessary and proper for the protection of the Company, for the conservation of its assets, or for any purpose convenient, or beneficial to the Company;

G    To employ from time to time persons, firms or corporations for the operation and and managing agents, brokers, attorneys, accountants and other professionals, on such terms and for such compensation as the Manager(s) shall determine;

H    To pay any and all organizational expenses incurred in the creation of the Company;

I    To compromise, arbitrate, or otherwise adjust claims in favor of or against the Company and to commence or defend litigation with respect to the Company or any assets of the Company as the Manager(s) may deem advisable, all or any of the above matters being at the expense of the Company;

J    To borrow money from banks, other lending institutions, and other lenders for any Company purpose including the maintenance of a margin account with any securities broker (except as specifically prohibited by this Agreement), and in connection therewith issue notes, debentures and other debt securities and hypothecate the assets of the Company to secure ·repayment of borrowed sums; and no bank, other lending institution, or other lender to which application is made for loan by the Manager(s) shall be required to inquire as to the purposes for which such loan is sought, and as between this Company and such bank, other lending institution, or other lender, it shall be conclusively presumed that the proceeds of such loan are to be and will be used for the purposes authorized under this Agreement;

K    To authorize any entity in which the Company holds an interest to borrow money from banks, other    _ institutions, and other lenders for any purpose of such entity including' the maintenance of a margin account with any securities broker (except as specifically prohibited by this Agreement), and in connection therewith issue notes, debentures and other debt securities

10

AA-094

and hypothecate the assets of such entity to secure repayment of borrowed sums; and no bank, other lending institution, or other lender to which application is made for loan by such entity, as authorized by the Manager(s), shall be required to inquire as to the purposes for which such loan is sought, and as between this Company and such bank, other lending institution, or other lender, it shall be conclusively presumed that the proceeds of such loan are to be and will be used for the purposes authorized under this Agreement;

L      To maintain, at the expense of the Company, accurate records and accounts of all operations and expenditures and furnish the Members with annual statements of account as of the end of each Company Fiscal Year, together with tax reporting information, and quarterly reports on the operations of the Company;

M      To purchase, at the expense of the Company, liability and other insurance to protect the Company's properties and business and to protect the Manager(s), his or her agents and employees, and the Members;

N      To execute instruments, enter into agreements and contracts with parties, and give receipts, releases and discharges with respect to all of the foregoing matters set forth in subsections 8.3A through 8.3M above, and any matters incident thereto as the Manager(s) may deem advisable or appropriate;

O      To make elections under the tax laws of the United States and other relevant jurisdictions as to the treatment of items of Company income, gain, loss, deduction and credit, and as to all other relevant matters (including without limitation elections under Section 754 of the Code) as the Manager(s) believes necessary or desirable.

8.5      Compensation and Reimbursement. As determined by the vote of the Members, the Managers may be paid reasonable compensation for services provided to the Company and to reimbursement for reasonable expenses incurred on behalf of the Company.

8.5      Exculpation. The Managers shall not be liable to the Company or to any of its Members for honest mistakes of judgment or for losses due to such mistakes or to the negligence, dishonesty or bad faith of any employee or agent of the Company; provided that such employee or agent
reasonable care. The Managers may rely upon the advice of legal counsel to the Company in determining what acts or omissions are within the scope of authority conferred by this Agreement. The Company shall indemnify and hold harmless the Managers and their agents from and against any loss, expense, damage or injury suffered or sustained by them by reason of or in furtherance of the interest of the Company, including, but not limited to any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any action or threatened action, proceeding or claim, provided that the acts, omissions, or alleged acts or omissions upon which such action or threatened action, proceedings or claims are based were performed or omitted in good faith and not fraudulently, in bad faith, as a result of wanton and willful misconduct or gross negligence.

11

AA-095

## ARTICLE 9  MEMBERS

9.1                                                    as from time to time designated by the
Managers.  Such meetings shall be held at such time and place as designated by the Managers,
and may be by teleconference or in person.

9.2    Notice of Members Meetings.  The Manager shall give written notice stating the place,
day, and hour of both regular and special meetings, which shall be delivered not less than (5) nor
more than thirty (30) days before the date of the meeting, either personally, by facsimile
transmission or by first class mail (postage prepaid) to each Member of record entitled to vote at
such meeting.  Notice of any meeting of Members, regular or special, shall be given addressed to
the Member at the email address, telephone number, or mailing address of such Member
appearing on the books of the Company or given by the Member to the Company for the purpose
of notice.

9.3    Waiver of Notice.  If, under the provisions of the Act, the Articles of Organization, or this
Agreement, notice is required to be given to a Member or to the Manager(s), a waiver in writing
signed by the person or persons entitled to the notice, whether made before or after the time for
notice to be given, is equivalent to the giving of notice.

9.4    Quorum.  Members having a majority of outstanding Ownership Interests, represented in
person or by proxy, shall constitute a quorum at a meeting of Members.

9.5    Voting.  The vote of each Member shall be weighted based on that Member's Ownership
Interest in comparison to all other Ownership Interests, and all matters which call for a vote or
consent of the Members shall require a majority vote based on Ownership Interests.  A formal
meeting of the Company shall not be required.  In the event, however, that a meeting of the
Members is called, written notice of the time and place thereof shall be given to each Member at
least ten (10) days prior thereto.  At such meeting, a Member may be represented in person or by
written proxy.

9.6    Proxies/Power of Attorney.  At all meetings of Members, a Member may vote in person
or by proxy executed in writing by the Member or by his duly authorized attorney in fact.  Such
proxy shall be filed with the Company before or at the time of the meeting.  No proxy shall be
valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

9.7    Action by Manager and not Members.  Any acts taken on behalf of the Company shall be
carried out by the Manager.                    have no authority to act on behalf of the
Company or to take action for the Company.

12

AA-096

## ARTICLE 10 PROHIBITION ON TRANSFER OF COMPANY INTERESTS

10.1    Prohibition on Transfers by Members. Except with the written consent of all the Managers and Members, no Person shall have authority to sell, assign, transfer, mortgage, interest in any Interest in the Company. Individual Members may appoint a beneficiary of their interest upon their death by completing a written beneficiary designation and delivering it to the Manager to keep with the books and records of the Company. In the event of the death of an individual member, the interests owned by the individual member shall become the property of the designated beneficiary but the designated beneficiary shall not become a substitute Member unless they are accepted as such pursuant to Section 10.5 below.

10.2    Company's Option to Purchase Interests. If in the discretion of the Managers (voting according to Section 8.1) it is determined that a Member has filed a voluntary petition for bankruptcy, is adjudicated as bankrupt or insolvent, or is the subject of a lien, levy, charging order, or other judgment which, in the discretion of the Managers, has the potential of interfering with the operations, reputation, or success of the Company, the Company shall have an option to purchase the interest of such Member for a purchase price equal to the Member's tax basis in such interest. The Company shall have the option of paying the purchase price in the form of a promissory note, with interest payable annually at the applicable federal rate, over a term of fifteen (15) years.

10.3    Effect of Prohibited Transfers. Any Transfer or attempted Transfer by any Member in violation of this Agreement shall be null and void and of no force or effect whatever. Furthermore, the Company shall not recognize any attempted or purported transfer by operation of law or court order (such as a transfer pursuant to divorce or bankruptcy), without the consent of the Manager and all of the Members. Each Member hereby acknowledges the reasonableness of the restrictions on Transfer imposed in this Agreement in view of the Company purposes and the relationship of the Members and Managers. Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable.

10.4  . Substitute Member. No Person taking or acquiring by whatever means, including without limitation by purchase, operation of law, or any other transfer of any portion of an Interest of a Member in the Company, shall be admitted as a Substitute Member in the Company unless and until:

A    all the Managers and Members, in their sole discretion, approve in writing the admission of such person as a Substitute Member;

B    such transferee or assignee agrees in writing to be bound by the terms and conditions of this Agreement; and

C    all the Managers and Members execute and acknowledge such documents as are necessary to comply with the requirements of the Act.

13

AA-097

Until such time as all of such conditions have been satisfied, such assignee or transferee shall be entitled only to the rights and benefits of an assignee under the Act, with all other rights associated with ownership of such interest in the Company to remain with and exercisable by the Member from whom the interest was assigned or transferred, during the life of such Member (or until dissolution of the Member, if an entity). Such assignee or transferee shall pay all costs and expenses incurred by the Company in connection with such admission or substitution including, but not limited to, all legal and accounting fees, and the costs of preparing, filing and recording any

## ARTICLE 11 DISSOLUTION AND WINDING-UP

11.1    Waiver of Partition. No Member shall, either directly or indirectly, take any action to require partition, file a bill for Company accounting or appraisement of the Company or of any of its assets or properties or cause the sale of any Company property, and notwithstanding any provisions of applicable law to the contrary, each Member (and each of his legal representatives, successors, or assigns) hereby irrevocably waives any and all rights it may have to maintain any action for partition or to compel any sale with respect to his Company interest, or with respect to any assets or properties of the Company, except as expressly provided in this Agreement.

11.2    Covenant Not to Withdraw or Dissolve. Notwithstanding any provision of the Act, each Member hereby covenants and agrees that the Members have entered into this Agreement based on their mutual expectation that all Members will continue as Members and carry out the duties and obligations undertaken by them hereunder and that, except as otherwise expressly required or permitted hereby, each Member hereby covenants and agrees not to (a) take any action to file a certificate of dissolution or its equivalent with respect to itself, (b) take any action that would cause a Voluntary Bankruptcy of such Member, (c) withdraw or attempt to withdraw from the Company, (d) exercise any power under the Act to dissolve the Company, (e) transfer all or any portion of his interest in the Company, (f) petition for judicial dissolution of the Company, or (g) demand a return of such Member's contributions or profits (or a bond or other security for the return of such contributions or profits) without the consent of all the Managers and Members.

11.3    Dissolution and Termination of the Company. The Company shall be dissolved and terminated only upon the execution of a written termination agreement signed by all the Managers and Members. Such a termination shall be referred to herein as a "Liquidating Event."

11.4    Effect of Withdrawal, Resignation, Bankruptcy, Death or Incompetency of a Member. The withdrawal, resignation, bankruptcy, death, dissolution, liquidation, termination or adjudication of incompetency of a Member shall not cause the termination or dissolution of the Company and the business of the Company shall continue. Upon any such occurrence and unless the trustee, receiver, executor, administrator, committee, guardian or conservator of such Member is admitted as a Member of the Company in accordance with the Operating Agreement, the trustee, receiver, executor, administrator, committee, guardian or conservator of such Member shall have the rights specified in Section 10.4 of this Agreement. The transfer by such trustee, receiver, executor, administrator, committee, guardian or conservator of any Company

14

AA-098

Interest shall be subject to all of the restrictions set forth in this Agreement to which such transfer would have been subject if such transfer had been made by such bankrupt, deceased, dissolved, liquidated, terminated or incompetent Member. Any Member who withdraws or resigns or attempts to withdraw or resign from the Company in violation of Section 11.2 above shall cease to have the rights of a Member under this Agreement, rather such withdrawing or resigning Member shall have the rights specified in Section 10.4 of this Agreement.

11.5    Winding Up. Upon the dissolution of the Company, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, winding up the Company's business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Property has been distributed pursuant to this Section 11.5 and the Company has terminated. The Manager shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the Company's liabilities and Property, shall cause the Property to be liquidated as promptly as is consistent with obtaining the fair market value thereof, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed in the following order:

    A    First, to the payment and discharge of all of the Company's debts and liabilities, including debts and liabilities to creditors who are Managers or Members, and to the establishment of reserves for the payment of the debts and liabilities of the Company in accordance with applicable law;

    B    The balance, if any, to the Members in proportion with their Capital Accounts, after giving effect to all contributions, distributions, and allocations.

11.6    Final Accounting. The Company shall furnish each of the Members with a statement prepared the Company's accountant which shall set forth the assets and liabilities of the Company as of the date of termination and which shall disclose the sources and applications of Company assets and proceeds thereof during the course of winding up the Company affairs and dissolution. Upon completion of the winding up and termination of the Company, the Members shall execute, acknowledge and cause to be filed Articles of Dissolution of the Company.

## ARTICLE 12 BOOKS OF ACCOUNT AND RECORDS

12.1    Accounting Year and Method. The Company shall adopt a calendar year for its financial reporting and federal income tax purposes. The Company shall prepare all financial statements and federal and state income tax reports on a cash basis.

12.2                                      At all times during the existence of the Company, the Manager(s) shall keep or cause to be kept by an agent full and true books of account, in which shall be entered fully and accurately each transaction of the Company. No Company

AA-099

information shall be disclosed to an assignee or other Person without the consent of all the Managers and Members.

## ARTICLE 13 AMENDMENT

Amendments to this Agreement may be proposed by any Member. The Member proposing such an Amendment shall submit to the Members a verbatim statement of any proposed amendment and shall seek the written vote of the Members on the proposed amendment or shall call a meeting to vote thereon. A proposed amendment shall be adopted and be effective as an amendment hereto only if it receives approval of all of the Managers and Members.

## ARTICLE 14 MISCELLANEOUS

14.1     Notices. Except as otherwise expressly set forth herein, all notices under this Agreement shall be in writing and shall be given to the Member entitled thereto by personal service or by certified or registered mail, return receipt requested, to the address set forth in this Agreement for such Member or at such other address as he may specify in writing.

14.2     Title and Captions. Article and Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

14.3     Counterparts -- Facsimile Transmission. This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties are not signatory to the original or the same counterpart. Signature pages may be detached from the various counterparts and attached to a single copy of this Agreement to physically form one document. Facsimile (fax) transmission of a signed copy of this Agreement, and the retransmission of any signed fax shall be the same as delivery of an original.

14.4     Governing Law. This Agreement and all amendments hereto shall be governed by the laws of the State of Delaware.

14.5     Survival of Terms and Provisions. The terms and provisions of this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the respective Members.

14.6          The invalidity or unenforceability of any part of this Agreement shall not invalidate or affect the validity or enforceability of any other provision of this Agreement, which shall continue to govern the rights and obligations of the parties hereto as though the invalid or unenforceable provisions(s) were not a part hereof.

14.7     Further Instruments. The Members agree that they will execute any and all other documents or legal instruments that may be necessary or required to carry out and effectuate all of the provisions hereof.

16

AA-100

14.8   <u>Entire Agreement</u>. This Agreement constitutes and represents the entire agreement of the Members with respect to the subject matter hereof, and all other prior agreements, covenants, promises and conditions, verbal or written, between the Members are incorporated herein. No Member hereto has relied upon any other promise, representation or warranty, other than those contained herein, in executing this Agreement.

14.9   <u>Waiver of Lis Pendens and Partition</u>. The Members recognize that no Member has any direct right in any Company property, but only an interest in the Company which is deemed to be personal property. Accordingly, because the Company may suffer irreparable financial loss if a lis pendens were filed or an action for partition were brought with respect to Company property by a Member arising out of a Company dispute, each Member does hereby waive any such right to file a lis pendens against any property of the Company or bring an action for partition thereof.

<div align="center">* * *</div>

AA-101

The Manager and Member hereby adopt, accept and agree to be bound by all the terms and provisions of the Agreement.

Dated:                              **MANAGER:**

Paul Robert Hansmeier

Dated:                              **MEMBER:**

**THE MILL TRUST**

Padraigin Lane Browne, Trustee

18

AA-102

# EXHIBIT I

AA-103

# Scottrade®

## AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.

**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

### 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| | |
|---|---|
| Scottrade Account Number | Scottrade Account Title (Name on Account) *Monyet LLC* |
| Social Security or Tax ID Number | Telephone Number |

Reason for the Request (For your account protection, please be as specific as possible.)
*Posting of Appellate Bond re 12-cv-8333*

### 2. FINANCIAL INSTITUTION INFORMATION

| | |
|---|---|
| Name of Receiving Financial Institution *Frost National Bank* | Receiving Bank's ABA Routing Number / SWIFT Code |
| Bank Address *Frost Bank, 2735 Austin Hwy* | City and State *San Antonio, TX   78218-0000* |

### 3. AMOUNT OF WIRE TRANSFER

☒ $ *51,333* . *50*  - OR -  ☐ All Available Cash   Date to be Sent: *5 / 15 / 13*

### 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
*SureTec Insurance Company*

| | |
|---|---|
| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient *Customer* |

Recipient's Street Address (no P.O. Boxes)
*5555 Garden Grove Blvd, Suite 275*

| City *Westminster* | State *CA* | ZIP Plus 4 *92683* |

### 5. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
| Recipient's Street Address (no P.O. Boxes) | |
| City | State | ZIP Plus 4 |

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchange rate risk may apply if the intermediary or receiving institution converts the transfer amounts.  Scottrade reserves the right to request additional verification prior to processing a wire transfer request. Failure to provide all account holder signatures may cause a delay in your transfer.

I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees,and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities,claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

| X _____ *5/15/13* | X _____ _____ |
|---|---|
| Account Holder's Signature          Date | Account Holder's Signature          Date |

*Signature verified by Scott Gral 220 SC*
*also review D.L. in branch*

SF3675/9-12

AA-104

# Scottrade®

[Reset Form]  [Print Form]

## AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.
**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

### 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

Scottrade Account Number

Scottrade Account Title (Name on Account)
*Monyet LLC*

Social Security or Tax ID Number

Telephone Number

Reason for the Request (For your account protection, please be as specific as possible.)
*Investment/loan to Livewire*

### 2. FINANCIAL INSTITUTION INFORMATION

Name of Receiving Financial Institution
*JPMorgan Chase Bank, N.A.*

Receiving Bank's ABA Routing Number / SWIFT Code

Bank Address
*30 S Wacker Drive*

City and State
*Chicago, IL*

### 3. AMOUNT OF WIRE TRANSFER

☒ $ *10,000.00*  - OR -  ☐ All Available Cash      Date to be Sent: *6 / 27 /13*

### 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
*Livewire Holdings LLC*

Recipient's Account Number at Receiving Institution

Your Relationship to Recipient
*Investor*

Recipient's Street Address (no P.O. Boxes)
*161 N Clark St*

City *Chicago*        State *IL*        ZIP Plus 4 *60601*

### 5. FOR FURTHER CREDIT TO (If Applicable)

Account Title at Receiving Institution

Account Number

Recipient's Street Address (no P.O. Boxes)

City        State        ZIP Plus 4

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchange rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request. Failure to provide all account holder signatures may cause a delay in your transfer.

I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees,and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities,claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and in no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

X _____   *6/27/13*   X _____
Account Holder's Signature        Date        Account Holder's Signature        Date

*6/27/17 D.L. & Signature Verified by*
*Scott CraC Bum220  Bum220*

SF3675/9-12

AA-105


**Scottrade®**

Reset Form    Print Form

# AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.
**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

## 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

Scottrade Account Number

Scottrade Account Title (Name on Account)
*Monyet, LLC*

Social Security or Tax ID Number

Telephone Number

Reason for the Request (For your account protection, please be as specific as possible.)
*Business Transfer*

## 2. FINANCIAL INSTITUTION INFORMATION

Name of Receiving Financial Institution
*Chase Bank*

Receiving Bank's ABA Routing Number / SWIFT Code

Bank Address
*600 N. Dearborn St.*

City and State
*Chicago, IL 60654*

## 3. AMOUNT OF WIRE TRANSFER

☒ $ *10,000 .00*   - OR -   ☐ All Available Cash    Date to be Sent: *6 / 28 / 13*

## 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
*LiveWire Holdings*

Recipient's Account Number at Receiving Institution
*Chase*

Your Relationship to Recipient
*Business*

Recipient's Street Address (no P.O. Boxes)
*2100 M Street Northwest, Suite 170-417*

City
*Washington*

State
*DC*

ZIP Plus 4
*20037*

## 5. FOR FURTHER CREDIT TO (If Applicable)

Account Title at Receiving Institution

Account Number

Recipient's Street Address (no P.O. Boxes)

City

State

ZIP Plus 4

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchange rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request. Failure to provide all account holder signatures may cause a delay in your transfer.

I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees, and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities, claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

Signature(s) of Account Holder(s)

X _____   *6/28/13*   X _____
Account Holder's Signature      Date      Account Holder's Signature      Date

*6/28/13 Signature & DC   Verified   Scott Gal*
*pen 22/D*
*SC*

SF3675/9-12

AA-106

| Reset Form | Print Form |

# Scottrade®

## AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.
**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

### 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account)<br>Monyet LLC |
|---|---|

| Social Security or Tax ID Number | Telephone Number |
|---|---|

Reason for the Request (For your account protection, please be as specific as possible.)
Suretec Appellate Bond Amount re John Steele and 12-cv-8333

### 2. FINANCIAL INSTITUTION INFORMATION

| Name of Receiving Financial Institution<br>Frost National Bank | Receiving Bank's ABA Routing Number / SWIFT Code |
|---|---|
| Bank Address<br>2735 Austin Hwy | City and State<br>San Antonio, TX 78218-0000 |

### 3. AMOUNT OF WIRE TRANSFER

☑ $69,000 . - OR - ☐ All Available Cash   Date to be Sent: 7 / 15 / 13

### 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
SureTec Insurance Company

| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient<br>Business |
|---|---|

Recipient's Street Address (no P.O. Boxes)
3033 5th Ave., Ste 300

| City<br>San Diego | State<br>CA | ZIP Plus 4<br>92103 |
|---|---|---|

### 5. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|

Recipient's Street Address (no P.O. Boxes)

| City | State | ZIP Plus 4 |
|---|---|---|

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wire, foreign exchange rate risk may apply if the intermediary or receiving institution converts the transfer amounts.  Scottrade reserves the right to request additional verification prior to processing a wire transfer request. Failure to provide all account holder signatures may cause a delay in your transfer.

I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees,and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities,claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and in no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

X _____  7/15/13   X _____
Account Holder's Signature          Date       Account Holder's Signature          Date

Sign. be verified by Scott Card   Dennis A. SC
& DL in branch.

SF3675/9-12

AA-107

# Scottrade®

[ Reset Form ]   [ Print Form ]

## AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.
**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

### 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account) |
|---|---|
| | *Monyet LLC* |

| Social Security or Tax ID Number | Telephone Number |
|---|---|
| | |

Reason for the Request (For your account protection, please be as specific as possible.)
*Attorney's Fees Escrow*

### 2. FINANCIAL INSTITUTION INFORMATION

| Name of Receiving Financial Institution | Receiving Bank's ABA Routing Number / SWIFT Code |
|---|---|
| *Frost National Bank*   PH | |

| Bank Address | City and State |
|---|---|
| *P.O. Box 1600,* ~~San Antonio, TX~~   7/19 | *San Antonio, TX* |

### 3. AMOUNT OF WIRE TRANSFER

☒ $ *10,000* . *00*   - OR -   ☐ All Available Cash   Date to be Sent: *7* / *19* / *13*

### 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
*SureTec Insurance Co.*

| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient |
|---|---|
| | *Business* |

Recipient's Street Address (no P.O. Boxes)
*1330 Post Oak Blvd*

| City *Houston* | State *TX* | ZIP Plus 4 *77056* |
|---|---|---|

### 5. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
| | |

Recipient's Street Address (no P.O. Boxes)

| City | State | ZIP Plus 4 |
|---|---|---|

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchange rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request. Failure to provide all account holder signatures may cause a delay in your transfer.

I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees, and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities, claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

| X | *7/19/13* | X | |
|---|---|---|---|
| Account Holder's Signature | Date | Account Holder's Signature | Date |

*7/19/13  Signature verified by Scott Cul
Dominion* 

SF3675/9-12

AA-108



# AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.

**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

## 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account) |
|---|---|
| ▓▓▓▓▓▓ | Monyet LLC |

| Social Security or Tax ID Number | Telephone Number |
|---|---|
| ▓▓▓▓▓▓ | ▓▓▓▓▓▓ |

Reason for the Request (For your account protection, please be as specific as possible.)
Capitalize Law Firm

## 2. FINANCIAL INSTITUTION INFORMATION

| Name of Receiving Financial Institution | Receiving Bank's ABA Routing Number / SWIFT Code |
|---|---|
| Associated Bank | ▓▓▓▓▓▓ |

| Bank Address | City and State |
|---|---|
| 2870 Holmgren Way | Green Bay, Wisconsin |

## 3. AMOUNT OF WIRE TRANSFER

☑ $25000 . 00   - OR -   ☐ All Available Cash    Date to be Sent: 7 / 26 / 13

## 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
Class Justice PLLC

| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient |
|---|---|
| ▓▓▓▓▓▓ | Business |

Recipient's Street Address (no P.O. Boxes)
100 S 5th St Ste 1900

| City | State | ZIP Plus 4 |
|---|---|---|
| Minneapolis | MN | 55402 |

## 5. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
| | |

Recipient's Street Address (no P.O. Boxes)

| City | State | ZIP Plus 4 |
|---|---|---|
| | | |

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchange rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request. Failure to provide all account holder signatures may cause a delay in your transfer.

I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees, and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities, claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

X _____   7/26/13   X _____
Account Holder's Signature          Date          Account Holder's Signature          Date

SF3675/9-12

AA-109

| Reset Form | Print Form |

# Scottrade®

## AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.
**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

### 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account) |
|---|---|
| ▆▆▆▆ | Monyet LLC |

| Social Security or Tax ID Number | Telephone Number |
|---|---|
| ▆▆▆▆ | |

Reason for the Request (For your account protection, please be as specific as possible.)
Personal Transfer

### 2. FINANCIAL INSTITUTION INFORMATION

| Name of Receiving Financial Institution | Receiving Bank's ABA Routing Number / SWIFT Code |
|---|---|
| Associated Bank | ▆▆▆▆ |

| Bank Address | City and State |
|---|---|
| 2870 Holmgren Way | Green Bay, Wisconsin |

### 3. AMOUNT OF WIRE TRANSFER

☑ $5000 . 00  - OR -  ☐ All Available Cash   Date to be Sent: 7 / 30 / 2013

### 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
Padraigin Browne

| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient |
|---|---|
| ▆▆▆▆ | Personal |

Recipient's Street Address (no P.O. Boxes)
100 3rd Ave S #3201

| City | State | ZIP Plus 4 |
|---|---|---|
| Minneapolis | MN | 55401 |

### 5. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
| | |

| Recipient's Street Address (no P.O. Boxes) | | |
|---|---|---|
| | | |

| City | State | ZIP Plus 4 |
|---|---|---|
| | | |

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchange rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request. Failure to provide all account holder signatures may cause a delay in your transfer.

I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees,and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities,claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

| X _____ | 7/30/13 | X _____ | _____ |
|---|---|---|---|
| Account Holder's Signature | Date | Account Holder's Signature | Date |

*Signature verified by Scott Cool Dermott*
*& DC in br. 9 SC*

SF3675/9-12

AA-110

# Scottrade®

Reset Form    Print Form

## AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.

**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

### 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

Scottrade Account Number

Scottrade Account Title (Name on Account)
Monyet LLC

Social Security or Tax ID Number

Telephone Number

Reason for the Request (For your account protection, please be as specific as possible.)
Trust Agreement

### 2. FINANCIAL INSTITUTION INFORMATION

Name of Receiving Financial Institution
TCF Financial

Receiving Bank's ABA Routing Number / SWIFT Code

Bank Address
801 Marquette Ave

City and State
Minneapolis MN

### 3. AMOUNT OF WIRE TRANSFER

☑ $30000 . 00    - OR -    ☐ All Available Cash    Date to be Sent: 8 / 27 / 13

### 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
Padraigin Browne

Recipient's Account Number at Receiving Institution

Your Relationship to Recipient
Spouse

Recipient's Street Address (no P.O. Boxes)
100 3rd Ave S #3201

City
Minneapolis

State
MN

ZIP Plus 4
55401

### 5. FOR FURTHER CREDIT TO (If Applicable)

Account Title at Receiving Institution

Account Number

Recipient's Street Address (no P.O. Boxes)

City

State

ZIP Plus 4

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchange rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request. Failure to provide all account holder signatures may cause a delay in your transfer.

I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees,and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities,claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

X _____  8/27/13    X _____
Account Holder's Signature    Date    Account Holder's Signature    Date

8/27/13  Signature verified by Scott Grad  Demron

SF3675/9-12

AA-111

# Scottrade®

| Reset Form | Print Form |

## AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.

**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

### 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account) |
|---|---|
| ▓▓▓▓ | Monyet LLC |

| Social Security or Tax ID Number | Telephone Number |
|---|---|
| ▓▓▓▓ | ▓▓▓▓ |

Reason for the Request (For your account protection, please be as specific as possible.)
Legal Services

### 2. FINANCIAL INSTITUTION INFORMATION

| Name of Receiving Financial Institution | Receiving Bank's ABA Routing Number / SWIFT Code |
|---|---|
| BMO Harris Bank N.A. | ▓▓▓▓ |

| Bank Address | City and State |
|---|---|
| 1200 E. Warrenville | Naperville, IL |

### 3. AMOUNT OF WIRE TRANSFER

☑ $10,000 . 00   - OR -   ☐ All Available Cash   Date to be Sent: 09 / 25 / 13

### 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
Voelker Litigation Group

| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient |
|---|---|
| ▓▓▓▓ | Client |

Recipient's Street Address (no P.O. Boxes)
311 W. Superior Street, Suite 500

| City | State | ZIP Plus 4 |
|---|---|---|
| Chicago | IL | 60654 |

### 5. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
| | |

Recipient's Street Address (no P.O. Boxes)

| City | State | ZIP Plus 4 |
|---|---|---|
| | | |

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchange rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request. Failure to provide all account holder signatures may cause a delay in your transfer.

I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees,and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities,claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and in no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

| X _____ | 9/25/13 | X _____ | _____ |
|---|---|---|---|
| Account Holder's Signature | Date | Account Holder's Signature | Date |

SF3675/9-12

SV
TA
9/25/13

AA-112



| | Reset Form | Print Form |
|---|---|---|

# AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.
**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

## 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account) |
|---|---|
| ███████ | Monyet LLC |

| Social Security or Tax ID Number | Telephone Number |
|---|---|
| ███████ | ███████ |

Reason for the Request (For your account protection, please be as specific as possible.)
Business Loan

## 2. FINANCIAL INSTITUTION INFORMATION

| Name of Receiving Financial Institution | Receiving Bank's ABA Routing Number / SWIFT Code |
|---|---|
| Associated Bank | ███████ |

| Bank Address | City and State |
|---|---|
| Green Bay, PO BOx 19097 | Green Bay, WI |

## 3. AMOUNT OF WIRE TRANSFER

☑ $25000 . 00   - OR -   ☐ All Available Cash   Date to be Sent: 10 / 1 / 13

## 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
Class Justice PLLC

| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient |
|---|---|
| ███████ | Creditor |

Recipient's Street Address (no P.O. Boxes)
100 5th St S Ste 1900

| City | State | ZIP Plus 4 |
|---|---|---|
| Minneapolis | MN | 55402 |

## 5. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
| | |

| Recipient's Street Address (no P.O. Boxes) | | |
|---|---|---|

| City | State | ZIP Plus 4 |
|---|---|---|
| | | |

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchange rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request. Failure to provide all account holder signatures may cause a delay in your transfer.

I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees,and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities,claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

| X _(signature)_ | 10/1/13 | X _____ | _____ |
|---|---|---|---|
| Account Holder's Signature | Date | Account Holder's Signature | Date |

816-OK
JM 10/11/13

SF3675/9-12

AA-113



| Reset Form | Print Form |

# AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.
**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

## 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account) |
|---|---|
| ████████ | *Monyet LLC* |

| Social Security or Tax ID Number | Telephone Number |
|---|---|
| ████████ | ████████ |

Reason for the Request (For your account protection, please be as specific as possible.)
*Business*

## 2. FINANCIAL INSTITUTION INFORMATION

| Name of Receiving Financial Institution | Receiving Bank's ABA Routing Number / SWIFT Code |
|---|---|
| *BMO Harris Bank N.A.* | ████████ |

Complete Bank Address
*1200 E. Warrenville Road   Naperville, IL   60563*

Is this an international wire request? ☒ No ☐ Yes (A Scottrade representative will contact you at the phone number provided in section 1 to confirm this request. Failure to confirm your intent may result in the delay or cancellation of this request.)

## 3. AMOUNT OF WIRE TRANSFER

☒ $ *10,000* . *00*   - OR -   ☐ All Available Cash   Date to be Sent: *11* / *19* / *13*

## 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
*Voelker Litigation Group*

| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient |
|---|---|
| ████████ | *Client* |

Recipient's Street Address (no P.O. Boxes)
*311 W. Superior St. Ste 500*

| City | State | ZIP Plus 4 |
|---|---|---|
| *Chicago* | *IL* | *60654* |

## 4. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
| | |

Recipient's Street Address (no P.O. Boxes)

| City | State | ZIP Plus 4 |
|---|---|---|
| | | |

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchanges rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request. I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees, and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities, claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

| X _____ | _11/19/13_ | X _____ | _____ |
|---|---|---|---|
| Account Holder's Signature | Date | Account Holder's Signature | Date |

*Signature verified by Scott
Oral Dennison*

| | Accepted by Principal |
|---|---|
| SF3675/10-13 | Registered Principal |

AA-114



Reset Form    Print Form

# AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.
**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

## 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account) |
|---|---|
| ▉▉▉▉ | Monyet LLC |

Social Security or Tax ID Number: ▉▉▉▉    Telephone Number: ▉▉▉▉

Reason for the Request (For your account protection, please be as specific as possible.)
Business

## 2. FINANCIAL INSTITUTION INFORMATION

Name of Receiving Financial Institution: Associated Bank

Receiving Bank's ABA Routing Number / SWIFT Code

Complete Bank Address: Green Bay, PO Box 19097    WI  54307-9097

Is this an international wire request? ☒ No ☐ Yes (A Scottrade representative will contact you at the phone number provided in section 1 to confirm this request. Failure to confirm your intent may result in the delay or cancellation of this request.)

## 3. AMOUNT OF WIRE TRANSFER

☒ $ 20000 .00   - OR -   ☐ All Available Cash   Date to be Sent: 11 / 19 / 13

## 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
Class Justice PLLC

Recipient's Account Number at Receiving Institution: ▉▉▉▉

Your Relationship to Recipient: Business

Recipient's Street Address (no P.O. Boxes): 100 5th St. S  Ste 1900

| City | State | ZIP Plus 4 |
|---|---|---|
| Minneapolis | MN | 55402 |

## 4. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
|  |  |

Recipient's Street Address (no P.O. Boxes)

| City | State | ZIP Plus 4 |
|---|---|---|
|  |  |  |

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchanges rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request. I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees, and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities, claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

X _____   Date 11/19/13    X _____   Date _____
Account Holder's Signature                Account Holder's Signature

Signature verified by Scott
Grall Duncan

| Accepted by Principal |
|---|
| Registered Principal |

SF3675/10-13

AA-115

# Scottrade®

Reset Form    Print Form

## AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.
**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

### 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account) |
|---|---|
| ███████ | Monyet LLC |

| Social Security or Tax ID Number | Telephone Number |
|---|---|
| ███████ | ███████ |

Reason for the Request (For your account protection, please be as specific as possible.)
Trust Transfer

### 2. FINANCIAL INSTITUTION INFORMATION

| Name of Receiving Financial Institution | Receiving Bank's ABA Routing Number / SWIFT Code |
|---|---|
| TCF Bank | ███████ |

Complete Bank Address
801 Marquette Ave Minneapolis, MN 55402

Is this an international wire request?  ☐ No  ☒ Yes  (A Scottrade representative will contact you at the phone number provided in section 1 to confirm this request. Failure to confirm your intent may result in the delay or cancellation of this request.)

### 3. AMOUNT OF WIRE TRANSFER

☒ $ 175000 _____ . _____  - OR -  ☐ All Available Cash     Date to be Sent: 11 / 22 / 2013

### 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
Padraigin Browne

| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient |
|---|---|
| ███████ | Spouse |

Recipient's Street Address (no P.O. Boxes)
100 3rd Ave S #3201

| City | State | ZIP Plus 4 |
|---|---|---|
| Minneapolis | MN | 55401 |

### 4. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
| | M |

Recipient's Street Address (no P.O. Boxes)

| City | State | ZIP Plus 4 |
|---|---|---|
| | | |

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchanges rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request. I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees, and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities, claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

X _[signature]_                      11/22/13      X _____
Account Holder's Signature        Date        Account Holder's Signature        Date

SF3675/10-13

Accepted by Principal
_[signature]_  11/22/13
Registered Principal

AA-116

# Scottrade®

| Reset Form | Print Form |

## AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.
**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

### 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account) |
|---|---|
|  | Monyet LLC |

| Social Security or Tax ID Number | Telephone Number |
|---|---|
|  |  |

Reason for the Request (For your account protection, please be as specific as possible.)
Loan

### 2. FINANCIAL INSTITUTION INFORMATION

| Name of Receiving Financial Institution | Receiving Bank's ABA Routing Number / SWIFT Code |
|---|---|
| Bank of America |  |

Complete Bank Address
Bank of America US Trust Miami, Florida 33133

**Is this an international wire request?** ☒ No ☐ Yes (A Scottrade representative will contact you at the phone number provided in section 1 to confirm this request. Failure to confirm your intent may result in the delay or cancellation of this request.)

### 3. AMOUNT OF WIRE TRANSFER

☑ $21250 . - OR - ☐ All Available Cash   Date to be Sent: 12 / 9 / 13

### 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
Robert P. Balzebre

| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient |
|---|---|
|  | Business          ✗spok·12/9/13 Qu✗ |

Recipient's Street Address (no P.O. Boxes)
Bank of America US Trust    →D 1111  Lincoln Rd Ste 400  Miami Beach, FL  33139 12:10

| City | State | ZIP Plus 4 |
|---|---|---|
| Miami | FL | 33133 |

### 4. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
|  |  |

Recipient's Street Address (no P.O. Boxes)

| City | State | ZIP Plus 4 |
|---|---|---|
|  |  |  |

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchanges rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request. I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees, and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities, claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

| X _____ | 12/7/13 | X _____ | _____ |
|---|---|---|---|
| Account Holder's Signature | Date | Account Holder's Signature | Date |

5160R
Qm 12/9/13
R12-MNDi

| Accepted by Principal |
|---|
| Registered Principal |

SF3675/10-13

AA-117

# Scottrade®

Reset Form   Print Form

## AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.

**Failure to complete Sections 1-4 may result in the delay or cancellation of this request.**

### 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account) |
|---|---|
| ▓▓▓▓▓ | Monyet LLC |

| Social Security or Tax ID Number | Telephone Number |
|---|---|
| ▓▓▓▓▓ | |

Reason for the Request (For your account protection, please be as specific as possible.)
Loan Installment

### 2. FINANCIAL INSTITUTION INFORMATION

| Name of Receiving Financial Institution | Receiving Bank's ABA Routing Number / SWIFT Code |
|---|---|
| Associated Bank | ▓▓▓▓▓ |

Complete Bank Address
433 Main St. Green Bay, WI 54301

**Is this an international wire request?** [X] No [ ] Yes (A Scottrade representative will contact you at the phone number provided in section 1 to confirm this request. Failure to confirm your intent may result in the delay or cancellation of this request.)

### 3. AMOUNT OF WIRE TRANSFER

[✓] $ 20000                 . - OR - [ ] All Available Cash     Date to be Sent: 1 / 17 / 14

### 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
Class Justice PLLC

| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient |
|---|---|
| ▓▓▓▓▓ | Lender |

Recipient's Street Address (no P.O. Boxes)
100 5th St. S. Ste 1900

| City | State | ZIP Plus 4 |
|---|---|---|
| Minneapolis | MN | 55402 |

### 4. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
| | |

Recipient's Street Address (no P.O. Boxes)

| City | State | ZIP Plus 4 |
|---|---|---|
| | | |

A $25.00 fee applies to domestic wire transfers, and a $40.00 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchanges rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request. I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees, and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities, claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

X _____     _____     X _____     1/17/13
Account Holder's Signature              Date          Account Holder's Signature              Date

1/17/14     SV SG

| | Accepted by Principal |
|---|---|
| | Registered Principal |

SF3675/10-13

AA-118

# Scottrade®

[Reset Form]  [Print Form]

## AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.

### 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account) |
|---|---|
| ▮ | Monyet LLC |

| Social Security or Tax ID Number | Telephone Number |
|---|---|
| ▮ | ▮ |

Reason for the Request (For your account protection, please be as specific as possible.)
Trust Transfer

### 2. FINANCIAL INSTITUTION INFORMATION

| Name of Receiving Financial Institution | Receiving Bank's ABA Routing Number / SWIFT Code |
|---|---|
| TCF National Bank | ▮ |

Complete Bank Address
▮  Mpls, MN

Is this an international wire request? ☒ No  ☐ Yes - A Scottrade representative will call you at the number provided above to verify this request. If we are unable to contact you, your wire may be delayed or canceled. Please note that these calls will be made during U.S. business hours.

### 3. AMOUNT OF WIRE TRANSFER

☒ $ 70000 . 00  - OR -  ☐ All Available Cash (domestic wires only)   Date to be Sent: 02 / 07 / 2014

### 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
Padraigin Browne

| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient |
|---|---|
| ▮ | LLC Manager |

Recipient's Street Address (no P.O. Boxes)
100 3rd Ave S #3201

| City | State | ZIP Plus 4 |
|---|---|---|
| Minneapolis | MN | 55401 |

### 5. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
|  |  |

Recipient's Street Address (no P.O. Boxes)

| City | State | ZIP Plus 4 |
|---|---|---|
|  |  |  |

A $25 fee applies to domestic wire transfers and a $40 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchanges rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request.

I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees, and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities, claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

Signature(s) of Account Holder(s)

X _____   2/7/14   X _____
Account Holder's Signature    Date       Account Holder's Signature      Date

SF3675/10-13

Signature Verified By

AA-119



| Reset Form | Print Form |
|---|---|

# AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.

## 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account) |
|---|---|
| ▉▉▉▉ | Monyet LLC |

| Social Security or Tax ID Number | Telephone Number |
|---|---|
| ▉▉▉▉ | ▉▉▉▉ |

Reason for the Request (For your account protection, please be as specific as possible.)
Installment Loan

## 2. FINANCIAL INSTITUTION INFORMATION

| Name of Receiving Financial Institution | Receiving Bank's ABA Routing Number / SWIFT Code |
|---|---|
| Associated Bank | ▉▉▉▉ |

Complete Bank Address
2870 Holmgren Way Green Bay WI 54304

**Is this an international wire request?** ☒ No ☐ Yes - A Scottrade representative will call you at the number provided above to verify this request. If we are unable to contact you, your wire may be delayed or canceled. Please note that these calls will be made during U.S. business hours.

## 3. AMOUNT OF WIRE TRANSFER

☑ $ 25000 . 00    **- OR -** ☐ All Available Cash (domestic wires only)    **Date to be Sent:** 3 / 19 / 14

## 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
Class Justice PLLC

| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient |
|---|---|
| ▉▉▉▉ | Payee |

Recipient's Street Address (no P.O. Boxes)
100 5th St S Ste 1900

| City | State | ZIP Plus 4 |
|---|---|---|
| Minneapolis | MN | 55402 |

## 5. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
| | |

| Recipient's Street Address (no P.O. Boxes) | | |
|---|---|---|

| City | State | ZIP Plus 4 |
|---|---|---|
| | | |

A $25 fee applies to domestic wire transfers and a $40 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchanges rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request.

I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees, and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities, claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

X _____  3/19/14 /Date/    X _____
Account Holder's Signature        Date              Account Holder's Signature        Date

Signature Verified By

SF3675/10-13

AA-120



Reset Form    Print Form

# AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.

## 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account) |
|---|---|
| ▇▇▇▇▇▇ | Monyet LLC |

| Social Security or Tax ID Number | Telephone Number |
|---|---|
| ▇▇▇▇▇▇ | ▇▇▇▇▇▇ |

Reason for the Request (For your account protection, please be as specific as possible.)
Escrow

## 2. FINANCIAL INSTITUTION INFORMATION

| Name of Receiving Financial Institution | Receiving Bank's ABA Routing Number / SWIFT Code |
|---|---|
| BMO Harris Bank N.A. | ▇▇▇▇▇▇ |

Complete Bank Address
1200 E Warrenville Road Naperville, IL 60563

**Is this an international wire request?** [X] No   [ ] Yes - A Scottrade representative will call you at the number provided above to verify this request. If we are unable to contact you, your wire may be delayed or canceled. Please note that these calls will be made during U.S. business hours.

## 3. AMOUNT OF WIRE TRANSFER

[X] $ 3750 . 00   - OR -   [ ] All Available Cash (domestic wires only)   Date to be Sent: 3 / 19 / 14

## 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
Voelker Litigation Group

| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient |
|---|---|
| ▇▇▇▇▇▇ | Payee |

Recipient's Street Address (no P.O. Boxes)
311 W. Superior Street Suite 500

| City | State | ZIP Plus 4 |
|---|---|---|
| Chicago | IL | 60645 |

## 5. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
|  |  |

Recipient's Street Address (no P.O. Boxes)

| City | State | ZIP Plus 4 |
|---|---|---|
|  |  |  |

A $25 fee applies to domestic wire transfers and a $40 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchanges rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request.

I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees, and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities, claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

X _(signature)_     3/19/14     X _____

Account Holder's Signature     Date     Account Holder's Signature     Date

SF3675/10-13

_(signature)_ 220
Signature Verified By

AA-121



| | Reset Form | | Print Form |

# AUTHORIZATION TO WIRE BROKERAGE FUNDS

This form serves as a Letter of Authorization to wire cash from your Scottrade account to a bank or other financial institution.

## 1. SCOTTRADE ACCOUNT HOLDER INFORMATION

| Scottrade Account Number | Scottrade Account Title (Name on Account) |
|---|---|
| ███████ | Monyet LLC |

| Social Security or Tax ID Number | Telephone Number |
|---|---|
| ███████ | ███████ |

Reason for the Request (For your account protection, please be as specific as possible.)
Attorney's Fees Escrow

## 2. FINANCIAL INSTITUTION INFORMATION

| Name of Receiving Financial Institution | Receiving Bank's ABA Routing Number / SWIFT Code |
|---|---|
| Bank of America, N.A. | ███████ |

Complete Bank Address
PO Box 27025, VA2-430-01-01 Richmond, VA 23261

**Is this an international wire request?** [X] No   [ ] Yes - A Scottrade representative will call you at the number provided above to verify this request. If we are unable to contact you, your wire may be delayed or canceled. Please note that these calls will be made during U.S. business hours.

## 3. AMOUNT OF WIRE TRANSFER

[ ] $ _____ . _____ - OR - [X] All Available Cash *(domestic wires only)*    **Date to be Sent:** 5 / 5 / 14

## 4. RECIPIENT INFORMATION

Recipient's Account Title at Receiving Institution (Write out full title - "same" and "self" are not acceptable.)
Chisholm Properties South Beach, Inc.

| Recipient's Account Number at Receiving Institution | Your Relationship to Recipient |
|---|---|
| ███████ | Business |

Recipient's Street Address (no P.O. Boxes)
1717 Collins Ave.

| City | State | ZIP Plus 4 |
|---|---|---|
| Miami Beach | FL | 33139 |

## 5. FOR FURTHER CREDIT TO (If Applicable)

| Account Title at Receiving Institution | Account Number |
|---|---|
| | |

Recipient's Street Address (no P.O. Boxes)

| City | State | ZIP Plus 4 |
|---|---|---|
| | | |

A $25 fee applies to domestic wire transfers and a $40 fee applies to international wire transfers. Be advised that intermediary and/or receiving institutions may charge additional fees. For international wires, foreign exchanges rate risk may apply if the intermediary or receiving institution converts the transfer amounts. Scottrade reserves the right to request additional verification prior to processing a wire transfer request.

I hereby agree to indemnify Scottrade, its affiliates, successors, assigns, officers, directors, agents, and employees, and hold them free and harmless from, and to promptly pay Scottrade upon demand for, any and all losses, liabilities, claims, damages, and costs (including reasonable attorney fees) or financial obligations that may arise as a result of Scottrade's reliance on the information provided in this document, and from acting upon instructions believed by Scottrade to have originated with me. This indemnity is in addition to, and no way limits or restricts any rights or responsibilities that have been made under any other agreement or agreements between me and Scottrade.

**Signature(s) of Account Holder(s)**

| X _(signature)_ | 5/5/14 | X _____ | _____ |
|---|---|---|---|
| Account Holder's Signature | Date | Account Holder's Signature | Date |

*Sv VA*
Signature Verified By

SF3675/10-13

AA-122

# EXHIBIT J

AA-123



# Detail by Entity Name

**Florida Profit Corporation**

CHISHOLM PROPERTIES SOUTH BEACH, INC.

**Filing Information**

| | |
|---|---|
| **Document Number** | P97000035672 |
| **FEI/EIN Number** | 721360545 |
| **Date Filed** | 04/21/1997 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | AMENDMENT |
| **Event Date Filed** | 06/25/2012 |
| **Event Effective Date** | NONE |

**Principal Address**

1717 COLLINS AVE
MIAMI BEACH, FL 33139

Changed: 04/24/1998

**Mailing Address**

1717 COLLINS AVE
MIAMI BEACH, FL 33139

Changed: 04/24/1998

**Registered Agent Name & Address**

BALZEBRE, ROBERT P
1717 COLLINS AVENUE
MIAMI, FL 33139

Name Changed: 04/24/1998

Address Changed: 02/13/2001

**Officer/Director Detail**

**Name & Address**

AA-124

Title P

BALZEBRE, ROBERT P
1717 COLLINS AVENUE
MIAMI BEACH, FL 33139

Title STD

BALZEBRE, ROBERT P
2211 SW 27 WAY
MIAMI, FL 33133

## Annual Reports

| Report Year | Filed Date |
|-------------|------------|
| 2013        | 01/21/2013 |
| 2014        | 02/19/2014 |
| 2015        | 01/29/2015 |

## Document Images

| | |
|---|---|
| 01/29/2015 -- ANNUAL REPORT | View image in PDF format |
| 02/19/2014 -- ANNUAL REPORT | View image in PDF format |
| 01/21/2013 -- ANNUAL REPORT | View image in PDF format |
| 06/25/2012 -- Amendment | View image in PDF format |
| 04/02/2012 -- ANNUAL REPORT | View image in PDF format |
| 02/24/2011 -- ANNUAL REPORT | View image in PDF format |
| 03/22/2010 -- ANNUAL REPORT | View image in PDF format |
| 03/30/2009 -- ANNUAL REPORT | View image in PDF format |
| 05/21/2008 -- ANNUAL REPORT | View image in PDF format |
| 04/10/2007 -- ANNUAL REPORT | View image in PDF format |
| 05/22/2006 -- ANNUAL REPORT | View image in PDF format |
| 02/25/2005 -- ANNUAL REPORT | View image in PDF format |
| 02/25/2004 -- Amendment | View image in PDF format |
| 02/04/2004 -- ANNUAL REPORT | View image in PDF format |
| 03/17/2003 -- ANNUAL REPORT | View image in PDF format |
| 01/14/2002 -- ANNUAL REPORT | View image in PDF format |
| 02/13/2001 -- ANNUAL REPORT | View image in PDF format |
| 05/31/2000 -- ANNUAL REPORT | View image in PDF format |

AA-125

| [01/23/1999 -- ANNUAL REPORT](#) | View image in PDF format |
| [07/17/1998 -- Amendment](#) | View image in PDF format |
| [04/24/1998 -- ANNUAL REPORT](#) | View image in PDF format |
| [04/21/1997 -- Domestic Profit Articles](#) | View image in PDF format |

Copyright © and  Privacy Policies

State of Florida, Department of State

AA-126

P97000035672

02/25/200  11   FAX  936 88            OPO    ORN  EOP                              002

## Florida Department of State

Division of Corporations
Public Access System

### Electronic Filing Cover Sheet

**Note: Please print this page and use it as a cover sheet.** Type the fax audit number
(shown below) on the *top* and *bottom* of all pages of the document.

(((H04000040925 3)))

**Note:** DO NOT hit the REFRESH/RELOAD button on your browser from this page.
Doing so will generate another cover sheet.

To:
    Division of Corporations
    Fax Number     : (850)205-0380

From:
    Account Name   : LEOPOLD KORN & LEOPOLD, P.A.
    Account Number : I20010000025
    Phone          : (305)935-3500
    Fax Number     : (305)935-9042

04 FEB 25 PH 2: 13
SECRETARY OF STATE
TALLAHASSEE, FLORIDA
FILED

RECEIVED
04 FEB 25 AM11: 40
DIVISION OF CORPORATIONS

## BASIC AMENDMENT

### CHISHOLM PROPERTIES SOUTH BEACH, INC.

| | |
|---|---|
| Certificate of Status | 0 |
| Certified Copy | 1 |
| Page Count | 05 |
| Estimated Charge | $43.75 |

Electronic Filing Menu          Corporate Filing          Public Access Help

T BROWN FEB 25 2004

AA-127

FILED
04 FEB 25 PM 2: 13
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

## ARTICLES OF AMENDMENT TO
## ARTICLES OF INCORPORATION OF
## CHISHOLM PROPERTIES SOUTH BEACH, INC.

Pursuant to the provisions of Section 607.1003, Florida Statutes, the Articles of Incorporation of CHISHOLM PROPERTIES SOUTH BEACH, INC. are hereby amended to include the following provisions:

1.  The purposes for which the Corporation is organized is limited solely to (A) owning, holding, leasing, operating and managing the parcels of real property (the "Mortgaged Premises") described within Exhibit "A" attached hereto; (B) entering into and performing its obligations under the loan documents (the "Loan Documents") to be executed by the Corporation in favor of BANK OF AMERICA N.A. (the "Lender"); (C) selling, exchanging, transferring and refinancing the Mortgaged Premises to the extent permitted under the Loan Documents; and (D) transacting any and all lawful business for which the Corporation may be organized under the laws of the State of Florida that is incident, necessary and appropriate to accomplish the foregoing.

2.  The Corporation shall not incur any indebtedness other than the loan (the "Mortgage Loan") identified in the Loan Documents, except in accordance with the Loan Documents.

3.  For so long as the Mortgage Loan is outstanding, the Corporation shall not engage in any sale of assets, except in accordance with the Loan Documents, dissolution, liquidation, consolidation or merger.

4.  The Board of Directors of the Corporation shall consider the interest of creditors in all corporation actions.

5.  No transfer of any direct or indirect ownership interest in the Corporation may be made such that the transferee owns, in the aggregate with the ownership interest of its Affiliates and family members in the Corporation, more than a forty nine percent (49.00%) interest in the Borrower, unless: (i) such transfer is conditioned upon the delivery of an acceptable non-consolidation opinion to the holder of the Mortgage Loan and to any applicable rating agency concerning, as applicable, the Corporation, the new transferee and/or their respective owners; and (ii) the applicable rating agencies confirm that the transfer will not result in a qualification, withdrawal or downgrade of any securities rating.

6.  The Corporation shall at all times observe the applicable legal requirements for the recognition of the Corporation as a legal entity separate from any other person or entity including, without limitation, the following:

    a.  The Corporation shall maintain its books and records separate from any other person or entity;

    b.  The Corporation shall maintain its bank accounts separate from any other person or entity;

    c.  The Corporation shall not commingle its assets with those of any other person or entity and the Corporation shall hold all of its assets in its own name;

    d.  The Corporation shall conduct its own business in its own name;

    e.  The Corporation shall maintain separate financial statements, showing its assets and liabilities

LEOPOLD, KORN & LEOPOLD, P.A.
20801 Biscayne Boulevard, Suite 501, Aventura, FL 33180 Telephone: 305-935-3500

E:\work\REAL\ChisholmProp\BankOfAmer\ArtAmendArt[ncClean.wpd

separate and apart from those of any other person or entity and shall not have its assets listed on the financial statement of any other entity (provided, however, that the Corporation's assets may be listed in a consolidated financial statement of an Affiliate provided that: (i) an appropriate notation shall be made on such consolidated financial statement to indicate the separateness of the Corporation from such Affiliate and indicate that the Corporation's assets and credit are not available to satisfy the debts and other obligations of such Affiliate; and (ii) such assets are listed on the Corporation's own separate financial statements;

     f.    The Corporation shall file its tax returns separate from those of any other person or entity and shall not file a consolidated federal income tax return with any other person or entity;

     g.    The Corporation shall pay its own liabilities and expenses only out of its own funds;

     h.    The Corporation shall observe all corporate and other organizational formalities;

     i.    The Corporation shall enter into transactions with Affiliates only on a commercially reasonable basis and on terms similar to those of an arms-length transaction;

     j.    The Corporation shall pay the salaries of its own employees only from its own funds;

     k.    The Corporation shall maintain a sufficient number of employees in light of its contemplated business operations;

     l.    The Corporation shall not guaranty or become obligated for the debts of any other person or entity;

     m.    The Corporation shall not hold out its credit as being available to satisfy the obligations of any other person or entity;

     n.    The Corporation shall not acquire the obligations or securities of its Affiliates or owners, including those of shareholders;

     o.    The Corporation shall not extend loans to any other person or entity or buy or hold evidence of indebtedness issued by any other person or entity (other than cash and investment-grade securities);

     p.    The Corporation shall allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate;

     q.    The Corporation shall use separate stationery, invoices and checks bearing its own name;

     r.    The Corporation shall not pledge its assets for the benefit of any other person or entity, other than with respect to the Mortgage Loan;

     s.    The Corporation shall hold itself out as a separate entity;

     t.    The Corporation shall correct any known misunderstanding regarding its separate identity;

     u.    The Corporation shall not identify itself as a division of any other person or entity;

AA-129

    v.    The Corporation shall maintain adequate capital in light of its contemplated business operations; and

    w.    The Corporation shall not form, acquire or hold any subsidiary or own any equity interest in any other entity.

"Affiliate" means any person or entity other than the Corporation: (i) which owns beneficially, directly or indirectly, more than fifty percent (50.00 %) of the outstanding shares of the common stock of the Corporation or which is otherwise in control of the Corporation; (ii) of which more than fifty percent (50.00%) of the outstanding voting securities are owned beneficially, directly or indirectly, by any person or entity described in clause (i) above, or (iii) which is controlled by any person or entity described in clause (i) above; provided that for the purposes of this definition the term "control" and "controlled by" shall have the meanings assigned to them in Rule 405 under the Securities Act of 1933, as amended.

7.    Notwithstanding anything to the contrary contained herein and/or contained within any other documents governing the formation, management or operation of the Corporation to the contrary, any indemnification shall be fully subordinated to any obligations respecting the Mortgage Loan and shall not constitute a claim against the Corporation in the event that the cash flow of the Corporation, after payment of all obligations under the Mortgage Loan is insufficient to pay such obligations.

8.    The Corporation shall not, without the affirmative vote of one hundred percent (100%) of its Board of Directors, institute proceedings to be adjudicated bankrupt or insolvent; or consent to the institution of bankruptcy or insolvency proceedings against it; or file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to bankruptcy; or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Corporation or of a substantial part of its property; or make any assignment for the benefit of creditors, or admit in writing its inability to pay its debts generally as they become due; or take any corporate action in furtherance of any such action.

9.    The Corporation shall not, without the affirmative vote of one hundred percent (100%) of its Board of Directors; (i) liquidate or dissolve the Corporation in whole or in part; (ii) consolidate, merge or enter into any form of consolidation with or into any other entity, nor convey, transfer or lease its assets substantially as an entirety to any person or entity nor permit any entity to consolidate, merge or enter into any form of consolidation with or into the Corporation, nor convey, transfer or lease its assets substantially as an entirety to any person or entity; (iii) amend or modify the Articles of Incorporation of the Corporation; or (iv) recommend that the shareholders amend or modify the Articles of Incorporation of the Corporation.

10.    The Corporation shall not amend the provisions specified in Paragraphs 1 through 9 herein or amend the definitions of the defined terms used in such paragraphs or any other provisions of its organizational

AA-130

documents in a manner that is inconsistent with such provision, without the consent of the Lender, its successors or assigns as holders of the Mortgage Loan or, after the securitization of the Mortgage Loan, only if the Corporation receives: (i) confirmation from each of the applicable rating agencies that such amendment would not result in the qualification, withdrawal or downgrade of any securities rating; and (ii) approval of such amendment by the Lender, its successors or assigns as holders of the Mortgage Loan.

The foregoing amendments were adopted by the written consent of the Board of Directors and the Shareholders of the Corporation entitled to vote thereon on February _20_, 2004.

**IN WITNESS WHEREOF,** the undersigned has executed these Articles of Amendment this _20ᵗʰ_ day of February, 2004.

> CHISHOLM PROPERTIES SOUTH BEACH, INC.,
> a Florida corporation
>
> By: _____
> JOHNNY CHISHOLM, President

STATE OF FLORIDA          )
                          ) SS:
COUNTY OF MIAMI-DADE      )

The execution of the foregoing Articles of Amendment to Articles of Incorporation was acknowledged before me this _10ᵗʰ_ day of February, 2004, by JOHNNY CHISHOLM, as President of CHISHOLM PROPERTIES SOUTH BEACH, INC., a Florida corporation, who is personally known to me.

My Commission Expires:

_____
Notary Public, State of Florida

Print Name: _____



GARY A. KORN
MY COMMISSION # CC 982678
EXPIRES: August 22, 2004
Bonded Thru Notary Public Underwriters

LEOPOLD, KORN & LEOPOLD, P.A.
20801 Biscayne Boulevard, Suite 301, Aventura, FL 33180 Telephone: 305-935-3500

H\work\REAL\ChisholmProp\BankOfAmer\ArtAmendArtIncClean.wpd          4

AA-131

## EXHIBIT "A"

## LEGAL DESCRIPTION

### PARCEL I:

Lots Three (3) and Eighteen (18) and the South Forty (S.40) Feet of Lots Four (4) and Seventeen (17) of Block Twenty-eight (28), of FISHER'S FIRST SUBDIVISION OF ALTON BEACH, according to the Plat thereof, recorded in Plat Book 2, at Page 77, of the Public Records of Dade County, Florida.

### PARCEL II:

BEGINNING at the Southeast (SE) corner of Lot Three (3), Block Twenty-eight (28), as shown by a plat entitled "FISHER'S FIRST SUBDIVISION OF ALTON BEACH", said Plat being recorded in Plat Book 2, at Page 77, of the Public Records of Dade County, Florida, run in a Northerly direction along the East line of Block Twenty-eight (28), a distance of Ninety-one and Twenty-six one-hundredths (91.26) feet to a point, thence run in an Easterly Direction along a line parallel to and Ten (10) feet south of the North line of Lot Four (4), Block Twenty-eight (28) produced, to the High Water Line of the Atlantic Ocean; thence run in a Southerly direction, meandering said High Water Line a distance of Ninety-one and Twenty-six One-hundredths (91.26) feet plus or minus to a point, thence run in a Westerly Direction along the South line of Lot Three (3), Block Twenty-eight (28) produced, to the point of beginning.

### PARCEL III:

The South One-Half of the following described parcel of real property:

The North Ten (N.10) Feet of Lots Four (4) and Seventeen (17); all of Lots Five (5) and Sixteen (16), and the South Forty (S.40) Feet of Lots Six (6) and Fifteen (15) of Block Twenty-eight (28), of FISHER'S FIRST SUBDIVISION OF ALTON BEACH, according to the Plat thereof, recorded in Plat Book 2, at Page 77 of the Public Records of Dade County, Florida; together with the land lying to the East thereof, to the high water mark of the Atlantic Ocean.

### ALSO DESCRIBED AS:

Lots 16 and 5, less the North 10.00 feet thereof, and all of Lots 17, 18, 3 and 4, Block 28, of FISHER'S FIRST SUBDIVISION OF ALTON BEACH, according to the Plat thereof, as recorded in Plat Book 2, at Page 77 of the Public Records of Dade County, Florida;

### TOGETHER WITH:

That certain parcel of land lying South of the North line lot of the above described parcel, extended Easterly, lying North of the South line of the above described parcel, extended Easterly, lying East of the East line of the above described parcel, and lying West of the Mean High Water Line of the Atlantic Ocean.

F:\work\REAL\ChisholmProp\BankOfAmer\Legal.wpd

AA-132

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **LIGHTSPEED MEDIA CORP.,** | Civil No. 3:12-cv-889-DRH-SCW |
| *Plaintiff,* | |
| *v.* | **MEMORANDUM OF PAUL HANSMEIER IN OPPOSITION TO THE DEFENDANTS' JOINT MOTION FOR CONTEMPT, OR, IN THE ALTERNATIVE, FOR AN ORDER TO PLAINTIFFS' COUNSEL TO SHOW CAUSE WHY THEY EACH SHOULD NOT BE HELD IN CONTEMPT** |
| **ANTHONY SMITH, et al.,** | |
| *Defendants.* | |

Paul Hansmeier respectfully opposes the Defendants' Joint Motion for Contempt, Or, In The Alternative, For an Order to Show Cause Why They Each Should Not Be Held In Contempt (the "Motion") (Dkt. 107.)

## BACKGROUND

This is the second attempt by counsel for the Defendants to attempt to enforce a money judgment through contempt proceedings, rather that proper money judgment enforcement procedures. In a case pending in the U.S. District Court for the District of Massachusetts, Defendant Smith's counsel moved the district court to hold the undersigned and several others in contempt until they satisfied a money judgment. *See* Motion for Contempt, *AF Holdings, LLC v. Sandipan Chowdhury,* No. 1:12-cv-12105-JLT (D. Mass.), at ECF No. 50. The district court quickly denied the request without prejudice, with leave to re-raise the motion after the conclusion of the appeal of the matter. *Id.,* at ECF No. 55. There is no reason why a different result should command here.

AA-133

## DISCUSSION

The elements of civil contempt are well-known. The complaining party must establish by clear and convincing evidence that a party violated an "unequivocal command" of the district court. *Stotler and Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir. 1989). The Defendants have not met this heavy burden.

### A.   THE DEFENDANTS HAVE NOT SUBMITTED ANY EVIDENCE REGARDING COMPLIANCE

The most glaring problem in the Defendants' Motion is the complete absence of any evidence whatsoever on the issue of compliance. The Motion states, for example, that "None of Plaintiff's Counsel has complied with the Fee Order or sought a stay." (*See* Dkt. 107 at 1.) Yet, neither this statement nor others like it are supported by affidavit, declaration or anything else. (*See generally id.*) The Defendants' failure to submit any evidence whatsoever—much less clear and convincing evidence—of non-compliance with the November 27, 2013, Order is reason enough to summarily deny the Motion. *Stotler*, 870 F.2d at 1163.

### B.   MONEY JUDGMENTS ARE NOT ENFORCEABLE THROUGH CONTEMPT PROCEEDINGS

Even if the Defendants had established that the November 27, 2013, Order was unsatisfied, the Court must still interpret the Order to determine whether it is a money judgment or something else. By its very own words, the November 27, 2013, Order gave rise to, "a total judgment of $261,025.11, with interest as provided by law," jointly and severally against Messrs. Hansmeier, Duffy and Steele. (*See* Dkt. 100 at 13.) In other words, the November 27, 2013, Order is unambiguously a money judgment.

If the judgment imposed by the November 27, 2013, Order remains unsatisfied, the Defendants must, of course, follow proper money judgment enforcement mechanisms. In the very first case cited in the Defendants' Motion, *BASF Corp. v. Old World Trading Co.*, now-Chief Judge Easterbrook of the Seventh Circuit made clear how money judgments are properly

AA-134

enforced. "A money judgment entitles the prevailing party to the stated sum. If the loser does not pay, the winner can seize and sell its assets." *BASF Corp. v. Old World Trading Co.*, 979 F.2d 615, 616 (7th Cir. 1992). The Seventh Circuit's statements dovetail with Federal Rule of Civil Procedure 69, which states, "A money judgment is enforced by a writ of execution, unless the court directs otherwise." Fed. R. Civ. P. 69. In other words, the remedy for an unpaid judgment creditor is asset seizure and sale, not contempt proceedings.

The other cases cited by the Defendants are irrelevant to the instant matter. *Cleveland Hair Clinic, Inc. v. Puig* addressed the issue of appellate jurisdiction over interlocutory sanctions awards. 104 F.3d 123 (7th Cir. 1997). *Thomas v. City of Evanston*, involved the City of Evanston's alleged violation of a consent decree, not its failure to satisfy a money judgment. 636 F.Supp. 587 (N.D. Ill. 1986). In *Zivitz v. Greenberg*, certain defendants were adjudged to be in contempt for failing to abide by the terms of a settlement agreement. No. 98-cv-5350, 2000 U.S. Dist. LEXIS 7842, at *10 (N.D. Ill. Jun. 5, 200). Thus, the Defendants fail to cite to any case in which a money judgment was enforced through contempt proceedings, rather than writs of execution.

## C.   THE DEFENDANTS' CONTENTION THAT THE NOVEMBER 27, 2013, ORDER IS NOT A MONEY JUDGMENT IS BELIED BY THEIR ACTIONS

The Defendants' contention that the November 27, 2013, Order is not a money judgment is belied by their behind-the-scenes actions. At this very moment, the Defendants are taking active steps to enforce the relief granted in the Order, just as they would a money judgment. Specifically, yesterday, Hansmeier received correspondence from the Defendants which stated that attorney Jason Sweet, counsel to Defendant Smith and the lead signatory of Motion, has been issuing financial records subpoenas from this Court. *See* Hansmeier Declaration, Exhibits A and B. This Court should look to the Defendants' deeds, and not their words, to ascertain

3

whether the Defendants subjectively believe that the November 27, 2013, Order is anything other than a money judgment.

### D.   IN THE ALTERNATIVE, THE COURT SHOULD GRANT HANSMEIER AND THE OTHER JUDGMENT DEBTORS LEAVE TO SEEK A STAY OF THE NOVEMBER 27, 2013 ORDER

If the Court finds that the November 27, 2013, Order imposed an injunction, rather than a money judgment, then it should stay the November 27, 2013, Order as to Hansmeier and any other judgment debtor who seeks a stay. The elements of a stay are: (1) likelihood of success on the merits; (2) balance of interests weighing in favor of the movant; and (3) the public interest. The elements are readily satisfied in the instant matter. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Antonelli v. FBI*, 553 F. Supp. 19, 20 (N.D. Ill. 1982).

The first element—likelihood of success on the merits of the appeal—is satisfied for the following reasons: *First*, Hansmeier was not afforded the due process protections to which he was entitled. Smith's § 1927 motion was not served on Hansmeier, who had withdrawn from the case, and who found out about it only after it was granted. Counsel for Smith rebuffed the district court's suggestion to "just back up and make notice now." The district court excused Smith's lack of service on two grounds, but both are unavailing. For example, notwithstanding the district court's contention otherwise, due process requires that *each* attorney against whom sanctions are sought must be notified of the sanctions. That did not occur here. Further, the district court did not allow Hansmeier to challenge any of the Defendants' fee itemizations. These errors prejudiced Hansmeier and allowed discrepancies in the fee itemizations to go unchallenged. Because of these due process shortcomings, there is an excellent chance that Hansmeier will prevail on appeal.

*Second*, and even more importantly, the district court did not perform two necessary § 1927 inquiries. Liability under § 1927 is direct, not vicarious; sanctions must be specifically

4

AA-136

apportioned according to attorneys' individual actions and cannot be imputed to others. *FM Indus., Inc. v. Citicorp Credit Servs.*, 614 F.3d 335, 341 (7th Cir. 2010); *Claiborne v. Wisdom*, 414 F.3d 715, 722–24 (7th Cir. 2005). Yet the district court sanctioned Hansmeier jointly and severally for the entirety of the litigation without linking his individual actions to harm against the Defendants. As a matter of record Hansmeier, did not sign the Complaint, first appeared in the case after it was removed to federal court, and withdrew from the case long before it was dismissed. The only substantive action Hansmeier took was the filing of a single ten-page opposition paper to the Defendants' motion for a stay of discovery.

In other words, for the sole act of filing a single ten-page opposition paper, Hansmeier was sanctioned jointly and severally with others for over a quarter million dollars in liability. This result not only offends basic notions of fairness, but it also cannot be squared with controlling Seventh Circuit precedent. The Seventh Circuit has also established that if § 1927 motions are not brought within a reasonable time, the district court loses jurisdiction to consider them. *Overnite Transp. Co. v. Chicago Indus. Tire Co.*, 697 F.2d 789, 793 (7th Cir. 1983). Yet, the district court considered and granted § 1927 motions by AT&T and Comcast filed more than seven months after Plaintiff's voluntary dismissal, without any inquiry into the issue of timeliness.

*Third*, the sanctions order was not supported by the record. The sanctions order repeatedly describes Plaintiff's case as baseless, but it fails to explain how or why Plaintiff's claims were baseless. Nor is it evident from the record why the sanctioned attorneys should have known in advance that Plaintiff's claims would be adjudged baseless, particularly since the district court had expressed muted optimism regarding the case and had been made aware of supportive authority from other jurisdictions. The district court drew a negative inference from

5

AA-137

Plaintiff's voluntary dismissal, despite good-faith reasons for that dismissal. And the district court found that the three attorneys exhibited a "relentless willingness to lie," based only on several statements by Steele and Hansmeier (not Duffy) that were not contradicted by the record. These reasons also support Hansmeier's likelihood of success on the merits of his appeal.

The second element—balance of interests—is also met. On the one hand, AT&T and Comcast are among the largest companies in the United States. Smith was not billed by his attorneys for their work. Thus, the beneficiaries of the November 27, 2013, Order are not materially prejudiced by waiting for the Seventh Circuit to rule whether the November 27, 2013, Order will be vacated as to Hansmeier. This is particularly true where, as here, the appeal is proceeding in a timely manner. Appellants Duffy, Steele and Hansmeier have already perfected their appeal and filed their opening brief. *See* Hansmeier Declaration Exhibit C. On the other hand, the quarter of a million dollars liability created by the very tenuous November 27, 2013, Order would impose a crippling financial liability on Hansmeier. To be sure, if the November 27, 2013, Order is upheld as to Hansmeier or anyone else, there will be ample opportunity for the Defendants to engage in enforcement efforts.

The final element—the public interest—is not meaningfully implicated by Hansmeier's request. The equitable factors associated with requests for a stay cannot be reduced to a "set of rigid rules," but rather necessitate "individualized judgments in each case." *Hilton*, 481 U.S. at 777. Further, "to find that plaintiffs have a strong likelihood of success on appeal, the Court need not harbor serious doubts concerning the correctness of [a] decision. Otherwise, relief under rule 62© would rarely be granted." *Peck v. Upshur Cnty. Bd. Of Educ.*, 941 F. Supp. 1478, 1481 (N.D. W. Va. 1996). The substantiality of Hansmeier's arguments on appeal, together with the balance of equities, weighs heavily in favor of granting a stay pending appellate review.

AA-138

**CONCLUSION**

For the reasons set forth herein, the Court should deny the Defendants' Motion. In the alternative, the Court should stay the November 27, 2013, Order pending the Seventh Circuit's ruling on the appeal that is pending.

January 29, 2014                                    /s/ Paul Hansmeier
                                                   Paul Hansmeier
                                                   80 S. 8th St. Ste 900
                                                   Minneapolis, MN 55402
                                                   612-234-5744

AA-139

# EXHIBIT A

AA-140

**Account Agreement**

| Institution Name & Address | Date | 12/11/2013 |
|---|---|---|

Sabadell United Bank, N A
1688 Meridian Avenue
Miami Beach, FL  33139-2705

**BRANCH** _10_

**Internal Use**

**Account Title & Address**

John L Steele
Kerry E Steele
Tenancy By The Entireties
50 Samana Dr
Miami FL 33133

**IMPORTANT ACCOUNT OPENING INFORMATION**  Federal law requires us to obtain sufficient information to verify your identity  You may be asked several questions and to provide one or more forms of identification to fulfill this requirement  In some instances we may use outside sources to confirm the information  The information you provide is protected by our privacy policy and federal law

Enter Non-Individual Owner Information on page 2  There is additional Owner/Signer Information space on page 2

**Ownership of Account**

The specified ownership will remain the same for all accounts

*(For consumer accounts, select and initial )*

☐ Single-Party Account _____ ☐ Multiple Party Account _____
☒ Multiple Party Account   Tenancy by the Entireties  _KS_
☐ Corporation  For Profit      ☐ Corporation - Nonprofit
☐ Partnership  ☐ Sole Proprietorship  ☐ Limited Liability Company
☐ Trust Separate Agreement Dated _____

**Owner/Signer Information 1**

| Name | John L Steele |
|---|---|
| Relationship | Joint (Or) |
| Address | 50 Samana Dr
Miami, FL  33133 |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | MAVERICK |
| E Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov t Issued Photo ID (Type  Number  State  Issue Date  Exp  Date) | Drivers License
FLORIDA 02/22/2020 |
| Other ID (Description Details) | |
| Employer | Under The Bridge |
| Previous Financial Inst | |

**Beneficiary Designation**

*(Check appropriate ownership above - select and initial below )*

☐ Single Party Account
☐ Single Party Account with Pay On Death (POD)
☒ Multiple Party Account with Right of Survivorship   _KS_
☐ Multiple Party Account with Right of Survivorship and POD
☐ Multiple-Party Account without Right of Survivorship
☐

**Beneficiary Name(s), Address(es), and SSN(s)**

*(Check appropriate beneficiary designation above )*

**Owner/Signer information 2**

| Name | Kerry E Steele |
|---|---|
| Relationship | Joint (Or) |
| Address | 50 Samana Dr
Miami, FL  33133 |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov t Issued Photo ID (Type  Number  State  Issue Date  Exp  Date) | Drivers License
Florida 06/20/2011 02/16/2020 |
| Other ID (Description Details) | |
| Employer | Owner |
| Previous Financial Inst | |

☐ If checked  this is a temporary account agreement
Number of signatures required for withdrawal  1

**Signature(s)**

The undersigned authorize the financial institution to investigate credit and employment history and obtain reports from consumer reporting agency(ies) on them as individuals  Except as otherwise provided by law or other documents  each of the undersigned is authorized to make withdrawals from the account(s)  provided the required number of signatures indicated above is satisfied  The undersigned personally and as or on behalf of the account owner(s) agree to the terms of  and acknowledge receipt of copy(ies) of  this document and the following

☒ Terms and Conditions    ☒ Privacy
☒ Electronic Fund Transfers  ☐ Truth in Savings
☒ Substitute Checks    ☒ Funds Availability
☐ Common Features    ☒ Schedule of Fees and Charges

☐ Convenience Account Agent (See Owner/Signer Information for Convenience Account Agent designation(s) )

1 [ x _____ ]
  John L Steele

2 [ x _____ ]
  Kerry E Steele

3 [ x _____ ]    4 [ x KS ]

Signature Card FL
Bankers Systems *
Wolters Kluwer Financial Services , 2003  2006

Initials  KS WS

MPCAZ FL 5/2/2007
Page 1 of 2

_RECEIVED_

DEC 1 2 2013

## Owner/Signer Information 3

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov t Issued Photo ID (Type Number State Issue Date Exp Date) | |
| Other ID (Description Details) | |
| Employer | |
| Previous Financial Inst | |

## Owner/Signer Information 4

| | |
|---|---|
| Name | |
| Relationship | |
| Address | |
| Mailing Address (if different) | |
| Home Phone | |
| Work Phone | |
| Mobile Phone | |
| E Mail | |
| Birth Date | |
| SSN/TIN | |
| Gov t Issued Photo ID (Type Number State Issue Date Exp Date) | |
| Other ID (Description Details) | |
| Employer | |
| Previous Financial Inst | |

## Backup Withholding Certifications

*(If not a "U.S. Person," certify foreign status separately )*

TIN

☒ **Taxpayer I D Number (TIN)** - The number shown above is my correct taxpayer identification number

☒ **Backup Withholding** - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends or the Internal Revenue Service has notified me that I am no longer subject to backup withholding

☐ **Exempt Recipients** - I am an exempt recipient under the Internal Revenue Service Regulations

I certify under penalties of perjury the statements checked in this section and that I am a U S person (including a U S resident alien)

X _____ (Date)

John L. Steele

Signature Card FL
Bankers Systems ®
Wolters Kluwer Financial Services _ 2003 2006

## Non-Individual Owner Information

| | |
|---|---|
| Name | |
| EIN | |
| Phone | |
| Mobile Phone | |
| E Mail | |
| Type of Entity | |
| State/Country & Date of Organization | |
| Nature of Business | |
| Address | |
| Mailing Address (if different) | |
| Authorization/ Resolution Date | |
| Previous Financial Inst | |

## Account Description | Account # | Initial Deposit/Source

| Account Description | Account # | Initial Deposit/Source |
|---|---|---|
| Personal Checking | | $ 16,994 31 <br> ☐ Cash ☒ Check <br> ☐ |
| | | $ <br> ☐ Cash ☐ Check <br> ☐ |
| | | $ <br> ☐ Cash ☐ Check <br> ☐ |

## Services Requested

☐ ATM   ☐ Debit/Check Cards (No  Requested          )
☐ _____   ☐ _____
☐ _____   ☐ _____

## Other Terms/Information

Relate to existing HH# 0312129990000010

Purpose of Account Personal Expenses

MPMP LAZ FL 5/2/2007
Initials _____   Page 2 of 2

AA-142

##XXH1768DPCSTM

Statement of Account

Last statement: December 11, 2013
This statement: December 16, 2013
Total days in statement period: 6

Direct inquiries to:
305-604-6099

JOHN L STEELE                Sabadell United Bank, N.A.
KERRY E STEELE               1688 Meridian Avenue
TENANCY BY THE ENTIRETIES    Miami Beach FL 33139-2710
50 SAMANA DR
MIAMI FL 33133

                                                    0

Summary of Account Balance

Account                    Number              Ending Balance

Personal Checking                             $16,494.31

Personal Checking

Account number

Beginning balance          $0.00
Total additions            $ 16,994.31    Total subtractions        $-500.00

Date     Description            Control number      Additions    Subtractions
12-11 #Deposit                  000000012000396     16,994.31
12-12 #withdrawal               000000012000100                  -500.00

Daily balances
Date      Amount       Date        Amount      Date       Amount
12-11     16,994.31    12-12       16,494.31

                                                            Page 1

AA-143



**CHASE**

CASHIER'S CHECK

1174223767

Date   12/11/2013

Remitter   JOHN STEELE

Pay:   SIXTEEN THOUSAND NINE HUNDRED NINETY FOUR DOLLARS AND 31 CENTS

Pay To The
Order Of   JOHN STEELE                                    $   ******16,994.31***

                              JPMORGAN CHASE BANK, N.A.

                              *Michael Andrews*

Memo:
Note: For information only. Comment has no effect on bank's payment.

Senior Vice President
JPMorgan Chase Bank, N.A
Columbus, OH

**Tracer: 12000397 - Amt: $16,994.31 - 12/11/2013**



78291933

From Chase
to Sabadell

**Tracer: 12000397 - Amt: $16,994.31 - 12/11/2013**



Sabadell   S^B          DEPOSIT SLIP

                        CURRENCY & COIN        DOLLARS    CENTS

DATE 12/11/13.                    C
                                  H     16,994  31
  John Steele                     E
                                  C
                                  K     Subtotal
                                  S     Less Cash Received

                        TOTAL $      16,994.31

**Tracer: 12000396 - Amt: $16,994.31 - 12/11/2013**



**Tracer: 12000396 - Amt: $16,994.31 - 12/11/2013**

AA-144

# EXHIBIT B

AA-145

To:     Page 1 of 3                    2014-04-23 10:13:10 EDT                13056756248   From: Legal Department

Case 3:12-cv-00889-DRH-SCW   Document 158-1   Filed 04/23/14   Page 2 of 4   Page ID #3594
Case: 15-2440      Document: 26      Filed: 10/29/2015      Pages: 151

# Sabadell United Bank

S<sup>B</sup>

To:      Page 2 of 3                    2014-04-23 10:13:10 EDT                    13056756248   From: Legal Department

# FOR MODERN TIMES, A CLASSIC BANK.

AA-147

To:   Page 3 of 3                    2014-04-23 10:13:10 EDT                    13056756248   From: Legal Department

Case 3:12-cv-00889-DRH-SCW   Document 158-1   Filed 04/23/14   Page 4 of 4   Page ID #3596
Case: 15-2440   Document: 26   Filed: 10/29/2015   Pages: 151

# JOHN L. STEELE

April 16, 2014

Faxed to 305-675-6274

**RECEIVED**

APR 1 6 2014   4:17 pm

**RECORDS CUSTODIAN**

Dear Mrs. Guerrero,

It was a pleasure speaking with you today. I have attached the order we spoke about. The subpoena you have is dated March 26, 2014, and the order I have included shows that the Court stayed the matter on April 4, 2014. Please let me know if you need anything else. Thank you for your help in this matter. I can be reached at 786-612-9455 or johnlsteele33140@gmail.com if you need anything else.

Sincerely,

John Steele

50 SAMANA DR., MIAMI FL 33133
786-612-9455  JOHNLSTEELE33140@GMAIL.COM

AA-148